Ia9Wnea1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHRISTOPHER NEAL,

                    Plaintiff,

          v.                            15 Civ. 2822 (RA)

POLICE OFFICER ROMAINE WILSON,
et al.,
                                        Trial
                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        October 9, 2018
                                        10:30 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                        District Judge
                                        -and a Jury-


                         APPEARANCES

IHSAN DOGRAMACI
        Attorney for Plaintiff
        -and-
HIGGINS & TRIPPETT LLP
BY:  THOMAS P. HIGGINS


ZACHARY W. CARTER
        Corporation Counsel of the City of New York
        New York City Law Department
        Attorney for Defendant City of New York
BY:  MARIA F. DeCASTRO
        NICHOLAS D. MANNINGHAM
        Assistants Corporation Counsel




Also Present:  Genisa Monroe, Paralegal

```
 1              (Case called)

 2              MR. DOGRAMACI:  Ihsan Dogramaci, for the plaintiff.

 3   With me is Genisa Monroe, my paralegal, and my cocounsel.

 4              THE COURT:  Good morning.

 5              MR. HIGGINS:  Good morning.  Thomas P. Higgins,

 6   Higgins & Trippett, for Christopher Neal.

 7              MS. DeCASTRO:  Good morning, your Honor.  Maria

 8   DeCastro and Nicholas Manningham, for defendants.

 9              THE COURT:  If you could all just let me know your

10   names, so I know who's who, that would be helpful.

11              MR. KAISER:  Michael Kaiser.

12              MR. WILSON:  Romaine Wilson.

13              MR. CAMHI:  David Camhi.

14              MR. MALDONADO:  Osvaldo Maldonado.

15              MR. GREEN:  Coty Green.

16              MR. GARCIARIVAS:  Baudilo Garciarivas.

17              MR. RODRIGUEZ:  Juan Rodriguez.

18              THE COURT:  Good morning to all of you.

19              Just so you know, we're about to begin the voir dire

20   process, picking a jury.  When I call your name, I'm going to

21   ask -- and this goes for you as well, Mr. Neal.  I'm going to

22   ask you to stand and turn around so that both the folks in the

23   jury box can see you and also folks in the back of the

24   courtroom can see you.  We just do that to make sure no one

25   recognizes you or knows you from one place or another, and if
```

Ia9Wnea1

1    they do, they let us know.  That's what we're going to do

2    today.

3                First of all, I'm sorry to get started late today.

4    We're having some technological difficulties; our printer

5    wasn't working, and we also didn't have a jury pool.

6                Let's just focus right now, while we're waiting for

7    the jury -- they're not here yet -- on what we need to decide

8    before the jury selection process.  I think it's just to

9    confirm that there are no additional objections to the updated

10   case summary or voir dire questionnaire that I distributed.  Is

11   that correct?

12               MR. DOGRAMACI:  Plaintiff has no objections, your

13   Honor.

14               THE COURT:  Thank you.

15               MS. DeCASTRO:  We have no objections.

16               THE COURT:  OK.

17               One thing I did want to just talk about briefly is

18   scheduling.  I know I had alluded to this and raised the issue

19   of sitting a shorter day on Wednesday.  I think I would like to

20   do that.  What I would propose is that we sit from -- normally

21   as I said, and I'm going to tell the jury this.  First of all,

22   I'm going to tell them that I expect the trial to last less

23   than a week.  Can I say less than a week?

24               MR. DOGRAMACI:  We think so, your Honor.

25               THE COURT:  OK.  I'll say less than a week, and I'll

Ia9Wnea1

1    say we normally sit from ten to five.  I'll tell them the

2    normal schedule, as I already told you, but that tomorrow we

3    anticipate sitting from 10 to 2:30.  The idea is we'll sit from

4    10 to 12 without a break, take a half an hour break, and then

5    go from 12:30 to 2:30.  That way we'll still sit a solid four

6    hours, but there will be fewer breaks.  Hopefully we'll still

7    be able to conclude the trial on Thursday.  And as I said, if

8    the jury's deliberating, we'll sit on Friday.  If not, we'll go

9    to next Monday.  I just wanted to run that schedule by all of

10   you.

11            One other issue I wanted to talk about, because I was

12   thinking about mentioning it in my preliminary instructions

13   once a jury panel is chosen, and that relates to the lawfulness

14   of Mr. Neal's arrest.  I know we talked about this and I know

15   there's dispute on this, but this is what I would propose

16   saying, something to the effect that the questions you'll be

17   asked to decide in this trial are whether plaintiff was

18   unconstitutionally subjected to excessive force, and whether he

19   was unconstitutionally deprived of help to prevent that use of

20   excessive force during the course of his arrest in November of

21   2012.  You will not be asked to decide, nor is it relevant,

22   whether the decision to arrest the plaintiff was appropriate or

23   lawful.  Rather, you must assume the decision to arrest him was

24   permissible and assess only the conduct of the officers in the

25   course of executing that arrest, for whether the force used --

1    sorry.  Rather, you must assume the decision to arrest the

2    plaintiff was permissible and assess only the conduct of the

3    officers in the course of executing that arrest; namely,

4    whether the force used and any failure to intervene was

5    unconstitutional, and I'll instruct you later on the law.

6    Something to that effect.

7              Is everyone comfortable with that?  Do you need a

8    little more time?  Do you need me to read it again?

9              MR. DOGRAMACI:  Your Honor, on behalf of plaintiff,

10   that sounded good to us.

11             MS. DeCASTRO:  Your Honor, could we just have a moment

12   to confer?

13             THE COURT:  Yes, absolutely, and if you need me to

14   read it again, let me know that.  I was actually going to

15   change this language a little bit, so let me read it again:

16             "Specifically, the questions you will be asked to

17   decide are whether the plaintiff was unconstitutionally subject

18   to excessive force and whether he was unconstitutionally

19   deprived of help to prevent any such use of excessive force

20   during the course of his arrest in November 2012.  You will not

21   be asked to decide, nor is it relevant, whether the decision to

22   arrest the plaintiff was appropriate or lawful.  Rather, you

23   must assume the decision to arrest the plaintiff was

24   permissible and assess only the conduct of the officers in the

25   course of executing that arrest; namely, whether the force used

Ia9Wnea1

1    and any failure to intervene was unconstitutional."

2            The change I made is now it says "any" excessive use

3    of force, so that it's clear I'm not weighing in on it one way

4    or the other.

5            They're ready.  Why don't we bring the jury in.  I'm

6    sure we'll have a break before I give them any preliminary

7    instructions.  OK?

8            MS. DeCASTRO:  Yes.

9            THE COURT:  We'll bring them in.

10           (Jury selection followed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You can stay where you are.  It's going to

2     be another minute or so.  Later we'll have you sit in your

3     designated seats and we'll take out some chairs so it's not

4     quite so tight in there.  I'll give you more instructions after

5     the lunch break, because I know it's been a long morning, but

6     really what I want to emphasize to you now is that from this

7     point on -- and I'm going to have you sworn in in a moment --

8     it's going to be your duty not to discuss the case and to

9     remain outside the presence of anyone who may be discussing the

10    case.  And that's with everybody.  That's with anyone who may

11    try and discuss the case with you.  That's with each other.

12    Until it's time to deliberate, you're just simply not to

13    discuss the case.

14          In that regard, please understand that the parties and

15    counsel have been instructed to have no contact with you.  If

16    you see them in the hallways and they don't seem friendly or

17    they don't say hi, they're not being rude; they're just

18    following my instructions.

19          In addition, unless and until you're excused as a

20    juror, you should not attempt to gather any information on this

21    case on your own.  Don't engage in any outside reading on about

22    this case or cases you may view as similar.  Don't attempt

23    visit the place mentioned that I asked about earlier.

24          Don't use the Internet, Google, Facebook, Twitter, any

25    social media site, any website, to learn anything about the

Ia9Wnea3

1    case or anyone involved in the case or, again, to talk at all

2    about the substance, facts or circumstances of the case, or to

3    talk about what you learn at trial.  And that includes your

4    family and friends.

5         You can tell your family and friends that you've been

6    chosen to sit on a civil jury, but don't tell them anything

7    about it now other than that.  At the end of the case, once

8    deliberations are over, you'll be able to talk about it as much

9    as you like, but for now, please don't talk about the case at

10   all.  Don't tweet about it, etc.

11        The reason I give you this instruction, of course, is

12   that you must decide this case solely based on the evidence

13   that's adduced at this trial alone, and we don't want you to be

14   affected by any conversations you may have or anything you

15   learn outside this courtroom or anything someone may say to

16   you.

17        Other than that, I'm just going to tell you for now to

18   please keep an open mind throughout the trial.  Reserve

19   judgment until all of the evidence is in.  Until you've heard

20   all the evidence, you really won't be in a position to reach

21   any conclusions.

22        With that, we're going to swear you in as jurors.

23   Ms. Cavale is going to show you where the jury room is, and

24   then you're going to go to lunch, and we're going to start

25   again promptly at 2 p.m.

1          (A jury of eight was impaneled and sworn)

2          THE COURT:  Thank you.  See you after lunch.  Why

3     don't you follow Ms. Cavale.

4          Thank you.

5          (Jury not present)

6          THE COURT:  Everyone can be seated.

7          I know it's been a long morning, and we haven't taken

8     a break yet.  I just wanted to talk briefly about any issues

9     you feel you need the answer on before the lunch break so you

10    can prepare your openings and you can prepare your witnesses

11    for this afternoon.  I'm happy to go through it quickly, and if

12    you think we don't need to talk about something now, we can

13    talk about it later.

14         First of all, we were talking about the instruction

15    with respect to the lawfulness of the arrest, and I wanted to

16    see if defense counsel had any further thoughts on that,

17    because I was going to mention that in my initial preliminary

18    instructions, which are pretty short, but again, I just wanted

19    to focus the jury.

20         MS. DeCASTRO:  Yes, your Honor.  We do have just two

21    objections.

22         THE COURT:  OK.

23         MS. DeCASTRO:  Defendants continue to object to the

24    fact that it's being put in the jury's mind that the arrest

25    might not be lawful.

Ia9Wnea3

1          THE COURT:  I think what I said here is, "Rather, you

2     should assume that the decision to arrest the plaintiff was

3     permissible," so that is part of the instruction.

4          MS. DeCASTRO:  OK.  And at the beginning part, I

5     believe the language is "to decide whether plaintiff was

6     subjected to excessive force."  It should be limited to the

7     language about the use of the Taser and the use of the baton,

8     because that's all that's really at issue here.

9          THE COURT:  Subjected to excessive force by use of a

10    Taser.

11         MS. DeCASTRO:  By Kaiser.

12         THE COURT:  So essentially take some of the language

13    from the case summary.

14         MS. DeCASTRO:  Exactly.

15         THE COURT:  OK.  I'm happy to do that.

16         Then on a couple of other issues, and again, if you

17    think these can wait, let me know.  I haven't heard anything

18    more about the 2015 arrest.  Were you able to provide plaintiff

19    with information about that arrest?

20         MS. DeCASTRO:  Yes, your Honor.

21         We provided plaintiff with an updated rap sheet, the

22    conviction, the arrest date, everything.

23         THE COURT:  All right.  Are we all on the same page

24    that that's going to come in?  I think that there was no

25    objection to it coming in but that we're going to stick to the

Ia9Wnea3

1    basics about what the crime was, the date of the conviction,

2    and the fact that it was a felony.  Is that right?

3            MR. DOGRAMACI:  Your Honor, we received from

4    defendants an updated rap sheet, which looks like it's a

5    printout from the Internet.  It does not look like the

6    self-authenticating sort of document that we thought might be

7    coming from defendants, so we don't think that document is

8    admissible.

9            THE COURT:  But it wasn't going to come in anyway,

10   right?

11           MR. DOGRAMACI:  We're just going to -- plaintiff, I

12   believe, is going to testify to the date of the conviction, the

13   crime for which he was convicted, and the sentence, which was

14   30 months.

15           THE COURT:  All right.  I think we're all on the same

16   page about that.  Please let me know if that's not the case.

17           Is there anything else we need to talk about?  Is

18   there a limiting instruction you wanted me to give when that

19   comes in?

20           MR. DOGRAMACI:  Your Honor, we'd defer to the standard

21   limiting instruction.

22           MS. DeCASTRO:  Your Honor, on the crime, it was

23   criminal possession of a controlled substance that he finally

24   was convicted of, crack cocaine.  I just want to make clear if

25   we can talk about the whole, actual -- that it was crack

Ia9Wnea3

1    cocaine.  I don't want the jury to infer that it might be

2    marijuana or something small.

3            THE COURT:  Go ahead.

4            MR. DOGRAMACI:  Your Honor, we object.  The crime of

5    which he was convicted was criminal possession of a controlled

6    substance in the fifth degree for which the sentence is 30

7    months; that's what makes it a felony.  And we believe the

8    Court has already ruled on this.  The jury will be given the

9    offense, the conviction, and the sentence.

10           MS. DeCASTRO:  Your Honor, I have the exact language

11   of the conviction.  It was criminal possession of the

12   controlled substance in the fifth degree, cocaine, 500

13   milligrams.  We wouldn't go into the milligram amount, but --

14           THE COURT:  You know what?  I'll look at the law over

15   lunch on that and get back to you about whether the specific

16   controlled substance should be something that's elicited or

17   not.  I'll let you know that before your openings.

18           MS. DeCASTRO:  Just one more issue, your Honor.

19           THE COURT:  Yes.

20           MS. DeCASTRO:  On the parole, your Honor said you

21   would get back to us.

22           THE COURT:  Yes.  Do you want to be heard on that

23   further, on the parole issue?

24           MS. DeCASTRO:  Your Honor, like we stated, at the

25   final pretrial conference, one of the officers that was mainly

1  involved in the report, he heard during the 911 call that

2  plaintiff was on parole, and while he didn't know what crime

3  that was for, he, as a police officer, could assume it was a

4  serious crime, because you don't get parole time unless it was

5  for a serious crime.

6        THE COURT:  I have to say I do think it's relevant

7  that he was on parole, particularly given that at least one of

8  the officers knew that at the time of his arrest.  His status

9  as a parolee is relevant intent or motive to evade or resist

10  arrest, and I think the evidence coming in is consistent with

11  Rules 403 and 404(b), *See, e.g.,* the *Cruz* case, 326 F.3d 3 395

12  (3d Cir.), and *Daniels*, 986 F.Supp. 248.  Particularly in a

13  case where his prior conviction is coming in, I don't think

14  it's unduly prejudicial that the jury knows that he was on

15  parole at the time of the arrest.

16        Do we need to discuss the patrol guide issue any more?

17  I got defendants' letter.

18        MR. DOGRAMACI:  If I could just briefly be heard on

19  the parole issue?

20        THE COURT:  Yes, because I don't think you submitted

21  anything on the parole issue.  Correct?

22        MR. DOGRAMACI:  What we did is argue at the last

23  conference, and I think that was the end of it.

24        THE COURT:  Right.

25        MR. DOGRAMACI:  I wonder if the issue could be held

1     open and decided after Mr. Neal testifies, because I think when

2     the story of the arrest is explained, that will make clear this

3     is not a case in which the motive to flee is at issue at all.

4     There was no question of anybody trying to flee from the police

5     officers and avoid being arrested at all like that.

6             He was in his own home.  He was in his kitchen.  He

7     was surrounded by police officers, and he pushed the police

8     officers' hands off of him when they put their hands on him,

9     but there was noplace for him to flee to, and there was no

10    attempt to flee from the police officers.

11            For that reason, I think the relevance of the fact

12    that Mr. Neal was on parole is really nil.

13            THE COURT:  I'm fine keeping it open, and I'll

14    consider it.  I'll consider your arguments and I'll let you

15    know before cross-examination, but just don't mention it on

16    opening.

17            MS. DeCASTRO:  Your Honor, if we may just be heard on

18    that?

19            THE COURT:  Sure.

20            MS. DeCASTRO:  Plaintiff's deposition testimony is

21    not -- he does say he was trying to get away from the officers,

22    and we believe it does go to one of the *Graham* factors, the

23    officer's state of mind at the time the force was used.  Not

24    only did the officer hear he was on parole, he heard there was

25    a gun involved.  To then hear there was a situation with a

1    parolee with a gun is extremely dangerous, and that goes to

2    exactly what *Graham* looks at, the reasonableness of the force.

3           THE COURT:  As I said, I'm inclined to agree with you,

4    but I'm also willing to hear the evidence and I don't think you

5    need it for opening.  If plaintiff didn't want to elicit it on

6    his direct case, I'm happy to keep the issue open.  Again, I do

7    think it is appropriate for the jury to hear that, and I don't

8    think it's unduly prejudicial, particularly since the

9    conviction is coming in.

10          MS. DeCASTRO:  Just one more thing, your Honor.

11          The plaintiff testified he has continuing back injury

12   because of this incident, and the reason the back injury was

13   caused was from an incident that happened to him while he was

14   in jail.  I don't know if that's going to come out, but I just

15   wanted to raise that as an issue with your Honor.

16          THE COURT:  Look, we can talk about how that can come

17   in.  I think if he's going to talk about his back injury and

18   seek damages for a back injury that it's appropriate to get out

19   a prior existing injury.  Whether it needs to be elicited that

20   it was in jail, I don't know the answer to that.  I'm happy to

21   talk further about that.  I think it depends.

22          Why do you think you need the fact that he had a prior

23   incident in jail?  Are you going to use medical records from

24   the prison?  I don't know that I've seen those.

25          MS. DeCASTRO:  No, your Honor.  We have not been able

Ia9Wnea3

1    to get those.  It just goes to explain that it was with

2    correction officers too.  We don't necessarily need it, so we

3    would be OK with not talking about that.

4              THE COURT:  OK.  Why don't you talk to each other, and

5    then if you need to talk to me, I'm happy to talk to you, just

6    to make sure the cross-examination doesn't elicit the fact that

7    he had a fight with corrections officers in prison as much as

8    that he had some prior incident that may have contributed to or

9    caused the injury.  If there's an issue about that and he needs

10   to be cross-examined, then feel free to raise it with me.  It

11   seems like that's not a live issue now, but I'm happy to talk

12   about it whenever you'd like to.

13             Just a couple other things, and then I think I can let

14   you go for lunch.

15             With respect to the 911 report, I don't think I

16   received a limiting instruction, but we could say something

17   like this 911 report is being admitted --

18             Do you all have any particular language that you want

19   to propose with respect to the 911 report?

20             MR. DOGRAMACI:  Your Honor, plaintiff would suggest

21   the statements that the police officers heard from the 911

22   dispatcher are to be taken solely as statements that they heard

23   and not for whether or not they are true.

24             THE COURT:  How about saying something like consistent

25   with the rules of evidence, the statements the police officers

Ia9Wnea3

1    heard from the 911 report or from the 911 officer, whichever

2    you prefer, are being admitted for the effect on those officers

3    who heard it and not for the truth of the matters asserted?

4            MS. DeCASTRO:  That's fine with defendants.

5            MR. DOGRAMACI:  We would prefer that instead of the

6    Court saying "for the effect that they had on the officers,

7    simply for the fact that the officers heard these statements,"

8    and then leave it to the officers.

9            THE COURT:  I think it is for the effect that it had

10   on the officers.

11           MR. DOGRAMACI:  The point I wanted to suggest is that

12   the officers themselves will state whether they had an effect

13   on them and what the effect was, and if the Court were to tell

14   the jurors these are being given to you for the effect they had

15   on the officers, it's going to be reinforcing the officers'

16   testimony rather than leaving it to the officers.

17           THE COURT:  What I'll change it to is, I'll say it's

18   being admitted for any effect they had on the officers who

19   heard them, not for the truth of the matters asserted.  I'll

20   make it "any" instead of "the effect" so that I'm not

21   suggesting there was definitively an effect.

22           All right.  Is there anything else we need to talk

23   about now with respect to the NYPD guide for anything beyond

24   the Taser?

25           MR. DOGRAMACI:  Your Honor, we didn't file a response

1    to the letter that defendants sent on, I believe, Saturday,

2    because it wasn't clear to me that the letter called for a

3    response.  The letter says that the entire, complete patrol

4    guide is thousands of pages long and it would be unfair to

5    defendants if we didn't tell them exactly which pages we might

6    use in this trial.

7          I can say that the number of pages that was produced

8    from the NYPD patrol guide, I think, is on the order of -- I

9    don't know exactly, but I'm going to approximate 50 pages,

10   something like that, and we have no intention of using any

11   pages outside what was actually Bates-stamped by defendants.

12   So there's no issue of there being thousands of pages that we

13   might end up using.  It really all depends on how defendants

14   testify on direct, and then we'll see what cross is

15   appropriate.

16         MS. DeCASTRO:  Your Honor, the provisions of the

17   patrol guide were given to plaintiff.  It's my understanding

18   that that's what was requested.  However, in those pages that

19   were produced are things like the uniforms that the officers

20   have to wear, things that are completely irrelevant to the

21   issues here.  We believe that the use-of-force patrol guide and

22   the Taser provision, if anything, should be the only ones that

23   they should be allowed to be cross-examined on.

24         THE COURT:  All right.

25         MR. DOGRAMACI:  Your Honor, right now we have no

Ia9Wnea3

1    intention of using anything else, but I don't think it would be

2    fair for a ruling to come down saying we can't do something.

3    Who knows what's going to happen at this trial?

4            THE COURT:  Let's do it that way.  If you're going to

5    use it for something else, just ask for a sidebar.  As I said,

6    I don't usually like to have sidebars during trial, but if

7    you're going to use it for something else, we'll have a sidebar

8    and I'll make a quick decision.

9            Last on my list is certification of medical records.

10   I haven't seen them.  You may have given them to defense

11   counsel, but I haven't seen the certification with respect to

12   Defendants' Exhibit C, and I didn't know if you were getting

13   new certifications after our conversation last week.

14           MR. DOGRAMACI:  Your Honor, we received them this

15   morning.  They're fine.

16           THE COURT:  They're fine.  OK.  That issue is mooted.

17           Are there any other issues we need to discuss before

18   this afternoon?

19           MS. DeCASTRO:  No.  Plaintiff's demonstrative

20   exhibits, but that doesn't need to be raised right now.

21           THE COURT:  Are you going to be using a demonstrative

22   on opening?

23           MR. DOGRAMACI:  Yes.  It's actually right now turned

24   away from the Court.  It's a huge poster, but I can hand up a

25   small copy.

1    MS. DeCASTRO:  Your Honor, we definitely object to it

2    being used on opening statements.

3    MR. DOGRAMACI:  Oh, sorry.  We're not going to be

4    using it on the opening.

5    THE COURT:  All right.  Let me know if you want to

6    talk about it.  Can you just turn it around so I can see it.  I

7    think you just said it's, like, a diagram of the apartment,

8    right?

9    MR. DOGRAMACI:  Yes, your Honor.  And your Honor, it's

10   going to be offered not as an exhibit but solely to aid the

11   witness in the providing of testimony.  There's the front door,

12   the corridor, the kitchen.  There's a room here, and this is

13   the area where the arrest took place.

14   THE COURT:  What's your objection?

15   MS. DeCASTRO:  Our objection to it is it's not to

16   scale.  We actually got the blueprints from the building for

17   the specific apartment, and the dimensions are not accurate.

18   One of the dimensions is of the hallway.  They're about three

19   feet, according to that diagram the plaintiff is using, about

20   the same size as the bathroom.  It's just not accurate; it's

21   not to scale.

22   THE COURT:  I'll let you use it with your client.

23   I'll make clear it's not to scale, and then I'll let defense

24   counsel introduce through whichever one of your clients you

25   want to introduce the to-scale version of the same thing, and

1    it will be made clear that that is to scale.  All that

2    information will be before the jury.  OK?

3              MS. DeCASTRO:  Thank you, your Honor.

4              THE COURT:  Anything else we need to discuss right

5    now?

6              I'll see you all promptly at two.

7              MR. DOGRAMACI:  Thank you, your Honor.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia96nea2

1                    A F T E R N O O N   S E S S I O N

2                         2:00 p.m.

3              MR. DOGRAMACI:  Your Honor, we have a quick

4     announcement.

5              THE COURT:  Yes.

6              MR. DOGRAMACI:  Based on Mr. Neal's seeing a lot of

7     these defendants for the first time --

8              THE COURT:  I am sorry?

9              MR. DOGRAMACI:  Based on Mr. Neal's seeing a lot of

10    the defendants for the first time in the courtroom this

11    morning, we're going to dismiss one of them.

12             THE COURT:  Okay.

13             MR. DOGRAMACI:  That is Defendant Maldonado.

14             THE COURT:  Okay.  I assume there is no objection?

15             MS. DECASTRO:  No.

16             THE COURT:  Mr. Maldonado, your case is dismissed.

17    You are free to go.

18             The assumption is he wasn't present at the scene; is

19    that the idea?

20             MR. DOGRAMACI:  Correct.

21             MS. DECASTRO:  Your Honor, the only thing is he drove

22    some people here.  Is it okay if he sits in the gallery?

23             THE COURT:  Absolutely.

24             Was a motion made with respect to him that he wasn't

25    there?

Ia96nea2

1          MR. DOGRAMACI:  The pretrial disclosures state that he

2     was involved in the arrest.  That is what the initial

3     disclosures states.  A later disclosure says he was on a

4     sidewalk outside the building.  He never went inside the

5     building.  Now that Mr. Neal sees the person, we don't have

6     evidence from Mr. Neal saying I saw that person in the building

7     and we don't have defendant saying he was in the building.

8          THE COURT:  The case will be dismissed against Mr.

9     Maldonado.  The only thing I would say briefly and then we'll

10    bring the jury in is we do have this issue with respect to the

11    2015 conviction and whether defendants is going to elicit the

12    nature of the substance.  I think under Rule 403 the substance,

13    the drug of conviction, is substantially more prejudicial than

14    it is probative.

15          See, for example, the *Joe* case 2008 WL 2810169 at *3

16    and the *Daniels* case that I mentioned earlier at 986 F. Supp.

17    251 as well as the *Picciano* case at 2010 WL 43669999 at *4.  As

18    the court in *Joe* explained allowing the jury to note statutory

19    name of the defense including a substantive issue would add

20    little to their assessment to the credibility but would pose a

21    danger of unfair prejudice.  So I am going exclude the

22    reference that crack cocaine.  Also as a practical matter the

23    fact that it was a 30-month sentence and it was a felony I

24    can't imagine the jurors believing it was for marijuana

25    possession, which I think was the concern earlier.

1          So with that I am going to bring the jury in and give

2   some preliminary instructions and Mr. Dogramaci.

3          MR. DOGRAMACI:  Mr. Higgins will give the opening.

4          THE COURT:  Thank you for telling me that.

5          who is going to do the opening for defendants?

6          MR. MANNINGHAM:  I am, your Honor.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ia96nea2

1          (In open court; jury present)

2          THE COURT:  Everyone may be seated.  Thank you.

3          As I noticed before the lunch break now that you have

4     been sworn in as jurors, I am going to give you some

5     preliminary instructions to guide you in your participation in

6     this trial.  As I noted this morning, it can be difficult to

7     hear in the courtroom at times.  So if at any time you cannot

8     hear me, you cannot hear the witness, you cannot hear the

9     lawyers, please raise your hand.

10          During these instructions and at trial you are going

11    to hear me use a few terms that you may not have heard before

12    and I am going to explain some of those common ones to you.  I

13    think I mentioned this earlier.  The party who sues is the

14    plaintiff in this action.  The plaintiff is Christopher Neal.

15    The parties being sued are called defendants.  In this action

16    the defendants are Romaine Wilson, Juan Rodriguez, Coty Green,

17    Baudilo Garciarivas, David Camhi and Michael Kaiser.

18          Over the course of this trial, you will also hear me

19    referral to counsel.  Counsel is another way of saying lawyer

20    or attorney.  I will sometimes refer to myself as the Court.

21    It is a fancy way of saying me or the judge.  That is the term

22    we use sometimes.

23          When I say something is admitted into evidence or

24    received into evidence, I have ruled that a particular

25    statement or exhibit may be considered by you in making your

1   decisions.  So when a witness is shown an exhibit and it is not

2   received into evidence, it is not something that you are

3   ultimately going to consider.

4          It will be your duty to find from the evidence what

5   the facts are.  You and you alone are the judges of the facts.

6   From the evidence presented at trial, you are going to decide

7   what happened.  You will then have to apply the facts as you

8   find them to the law as I give it to you.  You must follow the

9   law as I explain it whether you agree with it or not.

10  Specifically in this case, the questions you will be asked to

11  decide are whether the plaintiff was unconstitutionally

12  subjected to excessive force from a baton or baton like

13  instrument and/or a taser during the course of his arrest in

14  November of 2012 as well as whether he was unconstitutionally

15  deprived of health to prevent any such use of excessive force

16  if you find such use.

17         You will not be asked to decide nor is it relevant

18  whether the decision to arrest the plaintiff was appropriate or

19  lawful.  Rather you must assume the decision to arrest the

20  plaintiff was permissible and assess only the conduct of the

21  officers in the course of executing that arrest, namely,

22  whether the force used and any failure to intervene was

23  unconstitutional.  I will instruction you on the law that you

24  will use in making those determinations at the end of the

25  trial.

Ia96nea2

1        I also just want to remind you that nothing I say or

2   do during the trial is intended to indicate in any way what

3   your verdict is.  So please don't speculate as to what I may be

4   thinking.  Again, anything I say is not evidence.  The evidence

5   from which you will find the facts will consist of the

6   testimony of the witnesses and documents and other things

7   received into the record as exhibits as evidence.  The lawyers

8   may also agree or stipulate to certain facts and you are to

9   accept those facts as true.  Although, you still must decide

10  the weight, if any, to be given to those facts.

11       Certain things are not evidence and must not be

12  considered by you.  I will list them for you now.  Statements,

13  arguments and questions of the lawyers are not evidence.

14  Objections to questions are not evidence.  Lawyers have an

15  obligation to their clients to make an objection when they

16  believe that evidence is improperly being sought to be admitted

17  under Federal Rules of Evidence.  You should not be influenced

18  by an objection or by my ruling on it.  If the objection is

19  sustained, the witness will not be permitted to answer the

20  question and you must ignore the question.  If the objection is

21  overruled, the witness will be permitted to answer the question

22  and you should treat the answer like any other.

23       If you are instructed that an item of evidence is

24  being received for a limited purpose only, just follow that

25  instruction and only consider it for that purpose.  If I strike

Ia96nea2

1    the answer or instruct you to disregard an answer, then that

2    testimony is not evidence and may not be considered by you.

3    Anything that you may see or hear outside of the courtroom

4    obviously is not evidence and must be disregarded.  Again --

5    and I will say this a couple times -- your verdict must be

6    based solely on the evidence or lack of evidence presented here

7    in this courtroom at this trial.

8           So one of your most important tasks is going to be to

9    evaluate the credibility of the witnesses who will testify here

10   at trial.  It will be up to you to decide which witnesses to

11   believe, which witnesses not to believe, and how much of any

12   witness's testimony to accept or to reject.  I will give you

13   some guidelines for determining the credibility of witnesses at

14   the end of trial.  In the meantime, please listen carefully to

15   the witnesses as they testify.  Again, you will be called upon

16   to evaluate their credibility and truthfulness of their

17   testimony.

18          It is important to remember that this is a civil case.

19   I said that earlier, but you may have heard of the term beyond

20   a reasonable doubt.  That is the standard in criminal cases.

21   That requirement does apply to a civil case and you should put

22   it entirely out of your mind.  In civil cases the burden of

23   proof is different.  It is called proof by a preponderance of

24   the evidence.  To establish facts by a preponderance of the

25   evidence, you need to prove the facts are more likely true than

1   not true.  Again, I will instruct you fully on the burden of

2   proof after all of the evidence has been received.

3          Now, just a few words about your conduct as jurors.

4   As I noted previously during the trial, you are not to discuss

5   the substance of the case with anyone nor are you to permit

6   anyone to discuss it with you until you retire to the jury room

7   at the end of the case to deliberate.  You are simply not to

8   take about the case with anyone, not even with each other until

9   you actually begin your deliberations at the end of the trial.

10  Again, if you see any of the lawyers or the parties and they

11  don't say hello, they are not being rude.  They are following

12  my instructions.  If anybody does try to talk to you about the

13  case, obviously you are not going to talk to them, but don't

14  tell anyone else.  Just tell Ms. Cavale and she will notify me.

15  Don't talk about or read anything about the facts or

16  circumstances of this case on any of the social networking

17  sites -- Facebook, Twitter, Instagram, etc.  Don't Tweet or

18  communicate anything about the substance of the case in any

19  mode whatsoever or watch any media reports in any form about

20  any aspect of the case, any of the individuals involved because

21  again you cannot be affected by anything that comes outside of

22  the courtroom.

23         Finally, if at any point you see someone you recognize

24  in the courtroom, just raise your hand and I will see you at

25  side bar and you can let me know who that is.  If you see

1    someone outside the courtroom where you are not actually

2    sitting, you can let Ms. Cavale know.  Keep an open mind and

3    make no judgment until end of the trial.

4         I wanted to say a word about note-keeping.  Ms. Cavale

5    gave each of you a notepad and pin.  If you do take notes do so

6    only in these pads and don't remove the pads from the courtroom

7    or jury room.  Leave them in the jury room or give them to Ms.

8    Cavale overnight.

9         Any notes that you do take are for your use only.

10   They are only to be used as an aid to your memory.  Your memory

11   controls.  If you do take notes, just be careful not to get so

12   involved in taking nose that you are not listening to the

13   evidence that comes in, you are not watching the witnesses as

14   they testify.  Once you are in deliberations if there is a

15   disagreement between one juror's notes and another juror's

16   notes or between one juror's notes and another juror's

17   recollection, you can ask to have the court reporter read back

18   the testimony and that is the official court transcript that

19   controls, not any particular jurors' notes.

20        During the course of the trial, exhibits will be

21   received into evidence but will be marked by an exhibit number.

22   So if there is an exhibit you are particularly interested in

23   seeing, you should feel free to write that exhibit number down.

24   I will give a list of the witnesses and exhibits.  This is not

25   a particular document heavy case so it will not be hard to find

Ia96nea2

1  what you are looking for.

2        We're now going to begin the trial.  As I said

3  earlier, we generally begin promptly at 10:00 a.m., and

4  continue to 5:00 a.m.  Although as I said tomorrow we're only

5  sitting from 10:00 to 2:30 an taking one short break.  Normally

6  we take a lunch break for an hour and a short break in the

7  morning and afternoon.  I am going to ask you to arrive closer

8  to 9:30 each day.  As an incentive, I will have breakfast

9  waiting for you.  We cannot start until all of you are here.

10  If any of you are late, all of us -- the parties, lawyers,

11  court reporter -- have to wait.  So I will ask you to be on

12  time and arrive as close to 9:30 as you can.

13        Finally, I am going to tell you briefly how the trial

14  will proceed.  We'll have the opening statements first.

15  Plaintiff's counsel will make an opening statement and then

16  defense counsel will make an opening statement.  The opening

17  statements are neither evidence nor argument.  They are simply

18  outlines of what the attorneys believe the evidence will show.

19  It will help you follow the evidence as it is presented.

20        After the opening statements, the plaintiff will

21  present its case.  After plaintiff testifies on direct

22  examination, counsel for defendants will have an opportunity to

23  cross-examine him.  After cross they may be a little of what we

24  call redirect and then recross.  Plaintiff may call any other

25  witnesses he chooses to.  He may, in fact, call each of the

Ia96nea2

1    defendants to the stand and they will be questioned by both

2    sides as well.

3         When that is completed, defendant has an opportunity

4    to call their own witnesses to the extent that they weren't

5    called on plaintiff's case.  It doesn't matter who calls a

6    witness.  All that matters is that you listen to their

7    testimony and you assess their credibility and you decide what

8    you believe and what you don't.

9         After the presentation of the evidence is completed

10   and both sides have rested, the attorneys will deliver their

11   closing arguments and summarize and interpret the evidence.

12   Just as the lawyers opening statements are not evidence, the

13   closing statements are not either but they are argument and

14   they are important.  After that I am going to give you

15   instructions on the law.  Finally, you will retire to

16   deliberate on your verdict, which must be unanimous and based

17   on the evidence presented in this trial.

18        You have a tremendously important task as jurors.  It

19   is to determine the facts.  You and you alone, not the Court,

20   are the sole judges of the facts.  The Constitution itself

21   recognizes your unique role in our system of justice.  Pay

22   careful attention to the witnesses and the evidence received at

23   trial as well as my instructions on law.  Keep an open mind and

24   you will do your duty.

25        With that we'll begin with opening statements, Mr.

Ia96nea2

1    Higgins.

2          MR. HIGGINS:  Thank you, your Honor.

3          Good afternoon, ladies and gentlemen of the jury.  My

4    name is Thomas Higgins.  I am one of the attorneys for the

5    plaintiff, Mr. Christopher Neal.  This is another one of his

6    attorneys, Mr. Dogramaci, and our paralegal.

7          The evidence in this case is going to show you that on

8    Thanksgiving night in 2012 the plaintiff Mr. Christopher Neal

9    was in his kitchen.  He was tending to a head wound when police

10   entered into his home, grabbed him, put him on the floor --

11   tased him, put him on the floor.  While he was on the floor

12   with at least two officers on top of him, one of the other

13   officers took out a baton and hit Mr. Neal.  And while all this

14   was going on, some of the officers were laughing.  Mr. Neal is

15   going to testify that he didn't think it was very funny.

16         So Thanksgiving night 2012 805 E. 165th Street,

17   Apartment 3, that is where Mr. Neal lived.  He lived with

18   Audrey Barnes and their daughter Talasia, who was a

19   two-year-old, and they had other members of Ms. Barns's

20   extended family all lived together, including two of her adult

21   daughters, Kianna and another Shaquana.  They were celebrating

22   Thanksgiving.  There was some alcohol consumed and Audrey

23   Barnes had a disagreement and almost got in a fight with

24   another woman.  Mr. Neal tried to prevent that argument between

25   Audrey Barnes and this other woman from escalating from coming

Ia96nea2

1    to blows.  One blow was struck.  Mr. Neal was hit in the head

2    with a bottle by Kianna Barnes.  She doesn't really know why

3    she hit him, but she did.

4        His head was bleeding as he will tell you and Mr. Neal

5    is going to tell you that he was mad and angry about being hit

6    with the bottle and he confronted Kiana and Kianna's boyfriend,

7    baby daddy, a man named Chris Goff stood between them and in

8    anger Christopher Neal is going to tell you he said to

9    Mr. Goff, Let's get our guns and settle it like men.  You will

10   hear no testimony about any gun flying.  No guns were

11   brandished.  Mr. Neal calmed down.  911 had been called, but

12   there was no fight between Mr. Goff and between Mr. Neal and he

13   was upstairs in his kitchen tending to his head wound from

14   getting hit from the bottle when the police came upon the

15   scene.

16       Now, the front door to Mr. Neal's apartment was open

17   and he will testify that he heard the radios of the police

18   officers and that is how he knew the police were there.  So the

19   evidence is going to show and Mr. Neal is going to tell you

20   about how officers -- at least three -- surrounded him in his

21   kitchen and told him, You have to come with us to the hospital.

22   Mr. Neal is going to tell you he didn't want to go to the

23   hospital.  He didn't want to go with the police to the

24   hospital.  He wanted to deal with the situation himself.

25       At that point the interaction between Mr. Neal and the

police officers became physical.  One or more of the police

officers tried to grab Mr. Neal and he is going to testify that

he pushed their hands away.  He stiffened his arms.  He didn't

want to go with them.  By the way, they had asked him if he

lived there and he had shown them his ID.  He will it testify

about that.  He was in his own home and he had given them his

ID.

When they grabbed him, he didn't want to go with them.

So the testimony is going to be that one of the officers behind

Mr. Neal sort of grabbed him and tackled him and Mr. Neal and

one or more of the officers banged into a door to a bedroom

that was adjacent to the kitchen hallway area.  Mr. Neal is

going to testify that this a bedroom that they called the

girl's bedroom because that is where little Talasia would

sleep.  Now, she wasn't in there.  In fact, no human was in

there.

What was in that bedroom was Mr. Neal's pit bull, a

dog named Loyalty.  So when the door got knocked open, the pit

bull came running out onto the scene where Mr. Neal was

bleeding from his head wound with at least three police

officers and the pit bull ran around barking and got hold of

one of the police officers's shoes.  You will hear about what

that whole situation from Mr. Neal in more detail.

One of the officers pulled out his service arm as

Mr. Neal will tell you and said, Get the dog out of here or I

am going to shoot it.  At this point one of Audrey Barnes'
other adult daughters Shaquana came in and got Loyalty.  She
dog out of there.  So you have the situation where you still
have Mr. Neal, who is going to tell you he is in the kitchen
still bleeding.  Police officers are still there.  The dog has
been removed.  One of the police officers shot his taser at
Mr. Neal in the back and tased him.  Mr. Neal is going to tell
you what that felt like.

As he was being tased, Mr. Neal is going to tell you
that he heard other police officers saying, Hit him again.  Hit
him again.  He will also testify that he heard some of the
police officers laughing.  So after being tased, he was grabbed
again by police officers and they went through that door into
the girls' bedroom and they put him on the floor but on the
floor there was a mattress.  So they landed on top of a
mattress.  Mr. Neal was on top of the mattress and he had two
police officers on top of him and he was face down.  At this
point As Mr. Neal will testify one of the police officers took
out a baton and started hitting him in the back.  Whack.
Whack.  Whack.  He will tell you.

So at this point Mr. Neal had been handcuffed and he
was taken to Lincoln Hospital and he really didn't want to be
there.  He knew he would be processed.  He knew he was under
arrest.  He will testify about that.  So they were not in the
hospital very long and he was arraigned and released on his own

Ia96nea2

1    recognizance.

2         When he got back to his apartment, Mr. Neal will

3    testify that he was with his girlfriend then and as he took off

4    his gray hoodie he found in the back the taser darts with wires

5    in the back of his gray hoodie.  He will also testify that he

6    looked in the mirror and saw his back, the marks left by the

7    taser.  So that is Thanksgiving night 2012.

8         At the end of this trial, you will hear again from the

9    lawyers, and you will hear from Mr. Dogramaci, and at that

10   point we'll ask you to enter a verdict in favor of Mr. Neal not

11   to undue what happened Thanksgiving night but to compensate him

12   for what did happen to make sure that the police are not

13   incentivized to let that happen to anyone else.

14        We thank you for your time and attention and the time

15   you spent today.

16        THE COURT:  Thank you, Mr. Higgins.

17        Mr. Manningham.

18        MR. MANNINGHAM:  Thank you, your Honor.

19        Good afternoon.  On November 23rd, 2012, plaintiff

20   decided to take things to the extreme.  He brought a gun to a

21   family fight.  I will explain that in a minute.  Then he threw

22   police officers around as they tried to arrest him and now he

23   is here asking for money claiming excessive force.  You will

24   hear that the only thing that was excessive that night was the

25   plaintiff.

1           Now, I want to make one thing clear:  There is no

2    question whether plaintiff should have been arrested on that

3    night, but let me give you some background.  The story starts

4    out like many others.  It was Thanksgiving night and a family

5    was fighting.  Now, do families fight on Thanksgiving?  Sure.

6    But not like this.  At the time plaintiff was living with his

7    girlfriend Audrey in her home.  Their two-year-old daughter and

8    Audrey's eight other children also lived there.  Around 11:30

9    that night plaintiff started drinking vodka mixed with malt

10   liquor.  He will tell you himself he was drunk.  Then he took

11   food that Audrey took over to his other girlfriend's apartment.

12   Let me say that again.  His girlfriend Audrey that he lived

13   with cooked Thanksgiving dinner --

14           MR. DOGRAMACI:  Objection.

15           MR. MANNINGHAM:  -- and plaintiff --

16           MR. DOGRAMACI:  Side bar.

17           THE COURT:  Is this evidence that will come out during

18   the trial?

19           MR. MANNINGHAM:  Yes, your Honor.

20           THE COURT:  I will allow it.  Overruled.

21           MR. MANNINGHAM:  His girlfriend Audrey that he lived

22   with cooked Thanksgiving dinner and plaintiff decided to take

23   leftovers to his other girlfriend's apartment.  When he came

24   back, surprise, Audrey confronted him about cheating.  Then

25   they started fighting outside of their apartment building.

Ia96nea2

1  Audrey's daughter Kiana also got involved in the fight and at

2  some point the fight turned physical.  Plaintiff became furious

3  and in his own words decided to take things to the extreme.  So

4  he ran upstairs and got his gun and came back outside.

5      At this point 911 was called.  It is unclear who

6  called, but the female caller said plaintiff was threatening to

7  shoot one of Audrey's kids.  We are not sure which one he was

8  threatening, but at the time of Audrey's kids ranged from two

9  to 18.  Then the police showed up.  Plaintiff will tell that

10  you when he saw the police coming, he ran upstairs to get rid

11  of his gun.

12      Now, Kianna, who is Audrey's 18-year-old daughter,

13  told the officer that plaintiff hit her and they saw she had

14  injuries on her face.  You will learn when there is a domestic

15  violence allegation and there are visible injuries, the

16  officers must arrest.  Kianna also told the officers that she

17  hit plaintiff in the head with a bottle and he was bleeding

18  from his head in the apartment upstairs.

19      So Sergeant Camhi went up to arrest him.  When he got

20  upstairs, he went down a narrow hallway that opened into a

21  kitchen.  Plaintiff was at the kitchen sink trying to clean the

22  blood off his self.  Sergeant Camhi stood behind him and

23  scanned the room for weapons.  He didn't see the gun anywhere,

24  but he did see there were some knives on the counter and on the

25  kitchen sink.  He tried to talk to plaintiff and get him away

from the knives.  He told plaintiff that an ambulance was

coming and that he should come with him downstairs.  Plaintiff

refused.  He was furious.

Sergeant Camhi then decided it would be best to wait

for other officers to get there before trying to arrest

plaintiff.  That is because as you will learn kitchens are

dangerous areas for police officers.  There are a lot of things

in there that could be used as weapons such as knives that are

known to the person living there but not necessarily known to

the police.  This is when Sergeant Kaiser showed up.  He went

into the apartment and stood in the hallway at the edge of the

kitchen.  Plaintiff started walking towards Sergeant Kaiser.

Sergeant Camhi followed from behind until the three were in the

narrow hallway.

Sergeant Camhi told plaintiff to give him his hands.

He didn't.  So each sergeant grabbed one of plaintiff's arms

trying to put his hands behind his back.  Plaintiff stiffened

them.  He tried to break free from the sergeants' grips by

swinging his arms.  The sergeant didn't let go.  They were

being thrown away bouncing back and forth off the walls of the

narrow hallway.  Plaintiff swung Sergeant Kaiser into a door.

The door opened and a pit bull ran through the sergeant's legs

and into the kitchen.  It charged Officer Rodriguez barking and

bit his foot.  The officers got the bit bull off of Officer

Rodriguez, but then it ran and bit Officer Green's foot.

Ia96nea2

1          Now, in the hallway Sergeant's Kaiser and Camhi were

2    getting nowhere with plaintiff.  Plaintiff will tell you in his

3    own words that he was too strong and he was too powerful to let

4    two officers take him down.  He was right.  So Sergeant Kaiser

5    stepped back, took out a taser and discharged it.  Now, you

6    will hear about how a taser works.  It has two prongs that

7    launch out each connected to the taser by a thin wire.  Kind of

8    like a fishing line.  When the prongs launch out, five seconds

9    of electricity is sent through the wires.  In an a ideal

10   situation, the prong will penetrate the person's skin and that

11   person will lockup and fall to the ground.

12          That is not what happened here.  Here, the prongs did

13   not penetrate plaintiff's skin.  He didn't lockup.  He didn't

14   fall to the ground.  It wasn't effective.  It appears that one

15   of the prongs may have made contact with plaintiff's clothing,

16   but all we know for sure is that the darts did not penetrate

17   plaintiff's skin.  In fact, after the taser was discharged,

18   plaintiff kept resisting.  So Sergeant Kaiser went back and

19   grabbed plaintiff.  Sergeant's Kaiser and Sergeant Camhi and

20   plaintiff wrestled into a bedroom and fell onto a bed.

21   Plaintiff continued struggling, but soon after the officers

22   were able to handcuff plaintiff on the bed.  That was it.

23          Now let's talk about what plaintiff is claiming.  You

24   just heard plaintiff's version of the events.  You will see

25   that the medical evidence doesn't support it.  He made no

Ia96nea2

complaints to the EMTs who took him to the hospital.  He denied

any injury at the hospital.  He did not complain of any

injuries at any point until he brought this lawsuit and now he

is here in federal court asking you to give him money.  Why?

You will see that somewhat of a mystery.  I will like to point

out that opposing counsel did barely mentioned all the other

officers that were there and didn't mention them by name.

          At the end of this trial show plaintiff that he was

the only thing that was excessive that night and find a verdict

in favor of the defendants.

          THE COURT:  Thank you.

          Plaintiff, you may call your first witness.

          MR. DOGRAMACI:  Your Honor, plaintiff calls

Christopher Neal himself to the stand.

          THE DEPUTY CLERK:  Please raise your right hand.

 CHRISTOPHER NEAL,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

          MR. DOGRAMACI:  Let me first of all say to the court

reporter sometimes I don't speak loudly enough.  If at any

point I cannot be heard, please tell me to say it again louder.

          THE COURT:  I will remind everybody, the lawyers and

witnesses, to speak into the microphones.  That makes a big

difference.

DIRECT EXAMINATION

1    BY MR. DOGRAMACI:

2    Q.  Sir, would you for the record please tell us your name?

3    A.  Christopher Neal.

4    Q.  Mr. Neal, where were you born?

5    A.  Bronx, New York.

6    Q.  What is your occupation?

7    A.  Right now I work as a messenger for NYC Messenger.

8    Q.  Maybe the microphone could be brought a little closer to

9    you.

10       Sir, what is your occupation?

11   A.  Messenger.  I deliver medications for CVS.

12   Q.  How long have you had that occupation?

13   A.  About nine months now.

14   Q.  Where do you live now?

15   A.  I am currently in a shelter in the Bronx.

16   Q.  How long have you lived there?

17   A.  Since last year.

18   Q.  Where did you live before that?

19   A.  Before that I was incarcerated.

20   Q.  Where were you incarcerated?

21   A.  I was incarcerated at Governor Correctional Facility for

22   possession of a controlled substance.

23   Q.  When was that conviction?

24   A.  I believe it was 2014, April.

25   Q.  What was the sentence?

1   A.  I believe I got 30 months for it.

2   Q.  So when were you released from that?

3   A.  Last year.

4   Q.  Are you married?

5   A.  That I don't know.  I signed a uncontested divorce decree

6   but I never got a final decision.

7   Q.  Do you have children?

8   A.  Yes.

9   Q.  How many?

10  A.  I have three.

11  Q.  How old are they now?

12  A.  27, 27 and eight.

13  Q.  Where do they live now?

14  A.  Well, one is in the shelter, one lives in South Carolina,

15  the other one lives in the Bronx on Bassford.

16  Q.  What is the name of the youngest one?

17  A.  Talasia.

18  Q.  Mr. Neal, if you would take a look at the defendants who

19  are in this courtroom, please let us know do you recognize any

20  of them from before?

21  A.  Yes.

22  Q.  Which one?

23  A.  I recognize --

24  Q.  You can just point.

25  A.  I recognize Wilson, I recognize the gentleman sitting

1   right -- right there next to the counsel that gave the opening

2   statement, and I also recognize the other officer back there

3   with the glasses on.

4   Q.  Let me ask you about the man you identified as Wilson.

5       How do you know Officer Wilson?

6   A.  Well, I know Officer Wilson because, one, around where I

7   used to live on 156 Street I had a couple instances with him

8   before this incident.

9           MS. DECASTRO:  Your Honor, can we have a brief side

10  bar on this issue?

11          THE COURT:  Sure.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MS. DECASTRO:  I don't know if this is what is going

3     to come out, if you are going to bring out the prior incidents.

4     I thought we had motions in limine rulings on that.

5              MR. DOGRAMACI:  I will tell you what I expect he is

6     going to say.  He is going to say he knew Officer Wilson from

7     interactions with Wilson in the neighborhood before this

8     incident.  During those interactions they did -- one time

9     Wilson took an aggressive stance against him and he started

10    filming Wilson, but that is as far as he went.  He saw Wilson

11    more than once in the neighborhood that way.  Wilson refers to

12    him as the guy who takes video and he referred to him as Big

13    Head Wilson.

14             MS. DECASTRO:  That is character evidence.  It is

15    prejudicial and it is character evidence getting into an

16    incident of a video recording.  He claims he knows plaintiff

17    from the neighborhood but that is because he did patrol there.

18             MR. DOGRAMACI:  Your Honor, Mr. Neal is going to

19    testify when it comes time to the actual incident, Wilson is

20    the one who hit him with the baton.  When he was being held

21    down on the bed, he turned and recognized Wilson and he

22    addressed Wilson by name and Wilson stepped back shocked that

23    he had been addressed name and this testimony will know how he

24    knew who Wilson was.

25             THE COURT:  Why can't you get in all that without

1   saying what happened in the prior incident?  Leave the

2   testimony as it is now.  They had prior interactions that would

3   explain why they knew each other and recognized each other and

4   leave it at that.

5           MS. DECASTRO:  If I may.  If plaintiff gets to talk

6   about this, Wilson will get to talk about the crimes that

7   plaintiff commit, which we told him not to do because of the

8   prior rulings.

9           MR. DOGRAMACI:  Can I ask him how many times he had

10  seen Wilson in the neighborhood?  How confident he is that he

11  knew who Wilson was.  I think it is important.

12          MR. HIGGINS:  He is not going it make any reference to

13  any charge against him.

14          THE COURT:  Do you have any objection to him asking

15  how confident are you that this is the same person?

16          MS. DECASTRO:  We're fine with that.

17          THE COURT:  Let's leave it at that.  Let's not get

18  into the specifics.

19          MR. DOGRAMACI:  Can I ask him how many times he saw

20  Wilson in the neighborhood?

21          MS. DECASTRO:  I think it is going to open the door

22  and there is not a cure.

23          MR. DOGRAMACI:  I will be asking for a number.  Can I

24  also ask him if he had a nickname for Mr. Wilson, Big Head

25  Wilson.

1                THE COURT:  What is it?

2                MR. DOGRAMACI:  Big Head Wilson.  That shows the

3      familiarity.

4                THE COURT:  I think you can ask how confident you are

5      based on your prior interactions with the same person.  I don't

6      think you need to get into anything else.  I don't think it is

7      relevant.  I don't know if big head is something for arrogance

8      or what it means.  I don't think we need to go there.

9                MR. DOGRAMACI:  One thing that will be important right

10     now we don't have a chronology.  So the incident that we're

11     going to get into is 2012.  At some point I will want to make

12     clear that for some stretch of time before 2012, he and Wilson

13     had seen each other around.

14               THE COURT:  If you can ask him over a period of time

15     did you see him on a number of occasions.  Again, I don't think

16     you want to get into the specifics of what happened on a

17     specific objection.

18               MR. DOGRAMACI:  Okay.

19               (Continued on next page)

20

21

22

23

24

25

Ia96nea4                    Neal - direct

1                    (In open court; jury present)

2       BY MR. DOGRAMACI:

3       Q.  Mr. Neal, let me draw your attention to a particular night.

4       It's in 2012.  The night of Thanksgiving; all right?

5            Now, you are already familiar with Officer Wilson from

6       having interacted with him around the neighborhood for some

7       time before this night; correct?

8       A.  Yes.

9       Q.  Thank you.

10           So let's talk about the night of Thanksgiving 2012.  Where

11      were you living at that time?

12      A.  I was living with my then girlfriend Ms. Audrey Barnes at

13      805 East 156th Street, Apartment 3.

14      Q.  Who else lived with you and Ms. Barnes at that address?

15      A.  Shaquana Gillard, Patricia Mason, Christopher Mason Jr.,

16      Kianna Barnes, Jacquelyn Mason, Deneen Mason, Tamika Andrews,

17      Davon Mason and my daughter Talasia Neal.

18      Q.  I will hand you a piece of paper.

19           Is this something that you have seen before?

20      A.  Yes.

21      Q.  Is this a fair and accurate depiction of the apartment that

22      you and Ms. Barnes and all her children you just mentioned

23      lived in at that time?

24      A.  Yes.

25                    MR. DOGRAMACI:  Your Honor, this is going to be used

1    as a demonstrative solely to aid the witness's testimony.  We

2    have a large poster version of it that I will show to the jury.

3                THE COURT:  Okay.

4                MS. DECASTRO:  We continue our objection to the

5    demonstrative.

6                THE COURT:  I am going allow you to use the

7    demonstrative.  To be clear this is not to scale.  So you are

8    not to consider it as such.  It is just to aid to the

9    testimony.  I am going to allow them to use this exhibit.

10                MR. DOGRAMACI:  If we can bring it a little closer, I

11   think there will be one or two points which will be helpful for

12   the witness to --

13                THE COURT:  Do you want to move it over here?

14                MR. DOGRAMACI:  Let's do that.  Thank you.

15   BY MR. DOGRAMACI:

16   Q.  Mr. Neal, so if you can just very briefly please tell us

17   what it is that we're looking at in this mockup of the

18   apartment that you all lived in.

19                What floor of the building was this?

20   A.  This is actually a depiction of the third floor apartment.

21   Q.  So was there an elevator in that building?

22   A.  No.

23   Q.  Where are the stairs going to the third floor?

24   A.  Right here.

25   Q.  You can get up and point to make sure we're clear on what

1    you are pointing to if you would like.

2    A.   Right here.

3    Q.   When you come out from those stairs, do you see the area

4    that is shaded light gray.

5              What is that?

6    A.   That would be the landing of the staircase.

7    Q.   Is that the common area of the building?

8    A.   Yes.

9    Q.   How many doors into the apartment are there?

10   A.   This one right here and then this one right here.

11   Q.   All the rest of what we're looking at is one apartment

12   unit; is that correct?

13   A.   Yes.

14   Q.   Let's look at the door that is on the left.

15             MS. DECASTRO:  Your Honor, objection.

16             THE COURT:  To what exactly?

17             MS. DECASTRO:  To leading.

18             THE COURT:  Overruled.

19   Q.   Let's look at the door that is on the left.

20             Where does that door lead into?

21   A.   This door --

22   Q.   Yes.

23   A.   -- leads to like what we used to call the back of the

24   apartment.

25   Q.   What is that on your left if you walk in from that door?

1    A.   That is actually the bathroom.

2    Q.   What is on your right when you walk in from that door?

3    A.   That is actually what we used to call the boys' room.

4    Q.   What is inside that room?

5    A.   Normally it was a bunk bed.

6    Q.   If you go in farther from the front door, there is a second

7    door on your right.

8             What is that?

9    A.   That is what we used to called the elder girls' room.

10   Q.   If you were to keep going straight in, what is that room

11   that you go into?

12   A.   That is the kitchen.

13   Q.   If you can give us an idea how narrow that corridor is from

14   when you walk into the front door, how many people could fit

15   into it?

16   A.   Well, two people could not walk right by each other.

17   Someone would have to turn sideways to get out of the way.

18   Q.   Just primarily?

19   A.   Yes.

20   Q.   The kitchen area, about how many people could fit into that

21   room?

22   A.   Well, I would have to say approximately maybe if you wanted

23   to comfortable, three.

24   Q.   Thank you.  You can sit.  You may get up later, but for now

25   you can sit.

1    On the night of Thanksgiving 2012, you had an incident with

2  the defendants in this case; right?

3  A.  Yes.

4  Q.  I want to ask you how that incident began.  Let's start

5  where were you?

6  A.  Well, I was over here at the sink.  I didn't know how bad I

7  got hit in the head with a bottle.  I was trying to break up a

8  fight I didn't want to happen.

9  Q.  Hang on.

10       MR. DOGRAMACI:  Let the record reflect the plaintiff

11  just pointed to the area of the sink in the kitchen.

12  Q.  What were you doing at that spot?

13  A.  I actually had what we call a scully, which is a

14  close-fitting hat.  I was putting cold water on the wound

15  because I didn't know how bad the cut on my head was.

16  Q.  What sort of wound did you have -- go ahead and take a

17  seat?

18  A.  I actually had a 2-inch gash in my head that was bleeding

19  profusely.

20  Q.  How had you gotten that 2-inch gash?

21  A.  Kianna earlier in the night hit me in the head with a

22  bottle.

23  Q.  Who is Kianna Barnes?

24  A.  That is Audrey's middle child.

25  Q.  So what was going on when she hit you in the head with the

1    bottle?

2    A.   Well, Audrey was trying to fight a woman who I knew had

3    HIV.  She didn't know it, but I knew it.  I didn't want her to

4    hit her because I didn't want the mother of my child to risk

5    getting HIV.  I stepped in between them and I stopped her from

6    hitting her.  I said, What are you doing.  What you are doing.

7    Are you going to take her side over mine.  I said, Yeah.  I am

8    going take her side.  Yeah, I am going to take her side.  I

9    turned around and next thing I know, bang, hit in the head.

10   Q.   Now, these events that you just described, where did those

11   events happen?

12   A.   Excuse me?

13   Q.   Where did the events that you just described with Kianna

14   and Ms. Barnes, where did those events happened?

15   A.   That happened downstairs in the beginning of the building.

16   When you come up in the building.  Not the vestibule but the

17   hallway downstairs.

18   Q.   No where where we're looking at in that poster?

19   A.   No.

20   Q.   What time did this happen approximately?

21   A.   I would say it was probably after 11:30.

22   Q.   When you turned around and saw Kianna, what did you do

23   then?

24           MS. DECASTRO:  Objection.

25           THE COURT:  Overruled.

1    A.  Actually, I was tight.  I felt stuff coming down.  When I

2    put my hand there and seen the blood, I was mad.  So I went to,

3    like -- I was furious.  I went to go at her.  Her baby father

4    who I had been drinking with jumped in.  He was like, Yo, you

5    bugging.  I said, Man, you see my head.

6    Q.  What is that man's name?

7    A.  Christopher Goff.

8    Q.  Sir, what was his relationship to Kianna?

9    A.  That is her baby father.

10   Q.  What happened?

11   A.  When he jumped in the way he said, You bugging.  I said,

12   Yo, you see your head.  He was like, Eff your freaking head.

13   When he said that, I took it at -- my head, like, this is gonna

14   escalate now.  So I told him -- I said, You know what, go get

15   your gun.  I am gonna go get mine.  I proceeded upstairs.  I

16   went into Audrey's room.  I grabbed the gun and I came back

17   downstairs and I pointed to him and I said, Now, you go get

18   your gun.

19   Q.  Then what happened?

20   A.  He said, I don't wanna get no gun.  So I said, No, go get

21   it.  He said, No, I am not gonna go get it.

22   Q.  All right.  So what happened after that?

23   A.  After that I seen the police van coming up the block.  It

24   wasn't racing.  It was coming up the block.  I was like, Oh,

25   man I am bugging.  I went upstairs.  I put the gun back where I

1    found it and then I proceeded to go to the sink, which is all

2    the way over there.  I put it in this room.  I went all the way

3    back around, came through and that is when I was standing at

4    the sink.

5    Q.  Sir, you just pointed at the poster.  Which room was it

6    that you put the gun in?

7    A.  This one.

8    Q.  All the way on the other side of the apartment from the

9    kitchen?

10   A.  Yes.

11   Q.  So now are we at the point in time where you were standing

12   by the kitchen sink that you referenced earlier?

13   A.  Yes.

14   Q.  Had you had anything to drink on this night?

15   A.  Yes.  We were sitting there and I had a drink that I make

16   with Svedka and what you call fruity Saint Aug.  Saint Aug is

17   alike a beer or something.

18   Q.  Go ahead.

19   A.  That is the drink that I like.  I don't like Bacardi.  I

20   like my little special drink.

21   Q.  How many drinks had you had?

22   A.  I believe I had three cups.

23   Q.  Over what stretch of time had you had three cups?

24   A.  I would say about two and a half hours.

25   Q.  How had those three drinks affected you -- let me give you

1   a point in time.  At the point when you are standing by the

2   sink tending your head wound, what affect had those three

3   drinks had?

4   A.  I would say -- they say if you have certain amount, you are

5   intoxicated illegally.  I just had a little buzz.

6   Q.  What is the next thing that happened from the point in time

7   where you were standing by that sink tending your head?

8           MR. DOGRAMACI:  Actually, your Honor, may I close this

9   door?

10          THE COURT:  Yes.  Make sure it is not locked.

11  Q.  From the point in time where -- again, we're back at this

12  point in time you're at the kitchen sink.  Please tell us what

13  then happened.

14  A.  Well, as I was standing there tending to my head wound

15  trying to stop the bleeding, I heard walkie-talkies.  I went

16  over.  I saw the officers coming.  I am not worried about

17  nothing.  I didn't do nothing.  Tending to my head wound.  That

18  is when the defendant over there with the glasses --

19  Q.  What color shirt is the defendant you pointed at wearing?

20  A.  White shirt with the, I think, blue and black.  All of them

21  have blue and black ties, but right there.

22          THE COURT:  Where people are seated?

23          THE WITNESS:  The second one from the edge.  Right

24  there.

25              (Continued on next page)

1              MR. DOGRAMACI:  Let the record reflect that the

2    witness pointed at defendant Rodriguez.

3    Q.  What understanding did you have at this time of why the

4    police were there?

5    A.  I didn't know.  I didn't know.  All I know is when he came

6    in, he asked me did I live here.  He also had two other

7    officers that was with him.

8    Q.  How many officers entered the apartment?

9    A.  It was three, actually.

10   Q.  OK.

11   A.  He was one of the them.  He was the one who was talking to

12   me.  The other, the other, the other one sitting right there,

13   by counsel, he came in.  He took a position here.

14             MR. DOGRAMACI:  For the record, the witness pointed at

15   the part of the kitchen close to the fire escape.

16   Q.  What position did the other officers take?

17   A.  Officer Rodriguez stood here.  The other defendant stood

18   there, and another one stood on, like, my right side.

19   Q.  OK.  And where were you?  Can you just point one more time?

20   Where were you at this time?

21   A.  I was right here, at the sink.

22   Q.  So you had an officer on each side of you, is that correct?

23   A.  Yes.

24   Q.  And what did you and those officers say to one another, if

25   anything?

1    A.  Well, Officer Rodriguez asked me, did I live there.  I told

2    him, yes, I did, and in the process of me telling him I lived

3    there, I reached in my pocket and I presented my New York State

4    ID, nondriver's license.

5    Q.  What was your demeanor as you reached into your pocket to

6    get out your ID?

7    A.  He asked me to present ID.  I'm going to -- he's the

8    police.  I'm going to give him ID.

9    Q.  All right.  What happened after that?

10   A.  After that, he looked and he shook -- he was shaking his

11   head, like, OK, because he asked me did I live here, so I

12   provided proof that I live there.  After then he was like,

13   Well, you need to go to the hospital.  I was like, I'm not

14   going to the hospital.  He was like, Well, come with us.  I was

15   like:  I don't want to go with you.  No, I don't have to go

16   with you.  I know my rights.  I don't want to go with you.

17   Q.  OK.  Were there any other officers who appeared during this

18   incident?

19   A.  Who appeared?

20   Q.  Yes.

21   A.  As I was talking to him, I heard more, but my focus was

22   dealing with a conversation with him.

23   Q.  OK.

24   A.  So I don't know if they actually came in the apartment at

25   that time or not.

1   Q.  OK.  What do you remember happening next?

2   A.  At that time, when I told him that, no, I don't want to go

3   with him, he proceeded to, like --

4   Q.  I'm sorry.  If you could actually use your words --

5   A.  He tried to grab me.

6   Q.  -- for the court reporter --

7   A.  He attempted, like, to grab my arm.

8   Q.  Which of your arms?

9   A.  My left arm.

10  Q.  What were the other officers doing at that time?

11  A.  At this time, I was just focused on him.  I know once, when

12  he attempted to grab my arm, I did what I -- what I know --

13  what I was taught and was to smack his arms away, like:  Why

14  you touching me?  Don't touch me.

15  Q.  OK.  What happened after that?

16  A.  After that, this officer that was on this side attempted to

17  grab me here.

18  Q.  All right.  What did you do then?

19  A.  Knocked his arms, knocked his arms off of me too, and I

20  asked him:  Why are you touching me?  Why are you touching me?

21  I didn't do anything.

22  Q.  How exactly did you knock that officer's arms off of you?

23  A.  Well, I would have to -- it's like I was taught when

24  somebody go to grab you, it's like a swim move with your arms,

25  bring it and knock their hands down.

1    Q.  OK.

2           MR. DOGRAMACI:  Your Honor, I'm going to ask the

3    witness to demonstrate on me what he just called a swim move.

4    Can he come in front of the jury?  Is that all right?

5           THE COURT:  All right.

6           MR. DOGRAMACI:  If you could just show for the jury,

7    I'm going to put my hands on you, what it is you're saying you

8    did.

9           THE COURT:  Just don't get too close to the jury.  OK?

10          MR. DOGRAMACI:  I'm sorry.

11          Go ahead.

12          (Plaintiff demonstrated movement)

13          MR. DOGRAMACI:  You can sit back down.  Thank you.

14   Q.  Did you do anything else?

15   A.  No.

16   Q.  All right.  What happened after that?

17          THE COURT:  How do you want the record to reflect that

18   movement?

19          MR. DOGRAMACI:  Let the record reflect that I put my

20   hands on the forearm, left arm left forearm of Mr. Neal, and he

21   did a sort of circular motion that put my hands underneath his

22   arm, approximately.

23          THE COURT:  All right.

24          MR. DOGRAMACI:  That's my best attempt to put it into

25   words.

1   Q.  I'm sorry.  What, if anything, else did you do besides

2   that?

3   A.  Nothing.

4   Q.  OK.  What do you remember happening after that?

5   A.  Well, after he tried to grab me on this arm, I did the

6   same -- it was basically the same thing, but higher, and I

7   pushed his arms away.

8          THE COURT:  You're pushing his arm off, like, you're

9   not just sliding it under.  You're pushing his arm away.

10          THE WITNESS:  Yeah.  I smacked his arms, like smacked

11  his hands off me, like:  Get off me.  Why are you grabbing me?

12  Q.  Again, I saw you move your hands in a circle just now?

13  A.  Yeah, the same.  The same, but just higher.

14  Q.  What do you remember happening after that?

15  A.  After that, that's when this officer got a hold of me and

16  was pull -- actually pulled me.  When he pulled me --

17  Q.  Sorry.  Which officer?  You said this officer.  Just use a

18  couple words to say who you're talking about.

19  A.  Rodriguez.

20  Q.  OK.

21          Sorry.  So he did what?

22  A.  He, like he pulled me like to gain control of me, and

23  that -- at this point, while he's pulling me, the officer that

24  was on this side, where I smacked his hands away, he apply, he

25  tried, he apply a body hold, like a half body hold right here

1    on my waist.

2    Q.   Which part of his body made contact with your waist?

3    A.   It was like upper shoulder area, like how you see in

4    football tackles.

5    Q.   All right.  Yes.

6    A.   Like that.  And at that time, we're over here.  And when he

7    applied the half body hold, right here, it caused me to hit the

8    other officer that was pulling me, and we hit that door.

9            MR. DOGRAMACI:  The witness --

10           MS. DeCASTRO:  We can't hear him.

11           THE COURT:  Would you say that again, Mr. Neal,

12   please.

13           THE WITNESS:  I said when he applied the half body

14   hold, he hit me with the other officer pulling, and we hit the

15   door, the big girls' door.

16           MR. DOGRAMACI:  For the record, the witness was

17   pointing at the end of the first corridor, closer to the

18   kitchen, as he gave that bit of testimony.

19   Q.   And then you went into the door which is the door to the

20   big girls' room?

21   A.   Yes.

22   Q.   About how many police officers are around you at that

23   moment, when you went into that door?

24   A.   Well, that's when I seen other officers coming in here.

25   They were coming in here.

1          MR. DOGRAMACI:  And the witness just pointed to the

2    corridor area right past the front door.

3    Q.  OK.  Can you put a number on approximately how many

4    officers arrived on the scene?

5    A.  I would have to say it was probably anywhere from two to

6    three to four more.

7    Q.  So the total number?

8    A.  I would have to say all together in the whole house at that

9    time might have been like six, six, seven officers.

10   Q.  Was there anyone else within eye shot here?

11   A.  Well, after the dog came out, I didn't -- right offhand, I

12   didn't see anybody.

13   Q.  All right.  One thing at a time.  Let's stay at the moment

14   where you went into the door to the girls' room.  Up to this

15   time, had you seen anyone else anywhere around you other than

16   the police officers?

17   A.  No.

18   Q.  And to your knowledge, was anyone else in the apartment?

19   A.  No.

20   Q.  OK.  Now, what happened after the tackle and you went into

21   the door to the girls' room?

22   A.  My dog came out.

23   Q.  What kind of dog did you have?

24   A.  A pit bull, blue nose.

25   Q.  Was it a he or she?

1    A.   She.

2    Q.   What was her name?

3    A.   Loyalty.

4    Q.   All right.  Where is Loyalty now?

5    A.   I don't know.  I don't know where she -- because of my, me

6    being locked up, I don't know what happened to my dog.

7    Q.   Well, what happened to her while you were incarcerated?

8    A.   I don't know.

9            MS. DeCASTRO:  Your Honor, objection.

10           THE COURT:  Yes.

11           MR. DOGRAMACI:  I'll move on.

12           THE COURT:  Sustained.

13           MR. DOGRAMACI:  I'll move on.

14   Q.   Had you known that Loyalty was in that room?

15   A.   No.

16   Q.   All right.  Well, what happened after she came out of that

17   room?

18   A.   Well, she, she, she charged.

19   Q.   Who did she charge?

20   A.   Well, Officer Rodriguez.

21   Q.   OK.  And then what happened?

22   A.   She snatched him by the foot and was shaking his foot.  And

23   in the process of her shaking his foot, he was -- he was up

24   here with her shaking his foot on the sink.  I was standing

25   here.

1   Q.  OK.

2   A.  Right at --

3          MR. DOGRAMACI:  I want the court reporter to be able

4   to get this.  Hold your thought.

5          The witness just pointed to the corner of the diagram,

6   which has the, where the washer meets the sink when referring

7   to where Rodriguez and the dog were, and then pointed to the

8   other end of the sink when referring to where he was at this

9   time.

10         MS. DeCASTRO:  This exhibit isn't coming into

11  evidence.  I think for the record to be clear, we should

12  specify in the apartment, not on the diagram.

13         THE COURT:  I think that's a good point.

14         MR. DOGRAMACI:  OK.

15  Q.  Please continue from where you just left off.

16  A.  Well, she had his foot here.  At that time, I was standing

17  there.  Kaiser was there, and he drew his service revolver.

18  Q.  Who is Kaiser?

19  A.  Him, sitting right there.

20  Q.  OK.

21         MR. DOGRAMACI:  Let the record reflect the witness

22  pointed to defendant Kaiser.

23  Q.  Where was defendant Kaiser at this time?

24  A.  He was standing right here.

25  Q.  By the kitchen window?

1   A.  Yes, like --

2   Q.  OK.

3   A.  -- in between, like --

4   Q.  What did you see Kaiser do?

5   A.  After the dog -- after she was shaking Rodriguez's foot, he

6   drew his service revolver and he pointed it at the dog, and he

7   was like, Get the dog, get the dog, get the dog, like he was

8   hysterical; I'm going to shoot it, I'm going to shoot it.  I

9   told him, excuse my language, don't shoot my F'ing dog.

10  Q.  The tone of your voice doesn't go on the paper the court

11  reporter is making.  Would you describe in words the pitch of

12  Kaiser's voice when he said that?

13  A.  It's like he was --

14          THE COURT:  You can sit back down.

15  A.  It's like he was hysterical, like he was scared.

16  Q.  OK.  Then what happened?

17  A.  Then that's when Shaquana Gillard, Audrey's oldest

18  daughter, came in and grabbed my dog.

19  Q.  Where did Shaquana come from?

20  A.  That I -- I can't answer.

21  Q.  OK.  What happened after that?

22  A.  After that, she was taking the dog away, and I was actually

23  giving her a piece of my mind, like:  You fat -- you better

24  not -- get off my dog, get off my dog, get off my dog.  And she

25  took Loyalty through this room right here, which is the boys'

room.  She took her in there, closed the door, and that's the

last I seen of her.

Q.  OK.  Well, then what happened?

A.  After that, that's when the altercation came again, and

they started -- they started grabbing on me again.  And I was

like:  Get off me.  Why you all touching me?  Why you all

touching me?  And then next thing I know, they let go and I got

zapped.

Q.  And what happened when you were zapped with the Taser?

A.  Well, my whole body just froze.  My legs froze.  I was like

uh-uh-uh.

Q.  About how long did that last?

A.  Like for -- it was like BZZZZZZ, BZZZ, BZZZ, BZZZ, BZZZZZZ.

Q.  All right.  How many times did you feel yourself zapped?

A.  At least, at least four or five times.

Q.  OK.  And how much time had passed in between each of those

instances?

A.  Well, like I said, the first one and the last one were

longer than the ones in between.

Q.  What were the other police officers doing at this time?

A.  Well, when I got, when I got the initial hit, it was like

somebody -- I heard somebody yell, Hit him again, hit him

again.  And then after that, it's like I heard people laughing

at me, man.  Like people literally was sitting there laughing,

like it was funny.

1  Q.  What did you say, if anything, at this time?

2  A.  I couldn't say nothing.  I know when they hit me, I was

3  like, Oh, shh.

4  Q.  Why could you not say anything?

5  A.  It hurt.

6  Q.  What effect did it have on your upper body, the zapping?

7  A.  When it hit me, it's like my back just started hurting all

8  over again.

9  Q.  And what effect -- I want to ask you about your entire

10  body.  What effect did it have?  If you could just tell me,

11  what effect did it have on your entire body?

12  A.  Man, it's like when you hit that funny -- it's not funny

13  when you hit it, but if you ever hit your funny bone, they say

14  oh, it's a funny bone.  Ain't nothing funny about it.  But it

15  was like a thousand times worse than that being hit with the

16  Taser.

17  Q.  How did your muscles respond to the shock?

18  A.  They locked.  My muscles actually, my leg muscles --

19  everything just actually locked.  I was, like, stiff.

20  Q.  Did you have an understandings of what the officers were

21  laughing at?

22  A.  Me.

23            MS. DeCASTRO:  Objection.

24            THE COURT:  Overruled.  I'll let it go.

25            It's just your perception.  You obviously don't know

1   what was in other people's minds.

2           Go ahead.

3   A.  Me.  Like they thought -- it's like they thought it was

4   funny the way my body just -- you know what I mean?

5           THE COURT:  That's how it appeared to you?

6           THE WITNESS:  Yes, that's how it appeared to me,

7   like --

8   BY MR. DOGRAMACI:

9   Q.  And what effect did that laughter have on you?

10  A.  I felt like -- horrible, like disgusted, hurt, like these

11  are officers.  What is -- what's funny about it?

12  Q.  Was there a difference in the feeling between later

13  instances of the shock and earlier instances?

14  A.  I can't -- no.  I'm sorry.

15  Q.  Can you say at least how many times you were shocked?

16  A.  At least anywhere between four and six times.

17  Q.  Can you say at most how many times you were shocked?

18  A.  I don't think it was no more than six.

19  Q.  And can you approximate, if you're able, how much time

20  passed between the first and the last?

21  A.  I would have to say seconds, 10 seconds, in between 10 to

22  15 seconds.

23  Q.  All right.  And then what do you recall happening

24  immediately after that?

25  A.  Well, after, after, after they hit me with the Taser, here,

Ia9Wnea5                    Neal - Direct

1    they got on me again.  At this time, somebody -- I don't know

2    who, somebody hit me in my stomach.  I was punched in my

3    stomach.  That took the wind out of me, made me -- I fell back

4    into this door again, and we fell in this room on this bed.

5    Q.  Which room did you fall into?

6    A.  The big girls' room.

7    Q.  OK.  About how many of you fell onto that bed?

8    A.  Well, I recall one, two, three -- at least four.

9    Q.  And what were you doing immediately after the last Taser

10   shock?

11   A.  Well, I wasn't doing anything.  I got officers on me.  I

12   couldn't do anything.

13   Q.  What did you try to do, if anything?

14   A.  I didn't try to do anything.  I couldn't.

15   Q.  Why couldn't you do anything?

16   A.  You get hit with a Taser, you'll see why you couldn't do

17   anything.  It's like all the fighting, getting punched in the

18   stomach and -- no, you can't do anything.  You're helpless.

19   You got people grabbing you here, people hitting you, people --

20   you can't do anything.

21   Q.  What was it that made you helpless?

22   A.  That Taser.

23            MS. DeCASTRO:  Objection.

24            THE COURT:  Overruled.

25   A.  The Taser.

Ia9Wnea5                    Neal - Direct

1    Q.  And how is it that the Taser did that?

2    A.  It took -- it took, like, everything -- it made my whole

3    body just stiff, where I couldn't do anything.  I couldn't

4    respond.  I couldn't -- it just locked my whole body up, froze

5    my whole body.

6    Q.  OK.  So then with you and the officers on the bed in the

7    big girls' room, what were the officers doing at that time?

8    A.  Well, when I fell on the bed, I fell like this.

9    Q.  OK.  I'm going to put that in words.  Where was your left

10   arm?

11   A.  My left arm was under my body.

12   Q.  And were you lying facedown?

13   A.  Yes, I was laying facedown on the bed with my left arm

14   under my body.  I had an officer holding my right leg.  I had

15   an officer holding my left leg.  I had an officer on my back

16   who had my right arm.  And then --

17   Q.  Where did that officer have your right arm?

18   A.  He had my arm like this.

19   Q.  He had it with your hand in the small of your back?

20   A.  No.  He had actually up with -- twisted like this.

21   Q.  He had it twisted so your hand was in the middle of your

22   back?

23   A.  Yes.

24   Q.  All right.  What else was happening at that moment?

25   A.  At this time, that's when I felt whap, whap, whap.

1  Q.  What was it that you felt?

2  A.  Hits, like somebody hitting me with an object.

3  Q.  On which part of your body?

4  A.  Like my upper back, left part of my shoulder.

5  Q.  OK.  How hard were those blows?

6  A.  It was pretty hard.  It caused my shoulder to be sore for

7  the next two weeks.

8  Q.  All right.  About how many times were you struck?

9  A.  About four or five.

10  Q.  All right.  What did you do, if anything?

11  A.  Well, in the process of the first, the first hit, I'm

12  turning around to see who, who, who is hitting me.  And when I

13  turned around and I seen who was hitting me, it was defendant

14  Wilson.  So I looked at him, and I told him -- excuse my

15  language -- Wilson, you want to fucking stop hitting me.

16  Q.  How confident are you that it was Wilson?

17  A.  I'm 100 percent.

18  Q.  And how well did you know Wilson before this night?

19  A.  I knew him --

20          MS. DeCASTRO:  Objection.

21          THE COURT:  Based on your prior interactions with him,

22  did you feel confident that he was the person you thought him

23  to be?

24          THE WITNESS:  I know he was, your Honor.

25  BY MR. DOGRAMACI:

Ia9Wnea5                    Neal - Direct

1   Q.  OK.  When you looked at him and identified him, what did he

2   do?

3   A.  He -- first of all, he was shocked.  He was shocked, like,

4   Oh.

5   Q.  Sorry.  Why was he -- what was he shocked at?

6           MS. DeCASTRO:  Objection.

7   A.  It's like he was shocked that I knew his name.

8   Q.  How did he appear?

9           THE COURT:  I'm going to overrule the objection.

10          Again, this is your impression of his reaction.

11  Again, you don't know what another person's thinking, but

12  that's your perception.  I'm going to allow it with that

13  instruction.

14  BY MR. DOGRAMACI:

15  Q.  Your impression of that is Mr. Wilson was shocked by what?

16  A.  That I knew him, like I called his name.

17  Q.  And what did you say to him?  What was it that you said to

18  him?

19          MS. DeCASTRO:  Objection.

20          THE COURT:  No.  I'll allow what he said.

21          Go ahead.

22  A.  I told him, Wilson, you want to f'ing stop hitting me.

23  Q.  All right.  Tell us what happened after that.

24  A.  After that, he stopped.  He took a metal baton he had, and

25  it was like each time he pushed it, it would click.  So he

1   pushed it right back down, and it's like click, click, click,

2   click.

3   Q.  What color was this baton?

4   A.  It was either dark blue or black.

5   Q.  OK.  And about how long was it before he clicked it into a

6   smaller shape?

7   A.  Well, when he opened it, it looked like it was about --

8   what's that, a foot and a half?

9   Q.  All right.  And then what did it sound like when he

10  shortened it?

11  A.  It was like clicks.

12          MS. DeCASTRO:  Objection.

13          THE COURT:  Excuse me?

14          MS. DeCASTRO:  Your Honor, objection.  Asked and

15  answered a couple times.

16          THE COURT:  Overruled.

17  BY MR. DOGRAMACI:

18  Q.  Would you answer the question?

19  A.  It was like click, click, click, click.

20  Q.  All right.

21  A.  So each stage that he pushed it in, it was clicking.

22  Q.  And what did he do then?

23  A.  He holstered it back.

24  Q.  All right.  Tell us what happened right after that, please.

25  A.  After that, at this point that it's going on, they're like:

1    Give me your arm, give me your arm.  And I'm like:  How can I

2    give you me arm when he's on my back?  There's no way I can

3    give you my arm if I got an officer on my back and my arm is

4    under me and I got officers all holding me.  I can't give you

5    my arm, I'm telling them.  So officers on my back eased up, and

6    each time I --

7    Q.  Do you remember the words that you said to the officers?

8    What was it that you said to them?

9    A.  Well, I actually said that --

10             MS. DeCASTRO:  Objection.

11             THE COURT:  Overruled.

12   A.  I actually said, How the fuck can I give you my arm with

13   this MF on my back?

14   Q.  All right. what was the response to that?

15   A.  The response was that's when they eased up off of my back

16   and let me -- as I was giving him my arm, he slid his whole arm

17   down my arm, making sure that I wasn't going to try anything.

18   That's my perception of the way he was grabbing, each stage my

19   arm came out, he would grab it until he had it.  I was

20   handcuffed and stood up and walked downstairs.

21   Q.  Where were your wrists when you were handcuffed?  Where

22   were your wrists when you were handcuffed?

23   A.  Behind me.

24   Q.  All right.  And where were the other officers when the

25   handcuffs were placed on you?

1    A.  Well, they -- after, after he had secured both, both hands,

2    it's like they spread out.  I was stood up and walked out.

3    Q.  All right.  What happened after you walked out?

4    A.  After I walked out, I was taken downstairs, and as I was

5    standing, they stood me right in front of my stoop for a

6    minute, off to the side, when you come down the steps.  And

7    while I was standing there, me and Officer Rodriguez, he asked

8    me, What was all of that about?

9        I said, Listen, man, I'm sorry my dog bit you, you know

10   what I mean, bit your shoe.

11       And he was like, Don't worry about it.  And he was like,

12   What was all that about?

13       And I said:  All of what?  You all came in there putting

14   your hands on me.

15       He said, Well, you were getting placed under arrest.

16       I said:  But you all didn't tell me nothing.  You all just

17   came in, just putting your hands on me.  You didn't tell me

18   anything.  You didn't have a conversation with me.  You didn't

19   tell me, Listen, you're being placed under arrest, come with

20   us.  You just came in there trying to put your hands on me.

21   No.  I know my rights.

22   Q.  Were you then taken somewhere?

23   A.  Yes, I was taken -- I was put -- I vaguely remember I was

24   either a van or the ambulance, but I know I was taken to the

25   hospital.

1  Q.  And what happened at the hospital?

2  A.  When I was in the hospital, I was so agitated that I was

3  being arrested, I just wanted to get out.  I just wanted to get

4  out, because going through central booking is a long time, and

5  I knew I hadn't done anything, anything wrong.

6  Q.  What did you believe would have happened if you had stayed

7  longer at the hospital?

8  A.  I'd've stayed --

9        MS. DeCASTRO:  Objection.

10        THE COURT:  Sustained.

11  Q.  Was there a reason why you did not want to stay longer at

12  the hospital?

13  A.  Yes.  I didn't want --

14  Q.  What was the reason?

15  A.  I knew the longer I stayed in the hospital, the longer I

16  would sit in central booking.  I didn't want to sit in central

17  booking.

18  Q.  Why did you believe you'd spend more time in central

19  booking if you stayed longer at the hospital?

20  A.  Because --

21        MS. DeCASTRO:  Objection.

22        THE COURT:  Sustained.

23  Q.  Do you have a reason why you believed you'd spend more time

24  in central booking?

25        THE COURT:  Sustained.  I don't know why this is

1   relevant.

2           MR. DOGRAMACI:  Could we have a brief sidebar?

3           THE COURT:  Sure.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  No. 1, how much longer do you have on

3    direct?  I may just take a break now if you have a while.  If

4    you don't, we can go through until you're finished.  Ten

5    minutes or half an hour?

6          MR. DOGRAMACI:  I'm going to say 15 to 20 minutes.

7          THE COURT:  OK.  Why don't we take a break now.  I'll

8    let the jury take a break, and I'll hear you out on the

9    objection.

10         (In open court)

11         THE COURT:  Ladies and gentlemen, it's time for our

12   afternoon break.  Just remember to keep an open mind and don't

13   discuss the case.  We'll be back.  Thank you.

14         (Jury not present)

15         THE COURT:  Everyone can be seated.  I just didn't

16   want to make them sit.

17         What is the relevance to the excessive force claim of

18   how long he thought he'd be in central booking?

19         MR. DOGRAMACI:  Because defendants, and they spoke

20   about this during their opening statement, they're going to

21   make a point about how when he went to the hospital, he didn't

22   want to be seen by the doctors.  And the hospital records from

23   that visit to the emergency room make no mention of any

24   physical effect on the plaintiff from the Taser or the baton or

25   anything like that.  All that the hospital records say is he

1    had a cut on his head.  He refused treatment.  We told him

2    you're leaving against our advice, but he left against our

3    advice.  We told him keep that wound bandaged, and he left.

4              THE COURT:  You want to get out why he didn't want

5    treatment.

6              MR. DOGRAMACI:  We want to get out why there's no

7    record from that time in the hospital of the Taser marks on him

8    being examined or the injury of the baton on him being spoken

9    about.  It's because in his mind, he didn't want to be there;

10   he just wanted to get out.  He was afraid he'd spend more time

11   in central booking if he didn't just move out.

12             THE COURT:  Do you want to respond?

13             MS. DeCASTRO:  Yes, your Honor.

14             That is actually completely irrelevant to whether the

15   force was used and what force was used.

16             As far as his medical treatment, he was seen at the

17   hospital for 30 minutes, so it's going to lead the jury to

18   believe that -- I don't know where this is going, but the

19   central booking question is really irrelevant to why he refused

20   medical treatment.  If he wants to explain that, then maybe

21   that would be the thing that he could get out, not -- going

22   into the central booking is also opening the door to his prior

23   arrest and prior time that he spent at central booking.

24             THE COURT:  Yes.  I don't want the jury speculating

25   about how much time he was going to spend incarcerated or not.

1    Why can't you target the question more to why he did or did not

2    want treatment at the hospital?

3              MR. DOGRAMACI:  Your Honor, I can even do it -- yes,

4    I'll do that.

5              THE COURT:  OK.

6              MR. DOGRAMACI:  And then depending what happens on

7    cross, if rebuttal's appropriate.

8              THE COURT:  OK.  We'll do that.  Why don't we take ten

9    minutes for a break, and we'll be back at quarter to.

10             MR. DOGRAMACI:  Thank you.

11             (Recess)

12             THE COURT:  All right.  We're going to bring the jury

13   in.  You can come back up here, Mr. Neal.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  All right.  Everyone can be seated.

3          You may proceed.

4    BY MR. DOGRAMACI:

5    Q.  Mr. Neal, what hospital were you taken to right after you

6    were arrested?  What was the name of the hospital?

7    A.  Lincoln Hospital.

8    Q.  All right.  And what were you treated for at the hospital?

9    A.  I was treated for a head wound, two-inch gash, head wound I

10   had on my head.

11   Q.  Did you ever receive anywhere -- did you anywhere ever

12   receive any kind of attention for the injuries from the Taser

13   or from the baton?

14   A.  Not in the hospital.

15   Q.  Why not in the hospital?

16   A.  Because I wanted to get out, out of there as soon as

17   possible so I could get in front of the judge and be released.

18   And --

19   Q.  OK.  And in fact, what happened after you left the

20   hospital?

21   A.  Well, after I was processed, I got ROR'd.  The judge ROR'd

22   me, which means released on my own recognizance.

23   Q.  OK.  Now, you said you did not get treatment for the Taser

24   or baton injuries at the hospital, but is there somewhere else

25   where you got some attention?

1   A.  Yes.  My son that passed, his mother, she is a live-in --

2   well, she was at the time a live-in home health aide.

3   Q.  And what's her name?

4   A.  Her name is Jacqueline Cintron.

5   Q.  When did you see Jacqueline?

6   A.  I seen her the very next day.

7   Q.  And what happened at that time?

8   A.  Well, at that time -- well, I was in jail that night, going

9   through the system, my oldest child, Quadelia Sher Nostrand,

10  and Kianna Barnes found out --

11          MS. DeCASTRO:  Objection, your Honor.  Could we take a

12  quick sidebar?

13          THE COURT:  OK.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. DeCASTRO:  The reason for the objection is because

3    I believe plaintiff is going to start talking about how he was

4    robbed by his stepdaughter while he was in jail, and if that is

5    the case, it opens the door to that.  We actually have a 911

6    Sprint report that indicates that he went to the home the next

7    day, even though there was an order of protection that was

8    valid.  We've agreed with plaintiff's counsel not to talk about

9    that, but if he opens the door, that's something that's going

10   to be at issue.

11         MR. DOGRAMACI:  All of this is taking me by surprise.

12   I mean, I thought he was just going to talk about the injuries

13   that were attended to by Jacqueline.

14         The one thing this does make me think of is, I am

15   going to ask him how come he didn't take any photographs of his

16   back, and I believe his answer is going to be he didn't have

17   his phone.  His phone was left in that apartment, and he never

18   got it back.  I don't know if this is something that defense

19   counsel's talking about or not.  I don't think that would be

20   opening the door to anything.  That would just be a statement

21   of why he didn't take photos.

22         MS. DeCASTRO:  Well, he, in fact, went back to that

23   apartment even though there was an order of protection.

24         THE COURT:  To get the phone?

25         MS. DeCASTRO:  I don't know why he went back.  There

1    was a 911 call stating:  My ex-boyfriend is here.  There's an

2    order of protection my daughter has against him.

3            MR. DOGRAMACI:  Apparently we're talking about the

4    night of the next day.  The night after Thanksgiving, he went

5    to get his phone.  I actually don't even really know what

6    happened, because I never even asked him because it has nothing

7    to do with this case.

8            THE COURT:  OK.  If it has nothing to do with this

9    case, let's not go there.

10           MR. DOGRAMACI:  Yes, but I will ask him, Why don't you

11   have photographs?  I will ask him that.  It's not going to open

12   the door to anything.

13           MS. DeCASTRO:  What I would say to that is I think he

14   had a different phone.  We know that.  I think opening the door

15   to something like this is --

16           THE COURT:  How does that open the door?  Because he

17   did have his phone or he had a different phone?

18           MS. DeCASTRO:  Yes, he did have a different phone, and

19   a lot of this is going to go into him talking about the fact

20   that he thinks he was robbed by his family at that location,

21   and he's going to talk about how he was left without any money,

22   without any clothing.  It's highly prejudicial to defendants

23   and irrelevant, really.  It has nothing to do with what the

24   officers did that night.

25           MR. DOGRAMACI:  I have no expectation of the

1  testimony.

2          THE COURT:  OK.  You can limit it to whether or not if

3  you think his answer is that he didn't have his phone on him,

4  but I would stay away from this stuff.  It sounds like it's

5  going to open the door, and it sounds like you agree.

6          MR. DOGRAMACI:  I know.  Yes.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. DOGRAMACI:

3    Q.  Mr. Neal, I want to pick up right where we left off.  You

4    were telling us about what happened when you were with

5    Jacqueline.

6    A.  Yeah, when I got out --

7              THE COURT:  I thought you were going to ask a

8    different question pursuant to our discussion.

9              Is there a reason you didn't take photographs?

10             MR. DOGRAMACI:  Your Honor, we didn't come to that

11   yet.  Could we come right back to the sidebar?

12             THE COURT:  All right, but I really don't want to keep

13   the jury waiting anymore.

14             MR. DOGRAMACI:  I know.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  You just said that all that other stuff

3    had nothing to do with this case.

4          MR. DOGRAMACI:  That stuff had nothing to do with what

5    I was asking him about.  All this stuff that defense counsel

6    mentioned to you was nowhere in my head, because that's not

7    even what I was asking him about.  He went to this woman

8    Jacqueline's apartment.  She looked at him.  She treated his

9    wounds.  She mentioned to him there are these marks on your

10   back.

11         THE COURT:  What she says obviously is hearsay.

12         MR. DOGRAMACI:  OK, but he saw it.  Thanks to her, he

13   saw the marks on his back and the Taser prongs in his

14   sweatshirt.  He's just going to talk about that, and then I

15   might ask him why didn't you take photographs of your back, and

16   he'll say I didn't have my phone.

17         Honestly, none of this has anything to do with what we

18   came to the sidebar before.  I don't really know why we came

19   with the sidebar, but that's why I continued where I left off,

20   because I don't think it has anything -- none of this has

21   anything to do his going back to the home or anything like

22   that.

23         THE COURT:  That's not the discussion we just had.

24         Go ahead.

25         MS. DeCASTRO:  What my understanding was, previous to

1    my objecting, was that he was going to go into -- he mentioned

2    Audrey Barnes.  He went away from the home attendant to talk

3    about what he did the next day, not even with the home

4    attendant, and that goes into the fact that he went back to the

5    apartment the next day, found out that his stuff was stolen,

6    and --

7              THE COURT:  We'll cut him off if he talks about

8    finding out his stuff was stolen.

9              MS. DeCASTRO:  Yes.

10             THE COURT:  It sounds like everybody agrees it's not

11   relevant.

12             MR. DOGRAMACI:  Your Honor, to be clear, the last

13   sidebar I think we were two ships passing in the night.  I just

14   don't know why any of this stuff about him going back to the

15   old apartment came up at all.  It's not what I was trying to

16   ask him about at any point in this trial.

17             THE COURT:  OK.  Got it.

18             (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          MR. DOGRAMACI:  May I proceed with the questioning?

3          THE COURT:  Yes.

4   BY MR. DOGRAMACI:

5   Q.  What sort of treatment did you get for your injuries from

6   Jacqueline?

7   A.  Well, when she seen, when she seen my head was wrapped, she

8   took aloe vera pills.  She cleaned it, first of all, with

9   saline water.  Then she took an aloe, an actual aloe pill.  She

10  used a scissor and she cut it open, and she put the aloe pill

11  directly in the wound.  She squeezed it.

12  Q.  OK.  So she treated that, where Kianna had cut you, right?

13  A.  Yeah, where she hit me with the bottle.

14  Q.  What about where you'd been hit with the baton; how about

15  that?

16  A.  Well, she actually gave me some Tylenol 3s.  She made me

17  take some along with the aloe pills and then she gave me some,

18  like, for the rest of the week.

19  Q.  Did you see anything on your body at this time relating to

20  the Taser stuns you'd received?

21  A.  Well, not at this time.  I seen it when I had gotten home,

22  when I got ROR'd.  After I had got ROR'd and I went in the

23  house, that's when I seen it.  I was actually told by my --

24          THE COURT:  No, don't tell us what anyone else told

25  you.  OK?

1          THE WITNESS:  No.  I actually seen the wires on my

2     shirt, you know.  I seen them.

3     BY MR. DOGRAMACI:

4     Q.  OK.  Where were you at this moment that you're telling us

5     about now?

6     A.  I was down the block from where I used to stay.  I used to

7     stay at 156 and Union with Audrey, and I used to stay -- I was

8     staying down the block at 151.

9     Q.  About how long is this now after the whole arrest incident?

10    A.  Excuse me?

11    Q.  I just want to put us at a moment in time.  How much time

12    has passed since -- you're telling us about the thing you're

13    telling us about now.  About how long was this after your

14    arrest?

15    A.  Oh.  I'd say I got out about five in the morning, about

16    four or five in the morning.

17    Q.  OK.  All right.  And you saw something on yourself related

18    to the Taser stuns?

19    A.  I seen -- it's hard to explain, but it looks like -- let me

20    see.  You know a miniature, like a little, it's like a little

21    pitchfork, but the middle one is in the middle, and it has a

22    clamp here, a clamp here, a clamp, like clamps there, but

23    they're facing like that, and then it has a little thing in the

24    middle of it.  And then attached to it is a long copper, like a

25    copper -- a piece of copper.

1    Q.  OK.  About how long was that piece of copper attached to

2    this thing?

3    A.  I have to say about two feet.  That's two feet?

4    Q.  And where is it that you found this wire?

5    A.  It was on the, on the -- attached on the back of my hoodie.

6    Q.  OK.  And how about on your body; what did you see, if

7    anything?

8    A.  I seen, after I took my shirt off, took a hot shower from

9    being in the bullpen, I looked, after I was told and I looked

10   at my back, and I seen little black holes on my back, like --

11   Q.  And you say they were black.  Could you be any more precise

12   about what exactly these things looked like?

13   A.  Well, looked like, something like -- you know how you could

14   pinch yourself and you see a mark?  Well, it was like a pinch

15   mark, but in the middle of it, it was like a black -- like

16   something burnt.

17   Q.  How many of these marks did you see on yourself?

18   A.  I had approximately two, four, six -- about six of them.

19   Q.  And how were you able to see this on your back?

20   A.  Well, Tamba, my girlfriend at the time, she showed me

21   through a mirror.  She's like, Look at your back.  And I looked

22   through the mirror that was on the dresser, and she had one of

23   them little girlie mirrors.  She turned it and she was letting

24   me see it that way.

25   Q.  OK.  Now let me ask you about your shoulder.  For about how

1    long did you continue to feel the effect of the baton wounds?

2    A.   I would have to say anywhere from a little -- two to three

3    weeks.

4    Q.   And what did it feel like during that time?

5    A.   Well, it was stiff, limited motion.

6    Q.   Limited motion of what?

7    A.   Raising.

8    Q.   Raising, meaning what?

9    A.   Every time I moved it, I was in pain.

10   Q.   How high could you raise your arms during those two weeks?

11   A.   Well, I have to say like here.  I couldn't go like this,

12   above my head.  It would just come here, and then I'd be in

13   pain, so I would just put it down, try to do everything with my

14   right hand.

15   Q.   After those two weeks had passed, how was that part of your

16   body?

17   A.   It got better.

18   Q.   For about how long did you feel the effects of the Taser

19   after you were tased?

20   A.   That was about -- I'd have to say anywhere from a month to

21   month and a half.

22   Q.   And what did that feel like?

23   A.   That -- it's like every step I took I was in pain.  Every

24   time I had to go somewhere, I was in pain.  Every time I bent

25   down, I was in pain.

1    Q.  Where was that pain?

2    A.  In my lower back.

3    Q.  How do you know that was because of the Taser?

4    A.  Because it -- it re-aggravated an injury that I had prior.

5    Q.  Could you just tell us what you mean by that?

6    A.  It re-aggravated -- I always have back pain, like lower

7    back pain.  But normally, my back doesn't act up.  It acts up

8    when the weather change -- that's how I know the weather's

9    changing, because of my back and my knee.  But that, it just

10   hurt.  Like it hurts for a day or two and then go away, but

11   this was prolonged term.  Plus when I was hit with the Taser, I

12   immediately -- my back just -- like pain.  I was in total pain

13   when I got hit with that thing.  And ever since then, my back

14   is hurting, seriously hurting.

15   Q.  Let me ask you to go back to that.  You talked about what

16   you felt right after you were hit with the Taser, and you've

17   also told us about what you were capable of doing after all the

18   Taser stuns.  After the very first Taser stun, what was your

19   body able to do?

20   A.  Well, I was in pain.  I -- I was -- it was just total pain

21   and aggravation.  It's like I can't even describe it.  How you

22   have a migraine headache, and there's nothing you can do about

23   it.  You try to take pills and your head is still killing you,

24   just imagine that in your back.

25   Q.  I want to go back now.  There were between four and six,

you testified, stuns from the Taser, and I want to distinguish

between those.  Take the first one.  Right after that first

one, what was your body capable of doing?

A.  Nothing.  It was just shot.  My muscles locked on me.

   (Continued on next page)

IA96NEA4                    Neal - direct

BY MR. DOGRAMACI:

Q.   Let me ask you about about the affect on your mind now.

     Separate from the physical pain, have you been affected in any other way?

A.   That -- that -- I don't really think about it because it just takes me to a place when you are helpless.  It is like a helpless child.  And you seen somebody just beat on a helpless child and you can't do anything.  It's like you are feeling helpless, worthless.  Like, I cannot even defend myself.  What can I do?  Just don't kill me.  Do what you got to do.

Q.   Has that feeling interfered in any way with your regular life?

A.   Put it like this:  My job now you might as well call me the officer in my store.  Because if I see somebody doing something, I am telling.  I don't even -- like, it is not my job, but I help in other ways just because I don't ever want to be put in that predicament again.

Q.   In the years that have passed since then, how has the affect on you changed?

A.   I try to stay, like, clear.  I don't want anything -- if I don't have to deal with the police, I don't want any dealings with them.  None.

Q.   I want to ask you about things like sleeping.

          How, if at all, has those sorts of activities of yours been affected?

1            MS. DECASTRO:  Objection, your Honor.

2            THE COURT:  Overruled.

3            You can answer.

4   A.  I don't sleep right.  I am a light sleeper.  A siren,

5   anything, I am up looking up.

6   Q.  Why is that?

7   A.  It's like I catch a flashback like they coming to get me or

8   something.

9   Q.  I want to ask you to compare -- we're turning now to the

10  physical pain that you felt.  Is there a comparison that can be

11  made between the pain from the baton on from the taser?  How

12  would you compare that?

13  A.  Put it like this:  I will take the baton pain over the

14  taser pain any day.

15  Q.  Why is that?

16  A.  Because -- that -- to feel helpless like that, I wouldn't

17  want that on anybody.  It's just -- it's undescribable.  If you

18  never got tased, you don't ever want that.

19            MR. DOGRAMACI:  Just one moment, your Honor.

20            Your Honor, no further questions.

21            THE COURT:  Cross-examination.

22  CROSS-EXAMINATION

23  BY MS. DECASTRO:

24  Q.  Good afternoon, Mr. Neal.

25  A.  How you doing?

1    Q.  On the date of the incident, November 23rd of 2012, you

2    were living with the mother of your child, Audrey Barnes;

3    right?

4    A.  Yes.

5    Q.  You were living with her and her nine children at 805 East

6    156th Street; right?

7    A.  Yes.

8    Q.  You were at that apartment for Thanksgiving; right?

9    A.  Yes.  Downstairs.

10   Q.  Sorry?

11   A.  Downstairs.

12   Q.  The other children were also there; right?

13   A.  Well, the kids was upstairs.

14   Q.  They were there for Thanksgiving.  They lived there; right?

15   A.  Yes.

16   Q.  At some point on Thanksgiving you left your home to visit

17   your other girlfriend; right?

18              MR. DOGRAMACI:  Objection.

19              THE COURT:  Sustained.

20   Q.  At some point during Thanksgiving or at some point on the

21   night after Thanksgiving on November 23rd of 2012, you left

22   your home because you got a call from Tamba; right?

23              MR. DOGRAMACI:  Objection.

24              THE COURT:  Sustained.

25              MS. DECASTRO:  Your Honor, can we have a brief side

1   bar?

2           THE COURT:  Yes.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. DECASTRO:  The jury is going to have to make a

3     credibility assessment in light of the fact that he was

4     cheating on his girlfriend.  It goes to his credibility.

5          THE COURT:  I am not going to let that in.

6          MS. DECASTRO:  We haven't made a decision about the

7     parole.  I want to cross-examine about the fact that he was on

8     parole.  He admitted that he had a gun on him on the night of

9     the incident.

10          THE COURT:  I am going to allow him -- that he was on

11     parole for the reasons I said earlier.  I do think it is

12     relevant and he said at least one of the officers was aware of

13     the fact he was on parole.  I will allow that in.  I will not

14     allow in the fact that he had another girlfriend.

15          MS. DECASTRO:  Can I get into the fact when he got

16     there, he went to get rid of the gun?  He testified about the

17     direction of Kianna.  Can I talk about that?

18          THE COURT:  About the fact that he got rid of the gun?

19          MS. DECASTRO:  That he got into this allocation.

20          THE COURT:  Yes.

21          MS. DECASTRO:  Just not the girlfriend.

22          THE COURT:  We talked about the altercation already.

23          MR. DOGRAMACI:  Yes.

24          THE COURT:  That's fair game.

25          (Continued on next page)

IA96NEA4                    Neal  - cross

1              (In open court; jury present)

2              MS. DECASTRO:  Your Honor, can I have one more minute

3      at side bar?

4              THE COURT:  Yes.

5              I am sorry, folks.  We will try not to do this much

6      during trial.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. DECASTRO:  My cocounsel reminded me that the

3    altercation started because he was cheating.  So that is also

4    to provide the background of the altercation.  They left it as

5    an altercation he was the good guy and this woman who got AIDS.

6    The jury has no context for that situation except to believe

7    that the plaintiff is this upstanding citizen that wanted to

8    get in between these two people.  The wife confronted him

9    because of the cheating and he got into a fight with her and

10   went got back, got a woman, bought crack.

11         MR. DOGRAMACI:  The only reason I got into any of that

12   with him is because I anticipate that when the officers testify

13   they are going to talk about what they heard from the 911

14   dispatcher and this gets into what your Honor has ruled on.  It

15   is relevant what they believed they were being called for.

16   That is the only reason I brought any of that out.  So that

17   limited thing he got hit over the head with the bottle.  She

18   called the police.  Something to do with that, with an

19   allegation there was a gun.  These are things that the officers

20   heard.

21         What I think is completely inappropriate is what was

22   mentioned during the opening by defense counsel, which was, Oh,

23   he brought his wife's food to his girlfriend.  That has no

24   relevance to anything and is highly prejudicial and shouldn't

25   have been mentioned in the opening.

IA96NEA4                    Neal  - cross

1              MS. DECASTRO:  If it is stuff that he admits to.

2     There is no context for the fight.

3              THE COURT:  One at a time and one person per argument.

4              MR. MANNINGHAM:  There is no context for the fight

5     right now.  It was during his direct -- it was made to believe

6     he was just trying to break up a fight.  He is the reason there

7     was a fight.  There is no context of what the fight was over.

8     It is making him seem reasonable --

9              THE COURT:  How would the officers know that?

10             MR. MANNINGHAM:  They didn't know there was a fight

11    between them that he needed to break up a fight.  There is no

12    context for this fight needed to be broken up.  It was not a

13    fight between Kianna and him.

14             THE COURT:  What matters is what the officers

15    believed; right.

16             MR. MANNINGHAM:  Right.

17             THE COURT:  So why does it matter?

18             MS. DECASTRO:  It matters to undue the prejudice that

19    we suffered from the situation where he talked at length about

20    he was trying to prevent the mother of his child from getting

21    AIDS.  He talked about that a long time.

22             THE COURT:  You can make a fake reference to there

23    being a personal dispute.  I don't think you need to get into

24    that.  I really don't.

25             One person per argument.  Let's not keep the jurors

1    waiting.

2             MS. DECASTRO:  Can I bring one more thing up?  He

3    facilitated a drug sale right before the incident that also led

4    to the fight.

5             THE COURT:  But that is so prejudicial.  The officers

6    didn't know that; right?

7             MS. DECASTRO:  But it goes to his credibility, the

8    ultimate decision for him.  He is lying about what he said.  He

9    was lying about the fight.  He said he got in between them

10   because they were arguing about something.

11            THE COURT:  Do you want to respond to that?  If in

12   fact he is lying on the stand about what the source of the

13   fight was, it is fair for them to cross-examine him if he just

14   lied.  Otherwise, I would have said it is not relevant.

15            MR. DOGRAMACI:  He didn't testify to what the source

16   of the fight is.  All he did was give a certain amount of

17   context to why he got hit over the head.  What they want to do

18   is expand to make it more and more context.

19            THE COURT:  You can ask him a question without

20   eliciting the information about the drug sale, the other

21   girlfriend.  You can put it in your own words without getting

22   out the specifics, which is seeing if he -- just not providing

23   the whole context.

24            MS. DECASTRO:  Well, the whole fight is because Audrey

25   confronted him about cheating.

1          THE COURT:  Can't you say, this is the context about

2     this fight of a personal dispute between you and Audrey.  If he

3     denies it and says it is in this effort to keep her from

4     getting AIDS, then you can cross-examine if in fact he disputes

5     that.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MS. DECASTRO:

3    Q.  Mr. Neal, you testified on direct examination that Audrey

4    was going to get into a fight with a woman on the street;

5    right?

6    A.  Yes.

7    Q.  What was that fight about?

8              MR. DOGRAMACI:  Objection.

9              THE COURT:  Yes, sustained.

10   Q.  Was that because of a personal dispute you had with

11   Ms. Audrey Barnes?

12   A.  No.  Me?  No.

13   Q.  It was not because of a fight you had with Ms. Audrey

14   Barnes?

15   A.  First of all, me --

16   Q.  I asked you a yes or no question.

17             THE WITNESS:  It is not a yes or no answer, though,

18   your Honor.

19             THE COURT:  All right.  You can answer it.

20   A.  Okay.  The reason why it is not a yes or no answer is

21   because she wasn't fighting with me.

22   Q.  You were the one that caused the dispute, weren't you?

23             MR. DOGRAMACI:  Objection.

24             THE COURT:  Sustained.

25   Q.  She wasn't fighting with you personally, Audrey Barnes;

IA96NEA4                      Neal  - cross

1   right?

2   A.  No.

3   Q.  But she was angry with you, wasn't she?

4   A.  She wasn't angry with me.  She was the angry with the

5   person that I was stopping her from fighting that had the HIV.

6          THE COURT:  Was there more to this dispute that you

7   had with Ms. Barnes than just the scene on the street?

8          THE WITNESS:  It wasn't -- that is what I am saying,

9   your Honor.  It was not me she had the problem with.

10          MS. DECASTRO:  Your Honor, can we have a side bar?

11          THE COURT:  No.  You can ask the questions.

12          MS. DECASTRO:  I can ask the questions?

13          THE COURT:  Yes.  Limited to the personal dispute.

14   BY MS. DECASTRO:

15   Q.  Were they having a fight, those two women, because of a

16   personal dispute involving you?

17   A.  Yes.

18          MS. DECASTRO:  Your Honor, can I have one quick side

19   bar?

20          THE COURT:  This is the last one of the day.

21          (Continued on next page)

22

23

24

25

1              (At the side bar)

2              THE COURT:  First of all, you should have fleshed this

3     out pretrial.

4              MS. DECASTRO:  Now he has fully lied and said that it

5     wasn't about him.  He said at length at the deposition that

6     they were in a fight because she was mad that he was cheating

7     and he confronted this woman about his cheating.  Now he is

8     lying.

9              THE COURT:  Is that not true?

10              MR. DOGRAMACI:  I don't think he denied that right

11    now.

12              THE COURT:  He denied.  I am not allowing in the drug

13    deal.  Did he just testify that the dispute was not about him,

14    did he not?  Did he not just say twice the dispute was not

15    about him?  Again, this is not something I would have let them

16    get into because I don't think it is directly relevant; but if

17    he just lied about something whether it is big or small, then

18    it is fair impeachment.

19              MR. DOGRAMACI:  I think there is a question about what

20    he means by the dispute.

21              THE COURT:  No, huh-uh.  Go ahead.

22              (Continued on next page)

23

24

25

1            (In open court; jury present)

2    BY MS. DECASTRO:

3    Q.  Mr. Neal, Audrey was mad at you that night because you were

4    cheating on her; is that a fact?

5            MR. DOGRAMACI:  Your Honor, we put our objection on

6    the record.

7            THE COURT:  Okay.  Objection noted.

8    A.  Yes.

9    Q.  I am sorry?

10   A.  Yes.

11           THE COURT:  Now let's move on.

12   Q.  During this argument with Audrey is when you claim that

13   Kianna hit you with a bottle; right?

14   A.  She was trying to go after the lady.  I stepped in between

15   it and I stopped her from hitting the lady.  I let the lady go

16   out the door because we were in the vestibule of the building.

17   I put my hands up.  I blocked her from going after the lady.

18   She looked me in the face and told me, Are you going to choose

19   her over me?  Protecting her without her -- without her

20   knowledge of it I said, Yes, because I knew the lady had HIV.

21   So --

22           MS. DECASTRO:  Your Honor, I move to have that answer

23   stricken.

24           THE COURT:  No.  It will not be stricken.  You can

25   continue.

BY MS. DECASTRO:

Q.  I asked you during this argument with Audrey is when you

claimed Kianna hit you in the head with the bottle; right?

A.  No, it's not.  After I did that and she was gone, Audrey

went out the door.  She was gone.  That is when I got hit in

the head with the bottle.

Q.  So you got hit in the head with the bottle after the

argument?

A.  Yes.  After the the argument after she went outside.

Q.  You claim Kianna hit you from behind; right?

A.  I didn't say she hit me from behind.  I said she hit me

with the bottle.

Q.  She didn't hit you from behind?

A.  I don't know when she threw the bottle.  I got hit and she

threw it.

Q.  I asked you did Audrey hit you from behind?

A.  Did who?

Q.  Did Kianna hit you from behind?

A.  She was standing where you at and I am this way.  So I --

that is not behind.  That is her throwing the bottle hitting me

here.

Q.  So you are saying Kianna did not hit you from behind;

right?

A.  Yes.

Q.  Okay.  Now, sir, you testified at a deposition about this

1   incident, haven't you?

2   A.  Yes.

3   Q.  That deposition occurred two years ago, didn't it?

4   A.  I would have to say yes.

5   Q.  Would you like to take a look at it?

6   A.  Yeah.  We can look at it.

7           MR. DOGRAMACI:  Your Honor, if we're going to do this,

8   can we get a copy of the transcript?

9           THE COURT:  Sure.

10  Q.  Do you see the date on the front cover of that deposition?

11  A.  Yep.

12  Q.  September 1st of 2016?

13  A.  Yes.

14  Q.  You would agree that is two years prior to today; right?

15  A.  Well, a little over two years, but yes.

16  Q.  Yes.

17      So at that deposition you swore to tell the truth; right?

18  A.  Yes.

19  Q.  You took an oath similar to the one you took today; right?

20  A.  Yes.

21  Q.  That was under penalty of perjury; right?

22  A.  I wouldn't say perjury.  I would -- I would more less say

23  between now and then this was tooken when I was incarcerated.

24  Now I am out so I have a lot more on my mind.  A lot more.  I

25  have an eight-year-old child.  So I have a little more on my

IA96NEA4                        Neal  - cross

1    plate.

2    Q.  I was asking if this was taken under penalty of perjury,

3    the testimony, at your deposition?

4    A.  I believe all testimony you have to take perjury count.

5    Q.  So, yes, it was taken under penalty of perjury, yes?

6    A.  Yes.

7    Q.  You said that your memory has gotten better since two years

8    ago?

9    A.  I would have to say -- put it like this:  When you are

10   prison, you don't have time to be thinking about a lot of stuff

11   on the street.  You need be focused in the prison.

12   Q.  So your memory sitting here today you are saying has gotten

13   better than two years ago?

14   A.  I would have to say --

15             MR. DOGRAMACI:  Objection.

16             THE COURT:  Overruled.

17   A.  I would have to say practically, yeah.  Because I have more

18   evidences in front of me for me to read.

19   Q.  So with time your memory has gotten better?

20   A.  Somewhat on certain things.  Like, I might leave out minor

21   details here or minor details there.

22   Q.  But only minor details?

23   A.  To me they are minor.

24   Q.  When you took that deposition, you knew that it was

25   important to tell the truth; right?

1   A.  Yes.

2   Q.  When you testified at that deposition were you asked this

3   question and did you give this answer --

4               MR. DOGRAMACI:  Could you --

5               MS. DECASTRO:  I will give you the page number.  Page

6   87, 1 to 20.

7               MR. DOGRAMACI:  Give us a moment.

8               Your Honor, we object to having this read into the

9   record.

10              THE COURT:  I don't have a copy.  Do you want to give

11  me a copy?

12              Do I have a deposition binder?

13              MS. DECASTRO:  Yes.  It is actually 11 to 24.  I

14  apologize.

15              MR. DOGRAMACI:  All right.

16              MS. DECASTRO:  Page 87, 11 to 24.  It should be the

17  first transcript in the deposition binder.

18              THE COURT:  Give me one more second.

19              MS. DECASTRO:  I have another one.  I have an extra

20  copy if anyone needs it.

21              THE COURT:  Let's have one more side bar.

22              (Continued on next page)

23

24

25

1          (At the side bar)

2          THE COURT:  I really don't understand where you are

3     going.  Where is the cross at about what direction he was

4     standing in?  He didn't deny he got hit.  He said it didn't

5     happen from behind.

6          MS. DECASTRO:  He says it happened from behind.  I

7     turned around and I see Kianna standing there.

8          THE COURT:  I don't think that is inconsistent with

9     what he testified to.

10         MS. DECASTRO:  He said he hit her from the front.

11         THE COURT:  Isn't that your understanding?  I don't

12    think it is inconsistent.  I really don't.

13         MS. DECASTRO:  We can go back over his testimony, but

14    he was hesitating on the exact angle.  I assume that there will

15    be language in here that made it really clear he was hit from

16    behind.

17         THE COURT:  I don't think it matters anyway.

18         MS. DECASTRO:  My understanding is he was the victim.

19         THE COURT:  I don't think this is directly

20    contradictory.

21         (Continued on next page)

22

23

24

25

1              (In open court; jury present)

2    BY MS. DECASTRO:

3    Q.  After this alleged incident with Kianna, you were angry;

4    right?

5    A.  I believe I testified to that, yes.

6    Q.  So you were angry; right?

7    A.  Yes.  If you get hit in head with a bottle, you would be

8    upset too.

9              THE COURT:  Just try to answer yes or no if you can.

10             THE WITNESS:  Yes, your Honor.

11   Q.  You were going to take this to the extreme because of that

12   anger; right?

13             MR. DOGRAMACI:  Objection.

14             THE COURT:  Overruled.

15   A.  Yes.

16   Q.  To such an extreme that you actually went and got a gun,

17   didn't you?

18   A.  Yes.

19   Q.  So you went up the stairs; right?

20   A.  Yes.

21   Q.  You went into your apartment; right?

22   A.  Yes.

23   Q.  Into the apartment where your kids were sleeping; right?

24   A.  I don't know if they was sleeping, but I know they was in

25   there.

1    Q.  It was 2:00 in the morning; right?

2    A.  Yes.  But on holidays, we let our kids play.  It is not

3    always 2:00 in the morning on a holiday and you have got to go

4    to sleep.

5    Q.  They were in the apartment; correct?

6    A.  Yes.

7    Q.  You went into a bedroom; right?

8    A.  Yes.

9    Q.  And you got a loaded firearm, didn't you?

10   A.  Yes.

11   Q.  After you got that loaded firearm, you went back

12   downstairs; right?

13   A.  Yes.

14   Q.  And you confronted Kianna's boyfriend with it; right?

15   A.  Yes.

16   Q.  Or waved it at him; right?

17   A.  No.

18   Q.  You testified on direct examination that you pointed it on

19   him; didn't you?

20   A.  No.

21   Q.  So you just had it hidden?

22   A.  No.

23   Q.  So you had the gun out; right?

24   A.  No.  It was in my waist.

25   Q.  You had the gun in your waist?

1    A.   Yes.

2    Q.   Was it sticking out so somebody could see it?

3    A.   Yes.

4    Q.   Didn't you actually show it to Kianna's boyfriend and say,

5    Go get your gun?

6    A.   I believe that is what I testified to, yes.

7    Q.   So you showed it to him.  You said, Look at my gun.  Go get

8    your gun; right?

9    A.   I told him to him, Go get your gun.

10   Q.   You showed it to him; right?

11   A.   Yes.

12   Q.   But Kianna's boyfriend, unlike you, declined to go get his

13   gun; right?

14   A.   Yes.

15   Q.   He told you, No, I am not going to do that; right?

16   A.   Yes.

17   Q.   He declined that offer of a duel; right?

18   A.   Yes.

19   Q.   When you were downstairs with the gun, that is when you saw

20   the police coming down the block; right?

21   A.   Yes.

22   Q.   Now, on direct examination you testified that you weren't

23   worried when you saw them because you didn't do anything wrong;

24   right?

25   A.   That's not what I said.

1    Q.  You did not testify on direct examination that you were not

2    worried when you saw the police?

3    A.  What I said was is when I seen them, I went back upstairs

4    and put it back.

5    Q.  You didn't testify on direct examination to this jury that

6    when you saw the police you weren't worried so you went

7    upstairs and because you were doing anything wrong; is that

8    what you are saying?

9    A.  I know when I testified to the jury I testified that I was

10   doing nothing wrong when I was standing there dabbing my head.

11   Q.  You are saying, No, you didn't testify to that?

12              MR. DOGRAMACI:  Objection.

13              THE COURT:  Overruled.

14   Q.  Yes or no did you tell this jury that you were not worried

15   when you saw the police downstairs?

16   A.  I can't recall.

17   Q.  So you can't recall what you just testified to 20 minutes

18   ago?

19   A.  Can't recall.

20   Q.  Okay.  Now, on direct examination you claimed that you

21   weren't drunk by the time the police arrived; right?

22   A.  I said --

23              MR. DOGRAMACI:  Objection.

24              THE COURT:  Overruled.

25              Is that what you testified to?

1          THE WITNESS:  What I remember testifying, your Honor,

2     I said there is -- the way people see intoxication and being

3     drunk, I see drunk as being stumbling, bumbling and you have no

4     wits about yourself.  That is how I see being drunk.  I said I

5     had a little buzz.  Meaning, I was feeling nice.  I know where

6     I was at and I knew what was going on.

7     Q.  So you told this jury you were not drunk; right?

8     A.  If that is what you want to call it, yes.

9     Q.  I am asking you did you tell this jury that you were not

10    drunk?

11         MR. DOGRAMACI:  Objection.

12         THE COURT:  Do you remember the particular words you

13    used.

14         THE WITNESS:  No, I don't know.

15    Q.  Isn't it a fact that you went and got your gun that day

16    because according to you you are not a good fighter when you

17    are drunk?

18    A.  I know that.

19    Q.  You are not a good fighter when you are drunk?

20    A.  No, I am not.

21    Q.  That is why you got your gun; right?

22    A.  Yes.

23    Q.  So you were in fact drunk that night; right?

24         MR. DOGRAMACI:  Objection.

25         THE COURT:  Sustained.

1    Q.  You testified on direct examination that you had those

2    three cups of the same ice mixed with the vodka all within the

3    two and a half hour span of time?

4    A.  Svedka.

5    Q.  Between the two and a half hour of time; right?

6    A.  Yes.

7    Q.  Is that all you had to drink on Thanksgiving?

8    A.  Yes.  That I remember.

9    Q.  It could have been more?

10   A.  I doubt it because I just started.  We just caught the

11   liquor store at 11:30.

12   Q.  You are not 100 percent sure; right?

13   A.  I cannot say 100 percent sure.  It's six years ago.

14   Q.  Right.  When you saw the police, you didn't approach them

15   and say, Hey, I need help; right?

16   A.  How could I?  I went upstairs and put the gun back.

17   Q.  You saw the police while you were standing outside with the

18   gun, didn't you?

19   A.  Of course I did.

20   Q.  You didn't go towards them and say, Hey, I need help?

21   A.  No, I didn't.  Not with a gun in my waist.

22   Q.  That wouldn't have been smart; right?

23   A.  Of course.

24   Q.  That wouldn't have been smart because you were actually on

25   parole at the time, weren't you?

1  A.  Yes, I was.

2  Q.  So having a gun, a loaded firearm was a violation of your

3  parole, wasn't it?

4          MR. DOGRAMACI:  Objection.

5          THE COURT:  Overruled.

6  A.  Yes.

7  Q.  Actually, it is a crime in and of itself, right, having a

8  gun?

9          MR. DOGRAMACI:  Objection.

10          THE COURT:  Let's move on.

11  Q.  So when the police arrived you decided to go upstairs and

12  you decided to hide the gun; right?

13          THE WITNESS:  Your Honor, can I make a -- that is not

14  a yes or no answer, your Honor.  She keeps referring to it as

15  my gun.

16          THE COURT:  Do your best to answer yes or no.  If you

17  can't, say you can't.

18          THE WITNESS:  All right.

19  BY MS. DECASTRO:

20  Q.  You went upstairs and you hid that gun, didn't you?

21  A.  Yes.

22  Q.  You didn't have a license for that gun, did you?

23          You did not have a license for that gun?

24  A.  No.

25          MR. DOGRAMACI:  Objection.

1          THE COURT:  Overruled.

2     Q.  So you hid it in a place where all of the kids were; right?

3     A.  No.

4     Q.  You did not.  You said you hid it in the bedroom closest to

5     the front?

6     A.  This room right here.

7     Q.  Yes.

8     A.  No kids.

9     Q.  There were nine children in that apartment; right?

10    A.  No kids are in this room.

11    Q.  But there are nine children living in the apartment on the

12    date of the incident; weren't there?

13    A.  Yes.

14    Q.  You knew that the police were there to deal with the

15    situation at your home; right?

16    A.  No.  Because no incident happened in my home.

17    Q.  You said that you went upstairs and hid your gun when you

18    saw the police coming down the street; right?

19    A.  Yes.

20    Q.  So you knew they were coming towards you, didn't you?

21    A.  No.

22    Q.  Then why did you go upstairs and hide the gun?

23    A.  Because I have a gun on me.

24    Q.  Now, you said that when you encountered the police

25    officers, you were in the kitchen; correct?

1    A.  Yes.

2    Q.  When an officer attempted to place you in handcuffs, you

3    pulled your arm away from him, didn't you?

4    A.  No.

5    Q.  You did not pull your arm away from him?

6    A.  No.  You said when he attempted to place me in handcuffs.

7    No officer attempted to place me in handcuffs.

8    Q.  So when the officers came upstairs and tried to get your

9    hands behind your back, didn't you pull your hands away from

10   them?

11   A.  First of all, no officer attempted to get my hands behind

12   my back.  He immediately grabbed my arm.  Nobody told me

13   anything.

14   Q.  Exactly.  They couldn't get your hands behind your back

15   because you wouldn't allow that; right?

16   A.  Yes.  I don't know why he is grabbing on me.

17   Q.  So, yes, when an officer went to go grab your hands and

18   place them behind your back, you pulled away from him, didn't

19   you?

20   A.  No.  I stiffened up first.

21   Q.  Then you pulled your hand behind your back?

22   A.  No.  Then I did like I showed the jury and I smacked his

23   hands away.  Like off of me.

24   Q.  You pushed your arms out of the officer's hand; didn't you?

25   A.  I just stated that he attempted to grab my arm.  I used a

1  defensive maneuver and smacked his hands away.

2  Q.  Is that a no?

3           MR. DOGRAMACI:  Objection.

4           THE COURT:  Sustained.

5  Q.  The officers, they couldn't arrest you because you kept

6  pushing off of them, didn't you?

7           MR. DOGRAMACI:  Objection.

8           THE COURT:  I will allow that.

9  A.  I was never told I was being arrested.

10  Q.  I asked you --

11  A.  They was trying to put their hands on me and I didn't know

12  why.

13  Q.  So, Mr. Neal, I ask you they could not place you under

14  arrest because you kept pushing them off of you, didn't you?

15           MR. DOGRAMACI:  Objection.  Asked and answered.

16           THE COURT:  I will allow it if you can answer it.

17  A.  Like I said, I didn't allow anybody to do anything to me

18  because, one, I was never told I was being placed under arrest.

19  I was never read my Miranda rights or anything.  I was never

20  even asked.  It is just like immediately after he gave me my ID

21  back, it was just not, No, listen, you are being placed under

22  arrest.  Put your hands behind your back.  There was none of

23  that.

24  Q.  So the officers were trying to put your hands behind your

25  back and you kept pushing them off?

1    A.   Yes.  I don't know why they grabbing on me.

2    Q.   You also kept trying to break lose from them, didn't you?

3    A.   Yes.  Yes.

4    Q.   They were having a hard time trying to place you under

5    arrest because you were strong and powerful; right?

6    A.   You keep saying put me under arrest.  I don't know what is

7    going on.

8    Q.   They kept trying to put your hands behind your back and

9    they couldn't do that because according to you you are very

10   strong and powerful; right?

11   A.   I am.  I was anyway.

12   Q.   You were strong and powerful?

13   A.   I was.

14   Q.   On that date you were strong and powerful; right?

15   A.   I guess.

16   Q.   Yes or no?

17   A.   I am going to say yes.

18   Q.   In fact, that is the reason why they couldn't place you

19   under arrest; right?

20           MR. DOGRAMACI:  Objection.

21           THE COURT:  Sustained.

22   Q.   According to you it was actually going to take more than

23   two people to take you down; right?

24   A.   Yes.

25   Q.   It did take more than two people; right?

1   A.  Yes.

2   Q.  You said at some point your pit bull came out from the

3   room; right?

4   A.  Yes.

5   Q.  What was your pit bull's name?

6   A.  Loyalty.

7   Q.  Now, prior to being tased, you were told on multiple

8   occasions to stop resisting, weren't you?

9   A.  I heard that, yes.  Stop resisting.  Stop resisting.

10  Q.  So, yes, you were told that?

11  A.  I heard that.  I didn't understand why he was telling me

12  stop resisting when nobody even told me I was under arrest.  So

13  I immediately thought that I was being assaulted.  So I took

14  what I called defensive measures and that was to stop people

15  from putting their hands on me.

16  Q.  You took defensive measures?

17  A.  Yes.

18  Q.  You had no idea why you were being arrested even though you

19  had a gun outside?

20  A.  Yes.

21  Q.  You claim you were tased in the kitchen; right?

22  A.  Yes.

23  Q.  Tased by either Sergeant Kaiser or Sergeant Camhi?

24          MR. DOGRAMACI:  Objection.

25          THE COURT:  Overruled.

1    Q.  You hadn't had any physical contact according to you with

2    Sergeant Kaiser prior to being tased; right?

3    A.  Not that I recall.

4    Q.  So did you or did you not have any physical contact with

5    Sergeant Kaiser prior to being tased?

6    A.  Not that I recall.

7           MS. DECASTRO:  Your Honor, can I refresh the witness's

8    memory with his deposition testimony at page 124, question 11

9    to 13.

10          THE COURT:  You can try.  You can give it to him and

11   let him read it to himself.

12          Read it to yourself and see if it helps you remember.

13          MS. DECASTRO:  Mr. Neal, will you bring your voice up

14   too.  It is hard to hear sometimes.

15          MR. DOGRAMACI:  Your Honor, the deposition testimony

16   is --

17          THE COURT:  He is reading it to himself.  It either

18   helps him or it doesn't.  We're not reading it out loud.

19          THE WITNESS:  11?

20          THE COURT:  Line 11 to line 13 of page 124; is that

21   right?

22          MS. DECASTRO:  Yes.

23          THE WITNESS:  All right.

24          THE COURT:  The question was:  Did you or did you not

25   have physical contact with Sergeant Kaiser prior to being

IA96NEA4                    Neal  – cross

1   tased?

2           THE WITNESS:  No.

3   BY MS. DECASTRO:

4   Q.  You had no physical contact with Sergeant Kaiser prior to

5   being tased; right?

6   A.  No.

7   Q.  You also had no physical contact with Lieutenant Camhi

8   prior to being tased; right?

9   A.  No.

10  Q.  Meaning that they didn't touch you; right?

11  A.  No.  Not that I know, no.  I say that because I don't know

12  who was on my back when I was on the bed.

13  Q.  Prior to being on the bed, you had no physical contact with

14  either of those sergeants; right?

15  A.  Not that I recall.

16  Q.  Do you want to look at your deposition testimony again to

17  see if it refreshes your recollection?

18          MR. DOGRAMACI:  Same page and lines?

19          MS. DECASTRO:  Yes.

20  A.  No.

21  Q.  You did not have any physical contact with them prior to

22  being on the bed; right?

23  A.  No.

24  Q.  You claimed on direct examination that the taser caused

25  your muscle to tense up?

1    A.  Yes.

2    Q.  It actually immobilized you; right?

3    A.  Yes.

4    Q.  Isn't it a fact that the taser didn't work on you at all?

5    A.  It did.

6    Q.  It did work on you?

7    A.  Yes.

8         MS. DECASTRO:  Turning plaintiff counsel's attention

9    to page 112 of plaintiff's deposition line 8 to 19.

10        MR. DOGRAMACI:  Your Honor, we object to that.

11        THE COURT:  Give me one second.

12        Why don't you rephrase the question.

13   Q.  The taser, it didn't cause you to be immobilized; isn't

14   that a fact?

15   A.  Excuse me.  What page?

16   Q.  112.

17   A.  Oh, 112.

18   Q.  Line 8 to 19.

19   A.  The question again?

20   Q.  The taser did not cause you as you claim on direct

21   examination to cause you to be immobilized; correct?

22        MR. DOGRAMACI:  Objection to the characterization of

23   the testimony.

24        THE COURT:  I will allow it.  Folks, you will have the

25   testimony if you need it.  I will let your recollection control

1  and then you'll have the transcript if you need it.

2  A.  What I said was --

3         MS. DECASTRO:  Your Honor, I would like for him to

4  answer yes or no.

5         THE COURT:  Yes.  Can you answer the question about if

6  it immobilized you?

7         THE WITNESS:  It paralyzed my muscles.  It caused my

8  muscles to stiffen up.

9  BY MS. DECASTRO:

10  Q.  It immobilized you, right, according to you?

11  A.  It caused my muscles to stiffen up.

12  Q.  It caused you to be unable to move, isn't that a fact,

13  according to you?

14  A.  Yeah.  It froze my muscles.

15         MS. DECASTRO:  Your Honor, at this point I would

16  like --

17         THE COURT:  Go ahead.

18  Q.  At your deposition were you asked this question and did you

19  give in answer:

20  "Q.  At what point did you go into the bedroom?

21  "A.  Because after I got tased and I didn't fall, they are

22  still -- they got on me again.  He hit me with the taser and

23  bam, bam, bam, bam, bam.  When that didn't work, that is when

24  they grabbed me again.  When they grabbed me again, I am still

25  struggling.  I am still standing up.  I am like, Yo --

IA96NEA4                    Neal - cross

1        THE COURT:  I think you can stop there.

2        MS. DECASTRO:  Okay.  Were you asked that question --

3        THE COURT:  And did you give those answers?

4   Q.  Were you asked those questions and did you give those

5   answers at your deposition?

6   A.  Yes.  They are right here.  After I got tased, I didn't

7   fall.

8   Q.  It actually also didn't work; right?

9   A.  Excuse me?

10  Q.  It also actually didn't work on you; right?

11       MR. DOGRAMACI:  Objection.

12       THE COURT:  Overruled.

13  A.  You said it did not work?

14  Q.  Yes.  The taser according to you didn't work at your

15  deposition.

16  A.  That is not -- that is not what I said.  I said I did not

17  fall.  That's what I testified to.  I said I did not fall.  I

18  didn't.  My muscles --

19  Q.  It did not have an affect on you, did you?

20       MR. DOGRAMACI:  Objection.

21       THE COURT:  Overruled.

22  A.  It did.

23  Q.  You did not fall to the ground; right?

24  A.  No.

25  Q.  You actually believed two years ago that it did not work;

1   right?

2   A.   What do you mean by did not work?

3   Q.   Those were your words, Mr. Neal, that it didn't work?

4           MR. DOGRAMACI:  Objection.

5           THE COURT:  Overruled.

6   Q.   Those were the words you used two words ago, isn't that a

7   fact?

8   A.   Not to make me fall.

9   Q.   The taser did not work according to you two years ago?

10  A.   Not to make me fall on the floor, no, they didn't.

11  Q.   In fact even after the taser was used, you kept struggling

12  with the officers, didn't you?

13          MS. DECASTRO:  Your Honor, I would ask him not to be

14  able to look at the deposition.

15          THE COURT:  Right now it is based on your deposition.

16          Can you remember the answer to that?

17          THE WITNESS:  No, I can't.  I don't recall.

18  Q.   You do not recall whether you struggled with the officers

19  after you were tased?

20  A.   No.  After I was tased I -- after I was tased like I said,

21  my body froze.  That is when he grabbed me much.  He hit me

22  with the body hold.  Somebody punched me in the stomach.  We

23  fell on the bed and then the boom, boom, boom with the baton.

24  Q.   You struggled with the officers even after the taser was

25  used; right?

IA96NEA4                    Neal  - cross

```
 1   A.  No.

 2              MS. DECASTRO:  Your Honor, can I read this again for

 3   the jury?

 4              THE COURT:  Which lines are you looking at?

 5              MS. DECASTRO:  It is 8 to 13 -- 8 to 14.

 6              THE COURT:  I think you already read it.  I don't

 7   think that is necessary.  It is after 5:00.  How much longer do

 8   you have on cross?  Do you have a bit?

 9              MS. DECASTRO:  Yes.

10              THE COURT:  Ladies and gentlemen, whey don't we stop

11   for the day.  It is 5:00.  Try to get here at 9:30 tomorrow.

12   We'll start promptly at 10:00.  Time is of the essence.

13              Don't discuss the case.  Don't research the case.

14   Keep an open mind.  Have a nice evening.

15              (Jury excused)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25
```

1              THE COURT:  Everyone can be seated.

2              You can step down, Mr. Neal.

3              I wanted to talk for a minute about scheduling and see

4       if you have any other issues.  I wanted to get a sense of our

5       schedule so I can figure out if we think summations will be on

6       Thursday and build in a charge conference.

7              How far do you think we'll get tomorrow?  How long do

8       you have on cross?  How long do you think the officers'

9       testimony will take?

10             MS. DECASTRO:  Your Honor, I didn't expect cross to be

11      this long.  I would say half an hour to 45 minutes depending on

12      how he answers.

13             THE COURT:  How long do you think your defense case

14      will be?  It may be part of plaintiff's case.  How long do you

15      think the officers' testimony will be?

16             MS. DECASTRO:  Very short.  Under 20 minutes for each

17      of them.

18             THE COURT:  Do you think we'll get to summations on

19      Thursday?

20             MS. DECASTRO:  Yes, I think so.  Your Honor, one of

21      the EMTs is supposed to testify tomorrow.

22             THE COURT:  Mr. Dogramaci, Mr. Higgins, do you have a

23      different sense of timing?  I can get a draft tonight.  It will

24      take a couple hours, but I can get you something tonight and we

25      can meet at 2:30 right after we stop for the day and have a

1    charge conference then.  If there are any remaining issues, we

2    can do it first thing Thursday morning.

3              MR. DOGRAMACI:  I think that would work, your Honor.

4              THE COURT:  That is what our plan will be.

5              Are there any remaining issues that we need to discuss

6    tonight?

7              MS. DECASTRO:  Your Honor, I actually spoke too soon.

8    We're breaking early tomorrow at 2:30.  I do not believe with

9    the plaintiff's testimony and putting everyone in, I think it

10   will be done early Thursday morning.

11             THE COURT:  What will?

12             MS. DECASTRO:  All of the examination.

13             THE COURT:  I think we'll still have summations on

14   Thursday.  That is what I will get at.

15             MS. DECASTRO:  Yes.

16             THE COURT:  Ideally we'll start the charge conference

17   tomorrow afternoon.  I have to leave around 3:30, but we can

18   meet and complete that discussion Thursday morning so that you

19   have all the necessary language before summations.

20             MS. DECASTRO:  Perfect.  Thank you.

21             THE COURT:  Anything else that we need to discuss

22   tonight?

23             MS. DECASTRO:  Just that plaintiff be instructed that

24   he cannot talk to anyone and his counsel about his testimony.

25             MR. DOGRAMACI:  We will not talk, your Honor.

1          THE COURT:  Since you are on cross-examination, that

2     is a very standard request is when someone is on cross, that

3     they don't speak to their lawyers or anyone else.

4          Thank you.  Have a good evening.  See you tomorrow

5     morning.

6          MR. DOGRAMACI:  Thank you, your Honor.

7          (Adjourned to October 10 at 10:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

 CHRISTOPHER NEAL

Direct By Mr. Dogramaci  . . . . . . . . . . .43

Cross By Ms. Decastro  . . . . . . . . . . .98