Iaa6nea1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

CHRISTOPHER NEAL,

              Plaintiff,

          v.                    15 Civ. 2822 (RA)

POLICE OFFICER ROMAINE WILSON,
*et al.*,
                            Trial

              Defendants.

------------------------------x

                            New York, N.Y.
                            October 10, 2018
                            10:00 a.m.

Before:

                  HON. RONNIE ABRAMS,

                            District Judge
                            -and a Jury-

                    APPEARANCES

IHSAN DOGRAMACI
      Attorney for Plaintiff
      -and-
HIGGINS & TRIPPETT LLP
BY:  THOMAS P. HIGGINS


ZACHARY W. CARTER
      Corporation Counsel of the City of New York
      New York City Law Department
      Attorney for Defendant City of New York
BY:  MARIA F. DeCASTRO
      NICHOLAS D. MANNINGHAM
      Assistants Corporation Counsel



Also Present:  Genisa Monroe, Paralegal

IAA6NEA1

1          (In open court; jury not present)

2          THE COURT:  Good morning everyone.  The jury is here

3     so we'll bring them in now.

4          I assume everyone got the draft charge.  I know you

5     may not have had time to read it.  I apologize for sending it

6     so late.  We will see how much you read over the half an hour

7     break today.  Ideally we can meet at 2:30 if you are ready.

8          Mr. Neal, can you come back up, please, sir.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Good morning everyone.  Thank you for

3      being so prompted today.  Everyone can be seated.

4              We have a short day today.  We're going to sit for two

5      hours and take a half hour break and sit for another two hours.

6      If anyone needs to use the rest room, just raise your hand.

7              Mr. Neal, I remind you you are still under oath.

8              You may proceed.

9       CHRISTOPHER NEAL, resumed.

10     CROSS-EXAMINATION (Cont'd)

11     BY MS. DECASTRO:

12     Q.  Good morning, Mr. Neal.

13     A.  Good morning.

14     Q.  Before we left yesterday we were talking about the use of a

15     Taser; right?

16     A.  I guess.

17     Q.  Okay.  Since yesterday have you talked to anybody about

18     your testimony?

19     A.  No.

20     Q.  Have you reviewed the transcript that was generated from

21     the testimony yesterday?

22     A.  Some of it.

23     Q.  Now, you testified on direct examination yesterday that the

24     reason that you fell onto the bed was because you were punched;

25     right?

1    A.  No.  What I said was I had an officer pulling me, I had an

2    officer who you hit me with a body hold, and then there was a

3    punch.

4    Q.  Keep your voice up.  I cannot hear you.

5    A.  I said I had an officer that was pulling this arm, an

6    officer that put a body hold on me, and then I was hit and I

7    fell into the door.  It is like a motion.  It is not like you

8    are standing there and pull you and somebody hit you.  It is a

9    lot of things going on.

10   Q.  Well, isn't it a fact that you actually fell into the

11   bedroom because you tripped?

12   A.  No.

13   Q.  That is not a fact?

14   A.  It should be.  Somebody punched me and I guess somebody

15   else tripped me with their foot.  I testified to that --

16   Q.  So you testified --

17   A.  -- at my disposition (sic).

18   Q.  You testified previously that the reason that you fell into

19   the bed was because you tripped; right?

20   A.  Yes.  Somebody tripped me after I was hit.

21   Q.  I can't hear you.  I am sorry.

22   A.  After I was hit, I was tripped.

23   Q.  Okay.  Yesterday you neglected to add the part about being

24   tripped; right?

25   A.  Yes.

Q.  In fact, previously you never mentioned at your deposition

or elsewhere that you were punched prior to being tripped;

right?

A.  No.

          MR. DOGRAMACI:  Objection.

          THE COURT:  Overruled.

A.  That's not true.

Q.  That's not true?

A.  I believe I supplemented my original complaint I believe

like two or three times and I believe I stated that in one of

those.

          MS. DECASTRO:  Can I have a moment, your Honor?

          THE COURT:  Yes.

          (Pause)

Q.  Which amended complaint is it that you --

A.  I don't remember.  I don't remember.  I put in three of

them.  I know one of those got rejected while in the magistrate

judge's.  So I don't know if it was the one that got rejected.

I don't remember.

Q.  We'll come back to that.

          Isn't it a fact that at your deposition you never

mentioned that you were punched prior to being tripped?

A.  That I don't recall.

          MR. DOGRAMACI:  Objection.  We're going into past

statements of his that have not been -- it is not about them

1  being inconsistent with anything said here.

2          THE COURT:  I am going to allow you to ask and Mr.

3  Neal can respond.

4  Q.  What was your response, Mr. Neal?

5  A.  State it again.

6  Q.  Isn't it a fact at your deposition you did not mention that

7  you were punched prior to being tripped?

8  A.  I don't recall.

9  Q.  Do you want to take a look at your deposition transcript

10  again?

11  A.  Yeah.

12          MR. DOGRAMACI:  Your Honor, does the witness have a

13  copy?

14          THE COURT:  I don't see it.  Can you give him a copy?

15          MS. DECASTRO:  The testimony is at 114 about the

16  incident on the bed.

17  A.  Actually, it is several spaces in here that I talk about

18  that.

19          MR. DOGRAMACI:  What is the line number?

20          MS. DECASTRO:  114, line 13 to line 18.

21          MR. DOGRAMACI:  No objection, your Honor.

22  BY MS. DECASTRO:

23  Q.  Mr. Neal, at your deposition were you asked these questions

24  and did you give this answer:

25  "Q.  What, if anything, happened after you got Tased?

1    "A.   After whoever came by an tripped me, I fell.  I believe

2    that to be Sergeant Bones.  I fell on the bed.  I had two

3    officers on my back, another trying to grab my right harm,

4    another trying to grab my left arm."

5         Were you asked those questions and did you give those

6    answers?

7    A.   You said 114?

8    Q.   Yes.  Line 13 to line 18.

9    A.   Oh.  Well, if it is here, that is what I testified to.

10   That's what I said.

11   Q.   You would agree nowhere in there is this accusation by you

12   that you were punched?

13   A.   No.

14   Q.   Yes; right?

15   A.   Yeah, in here.

16   Q.   So you were asked those questions and you gave those

17   answers; right?

18   A.   Yes.

19   Q.   Now, on direct examination you also stated that when you

20   fell onto the bed you had one officer holding your right leg

21   while another officer was holding your left leg; is that right?

22   A.   Yes.

23   Q.   That is what you said yesterday; right?

24   A.   Yes.

25   Q.   But just like that other thing at your deposition, you

1    never claimed that you had an officer on your left leg and an

2    officer on your right leg?

3    A.  I mean, if you look at the complaint, the complaint states

4    that I didn't know who was on where.  I know what I felt.  I

5    don't know who was holding me where or anything like that.  I

6    know in the complaint -- in my complaint, I stated I felt hits,

7    punches and pulls.

8    Q.  Mr. Neal, at your deposition, you never testified when you

9    were testifying about the incidents in this case that you

10   brought this lawsuit that you had an officer at your left leg

11   and that you had an officer on your right leg; isn't that a

12   fact?

13   A.  Yes.

14   Q.  In fact, at your deposition you claimed that you had two

15   officers at your back and two officers one at your right arm

16   and one at your left arm; isn't that a fact, too?

17   A.  Yes.  Because that is what it felt like.

18           MR. DOGRAMACI:  Objection to the questions about what

19   he said at his deposition.  He can testify now as to what he

20   believes and if it is inconsistent --

21           THE COURT:  I think we're past that point now.  Okay.

22   Q.  During all of this your stepdaughter Shaquana was in the

23   apartment; right?

24   A.  I wouldn't know.

25   Q.  Well, your stepdaughter Shaquana was there immediately

1   prior to your being Tased you claim?

2   A.  I know I seen her coming.  I didn't know where she was

3   after that.

4   Q.  But she was there after that?

5   A.  I don't know.

6   Q.  You saw her when the dog came out; right?

7   A.  She came and grabbed the dog.

8   Q.  That means she was in the apartment; right?

9   A.  I guess.  I don't know.

10  Q.  Well, she went to grab the dog -- that is what you stated;

11  right?

12  A.  Yes.

13  Q.  That means that she was in the apartment; right?

14  A.  Yes.

15  Q.  Shaquana was actually in the room while you were trying to

16  get away from the officers, wasn't she?

17  A.  No.  I didn't see her.  I was never trying to get away from

18  the officers.  I was trying to stop them from putting their

19  hands on me.  I wasn't trying to go anywhere.  I had no reason

20  to go anywhere.  Why can I go anywhere?

21  Q.  Mr. Neal, at your deposition --

22          MS. DECASTRO:  This is at page 108, line one to line

23  nine.

24          MR. DOGRAMACI:  No objection.

25          THE COURT:  All right.

IAA6NEA1                    Neal - cross

1    Q.  At your deposition were you asked this question and did you

2    give this answer?

3    "Q.  Can you describe what you were doing to try to get their

4    hands off of you?

5    "A.  Pushing them off of me.  Trying to break their hold on me.

6    Like, get off me.  I am physically trying to get away.  Get off

7    me.  Trying to push them off me.  Get off me.  Get off me.

8    Then when the dog came out, I backed up into the kitchen.  He

9    is right next to me.  Shaquana walked by me and grabbed the

10   dog.  I am in the kitchen.  The next thing I know I am getting

11   Tased."

12            Were you asked those questions and did you give those

13   answers?

14   A.  Yes, I did.

15            Now, let me explain that.  What I mean by get away, it

16   is get away from them putting their hands on me.  Not literally

17   trying to get away.  I have an officer blocking the window.  I

18   have officers in the doorway.  Where am I going?  Where am I

19   going?

20   Q.  Those were your words not my words; right?

21   A.  Now it seems you are trying to get the jury to believe I

22   was trying to run away when I was trying to get away from them

23   putting their hands on me.

24   Q.  Mr. Neal, those words were the words you used at your

25   deposition; isn't that a fact?

1   A.   Right.

2   Q.   Those are not the words I was trying to put in your mouth?

3   A.   You are not trying to put any words in my mouth.  I am just

4   making it clear because it seems that you are trying to give an

5   impression that I was actually trying to run away and that is

6   why the officers Tased me.

7   Q.   Didn't you just hear in that statement that you stated I am

8   physically trying to get away?  That is what you said on that

9   day of the deposition, isn't it?

10          MR. DOGRAMACI:  Objection.  We just had something like

11  nine lines of the deposition read and if we're going to be

12  reading it, we should read all nine lines.

13          THE COURT:  You read all nine lines already?

14          MS. DECASTRO:  Yes.

15          THE COURT:  Okay.

16          You can answer the question.

17  A.   State that again.

18  Q.   Your words were, I am physically trying to get away.  Those

19  were your words, not mine.

20  A.   Yes, yes, yes.  That is what I stated.  Yes, that's what I

21  stated.

22  Q.   Mr. Neal, when you were testifying on direct examination

23  yesterday, you said you weren't sure how you got to the

24  hospital.  You said it was either by ambulance or by van;

25  right?

1   A.  Yes.

2   Q.  Can I show you something to refresh your recollection as to

3   how you got to the hospital?

4   A.  Yes.

5   Q.  Okay.  You have your deposition in front of you.  If you

6   look at page 130, lines 4 to 6.

7   A.  Yeah.  I stated it was a van.

8   Q.  Does that refresh your recollection as to how you were

9   transported to the hospital?

10  A.  I stated it was by a van.  I still wasn't really unclear.

11  All I know is I -- even right now I would state I don't

12  remember.  I stated it was a van here.

13  Q.  But right now you just don't remember?

14  A.  Nope.

15  Q.  Can I use something else to refresh your recollection?

16  A.  Yes.

17          MS. DECASTRO:  Can I hand this up to the witness?

18          THE COURT:  Go ahead.

19          THE WITNESS:  Thank you.

20          MS. DECASTRO:  Showing the witness what has been

21  marked for identification as Defendant's Exhibit A, the last

22  two pages.

23  Q.  Can you take a look at that, Mr. Neal.

24          Looking at the document does this refresh your

25  recollection as to how you were transported to the hospital?

1   A.  No.

2   Q.  What does this document appear to be to you?

3   A.  I don't know.

4   Q.  Now, you stated that you were brought immediately to the

5   hospital after your arrest; right?

6   A.  I was taken downstairs.  I said I was handcuffed.  I walked

7   downstairs, stood off to the side where I had a conversation

8   with Officer Rodriguez about what was that all about, where I

9   apologized to him my dog doing what he did -- what she did to

10  his shoe and then I was taken.

11  Q.  So you were taken to the hospital only a couple minutes

12  after the incident where you were handcuffed?

13  A.  Yes.  I don't know if it was minutes.  The time frame, I

14  don't know.  All I know I was taken to the hospital.

15  Q.  So it could have been longer than 10 minutes?

16  A.  I don't know.

17  Q.  Was it somewhere between one and 10 minutes?

18  A.  I don't know.

19          MR. DOGRAMACI:  Objection.

20          THE COURT:  Overruled.

21  Q.  You were brought to Lincoln Hospital; correct?

22  A.  Yes.

23  Q.  The hospital is in the Bronx; right?

24  A.  Yes.

25  Q.  You went to Lincoln Hospital before you went to the police

1   precinct; right?

2   A.   Yes.

3   Q.   At Lincoln Hospital you were seen by multiple medical

4   staff, weren't you?

5   A.   At least two.  I remember that.

6   Q.   At least two, but it could have been more; right?

7   A.   Maybe.  Could have been.

8   Q.   You explained to medical staff about what had happened to

9   you; isn't that right?

10  A.   No, I didn't.  All I stated was that they asked me what

11  happened and I told them I was hit in the head with a bottle.

12  Q.   Mr. Neal, I am going to show you what you have in front of

13  you, but I will put it on the Elmo so you can follow along with

14  me.

15          THE DEPUTY CLERK:  This is not in evidence; right?

16          MS. DECASTRO:  No, just for identification.

17          Your Honor, at this time we do move to have Exhibit A

18  into evidence.  It is certified medical records from Lincoln

19  Hospital.

20          MR. DOGRAMACI:  No objection.

21          THE COURT:  It will be admitted.

22          MS. DECASTRO:  At this time we would like to publish

23  it to the jury.

24          THE COURT:  That is Defendant's A?

25          THE WITNESS:  Yes.

1          THE COURT:  That's it.

2          (Defendant's Exhibit A received in evidence)

3    BY MS. DECASTRO:

4    Q.  Mr. Neal, showing you the second page of this document -- I

5    am sorry, the third page of this document, can you see at the

6    top of this page the left-hand corner where it says, Lincoln

7    Medical and Mental Health Center?

8    A.  Yes.

9    Q.  Do you see just to the right of that where it says Neal

10   Christopher?

11   A.  Yes.

12   Q.  That is you; right?

13   A.  Yes.

14   Q.  A little bit further down do you see where it says ADM?

15   A.  Yes.

16   Q.  It says 23rd November '12?

17   A.  Yes.

18   Q.  That is the date that you were treated at Lincoln Hospital;

19   right?

20   A.  Yes.

21   Q.  Do you see next to that a time?

22   A.  Yes.

23   Q.  What is that time?

24   A.  Well, I see numbers, 0238.

25   Q.  So that was 0238.  2:38 in the morning; isn't that what

1    that means?

2    A.   I don't know what it means.

3    Q.   You were arrested at around 2:00 in the morning; right?

4    A.   I don't know what time it was.

5    Q.   Well, you said on direct examination you had gone to the

6    liquor store around 11:00?

7    A.   No.  I said around 11:30.

8    Q.   So you went to the liquor store around 11:30 and you

9    proceeded to drink for two and a half hours thereafter?

10   A.   Yes.

11   Q.   That would put us somewhere around 2:00 in the morning,

12   wouldn't it?

13   A.   I guess.

14   Q.   You weren't arrested prior to that two and a half hour

15   period where you were drinking; right?

16   A.   I don't know what you mean by when you say arrest.

17   Q.   You weren't handcuffed and brought to the hospital prior to

18   that two and a half hour span between 11:30 and the two and a

19   half hours; right?

20   A.   No.

21   Q.   So your time that you were placed in handcuffs was

22   approximately 2:00 in the morning; right?

23   A.   Could be.  Possibly.

24   Q.   So it could be; right?

25   A.   Yeah.

1    Q.  So where it says 0238, isn't that the time that you were

2    admitted into the hospital?

3    A.  I guess.  If that is -- if that is what that is.  If that

4    is the time frame, I guess it was 2:30 in the morning.

5    Q.  So do you see next to it where it says DIS?

6    A.  Yes.

7    Q.  It says November 23rd, 2012?

8    A.  Yes.

9    Q.  That is the same date you were discharged from the

10   hospital; right?

11   A.  Yes.

12   Q.  Do you see a time next to that?

13   A.  Yes.

14   Q.  What does that say?

15   A.  It says 0305.

16   Q.  That is the time you were discharged; right?

17   A.  Yes.

18   Q.  These medical records are for the treatment that you

19   received at Lincoln Hospital after your arrest; right?

20   A.  I guess, yes.

21   Q.  Mr. Neal, I am going to direct you to the next page of this

22   document.  Do you see where I am pointing where it says mode of

23   arrival?

24   A.  Yes.

25   Q.  Do you see where it says, Other:  Ambulance?

1    A.   Yes.

2    Q.   Does that refresh your recollection about the fact that or

3    whether you were brought to the hospital in an ambulance?

4    A.   Well, it says other ambulance so I guess it was an

5    ambulance.

6    Q.   So it was an ambulance?

7    A.   I don't know.  I still say I don't remember.  I don't

8    remember if it was a van or an ambulance.

9    Q.   When you say a van, you mean police van; right?

10   A.   Yeah.

11   Q.   Can I ask you to speak up?  I can't hear you.

12   A.   Yes.

13   Q.   Let's turn to page 9 of this document.

14             Actually, page 6 first.  I apologize.

15             Do you see the section where it says, Patient's

16   complaint?  It's on the screen too if you want to take a look

17   at it.

18   A.   Yes.

19   Q.   What does that say that your complaint is?

20   A.   It says open laceration to the right side of the head, hit

21   with glass bottle.

22   Q.   No where in there does it say you were Tased; right?

23   A.   No.

24   Q.   No where in there does it say you had holes up and down

25   your back; right?

1   A.  Well, first of all no one examined and looked at my back.

2   Nobody looked at my back.

3   Q.  This section is talking about what you were complaining

4   about while you were in the hospital; isn't it?

5            MR. DOGRAMACI:  Objection.  The witness doesn't know

6   who wrote this or what the person was trying to say.

7            THE COURT:  Sustained.

8            Look, you can ask what he said there.  He is not a

9   doctor.  You can ask him what he said and you can ask him about

10  his experience and you can publish this to the jury as you are,

11  but he obviously didn't write this document.

12           MS. DECASTRO:  Yes, your Honor.

13  Q.  You did not complain to the hospital that you had holes up

14  and down your back; right?

15  A.  First of all, I was agitated and I wanted to get out of

16  there.  I wanted to get out of there as quick as possible so I

17  can get through the system.

18           THE COURT:  If you can answer the question yes or no

19  please do.  If the question was you didn't say that and the

20  answer is yes, say yes.  And if the answer is no, say no.  If

21  you can't answer it, say you can't answer.

22           THE WITNESS:  Yes, your Honor.

23  Q.  You did not complain to the doctor that you had holes up

24  and down your back; isn't that a fact?

25  A.  No.  Because I didn't know they was there.

1    Q.  You also did not complain to the doctor about being hit

2    with a baton on multiple occasions; right?

3    A.  No.

4    Q.  You didn't know that was there because you claim you felt

5    those; right?

6    A.  Yes.

7    Q.  You did not complain to the hospital that you had injured

8    your back; right?

9    A.  No.

10   Q.  Even though you claim that on direct examination you were

11   in immediate back pain after you were Tased; right?

12   A.  Yes.

13   Q.  Back pain so bad that if felt like somebody had hit your

14   funny bone a hundred times?

15   A.  Yes.

16   Q.  Back pain so bad that it actually immobilized you; right?

17   A.  Well, the stun.  The Taser.

18   Q.  Back pain so bad that your whole body froze up according to

19   you?

20   A.  I said that the stun immobilized me, not the pain.  I am in

21   pain now, but I am mobile.

22   Q.  Back pain so bad that you actually said on direct

23   examination that you could not walk; right?  You had trouble

24   walking afterwards?  It hurts when you walk?

25              MR. DOGRAMACI:  Objection, mischaracterized.

1          THE COURT:  Why don't you rephrase it as one question,

2     please.

3          MS. DECASTRO:  Yes.

4     Q.  On direct examination yesterday you said that it hurts when

5     you walk now because of that back injury from the Taser; isn't

6     that a fact?

7     A.  I said that it -- it re-aggravated it.

8          MS. DECASTRO:  Just one moment, your Honor.

9     Q.  Do you see where it says, Chief complaint:  Head trauma, no

10    LOC?  Do you know what that means?

11    A.  No.

12    Q.  Do you see further down this page where it says,

13    Assessment?

14    A.  Yes.

15    Q.  Do you see to the right where it says, Appearance:

16    Functional; NUTR; no distress; independent with activities of

17    daily living; appears well nourished; neuro RSP card; oriented

18    to time, person and place; ambulatory; normal gait, no acute

19    respiratory distress; pulse strong and regular.  And then it

20    says, Comment:  Patient refuses assessment by RN.

21    A.  Yes.

22    Q.  That means that you refused for the RN to look you over;

23    right?

24          MR. DOGRAMACI:  Objection.

25          THE COURT:  Overruled.

1   A.  Yes.  I believe I stated that and the reason why.

2   Q.  Looking at two pages over from that page, did you get a

3   chance to read that page over?

4   A.  I am looking at it.

5   Q.  Tell me when you are done looking at it.

6           Did you get a chance to read it?

7   A.  Yeah.

8   Q.  Looking at the section where it says -- I am sorry -- HPI.

9   A.  Uh-huh.

10  Q.  Do you see where it says, 43-year-old present with NYPD

11  custody with forehead laceration; patient states that he got

12  hit with a broken bottle; denies LOC, headache, nausea, visual

13  changes; denies other injury?

14          Do you see that?

15  A.  I see that.

16  Q.  Isn't it a fact that you were actually asked at the

17  hospital whether you had any other injuries and you stated, no?

18  A.  Yes.  And I am going to state again I wanted to get out of

19  there to get through the system.

20  Q.  It takes about five seconds to say, Yes, I do have other

21  injuries, doesn't it?

22  A.  Yes.  And then you stay longer.

23  Q.  So it is your claim that you didn't say yes because it

24  would have taken too long to say yes?

25          MR. DOGRAMACI:  Objection.

1          THE COURT:  Overruled.

2     A.  Because I did not want to stay in the system long.  I

3     wanted to get through the court system.  That was my main

4     concern.  My main concern was getting back out to the street.

5     Q.  You told them about the head injury, didn't you?

6     A.  They seen the head injury.

7     Q.  Well, it was actually your complaint, wasn't it?  We looked

8     at that part before.  Your chief complaint was that you had a

9     head injury, wasn't it?

10    A.  If it was up to me, I wouldn't have went to the hospital.

11    Q.  They took you to the hospital to get medical treatment?

12    A.  When they initially came in and told me I had to go to the

13    hospital, I didn't want to go.  I didn't want to go.  On my own

14    free will when they asked me, I did want to go.  They was,

15    like, come with me.  I was like, No, I don't want to go.  I

16    don't want to go with you.  He said, You need medical

17    attention.  I don't want medical attention.  I am fine.  I

18    didn't want to go to the hospital.  They took me to the

19    hospital.

20    Q.  Yet your chief complaint at the hospital still to the

21    hospital was your head injury, wasn't it?

22    A.  I did not complain.

23          MR. DOGRAMACI:  Objection.

24          THE COURT:  Overruled.

25    Q.  Because in fact you told them how you got the head injury,

1   didn't you?  You stated to them, and it says here, hit with a

2   broken bottle.

3          How would they have gotten the information if not by

4   you?

5   A.  By asking me.

6   Q.  They asked you and you told them?

7   A.  I got hit in the head with a bottle.

8   Q.  You did talk to them about what happened that night?

9   A.  They asked me a question and I told them I got hit in the

10  head with the bottle.  That is why every line I state hit in

11  the head with the bottle.  Hit in the had with a bottle.  I was

12  hit in head with a bottle.  Let me get out of here.

13  Q.  So it wasn't like the situation you talked about before

14  where you got there and started telling everyone, I don't want

15  treatment.  You did tell them about the head injury and you

16  told them about what caused it; right?

17  A.  Yes.  He asked me.

18  Q.  And you told him?

19  A.  Yes.

20  Q.  But when they asked you if you had any other injuries --

21  A.  No.  Because I am not trying to stay there long.  Let's go.

22  That's my answer.  Let's go.  In, out.  Let's go.  Just like I

23  thought I was ROR, released on my own recognizance.

24  Q.  Looking down at the physical exam part of the page down on

25  the bottom --

IAA6NEA1                    Neal - cross

1    A.  Uh-huh.

2    Q.  -- do you see where it states, EMS bandage in place?

3    A.  I am following you.

4    Q.  Yes?

5    A.  It says -- you talking about --

6    Q.  I am pointing to the screen if you can look at it.

7            It says, EMS bandage in place.  Do you see that?

8    A.  Uh-huh.  It says, Comment:  Patient refuses further --

9    what?

10   Q.  We'll get to that.  I am asking you do you see where it

11   says, EMS bandage in place?

12   A.  Yeah.

13   Q.  Does that refresh your recollection about whether you were

14   brought to the hospital in an ambulance?

15   A.  Yeah.  EMS is emergency services.

16   Q.  So you were brought to the hospital in an ambulance,

17   weren't you?

18   A.  Yes.

19   Q.  Sticking to this page for a second, this portion of the

20   medical records where it says, Physical exam, that is a

21   notation that the medical staff made about the physical exam

22   that they did on you, isn't it?

23   A.  I don't know.  You would have to ask someone in the medical

24   field about that.

25   Q.  Well, right here it says, Cranial nerves normal as tested;

1  right?

2  A.  Those are basic vitalies (sic).

3  Q.  I am sorry?

4  A.  Those are basic.  Whenever you go to the hospital, they do

5  a basic check on you.

6  Q.  They did do a check on you?

7  A.  Your pulse, your heart rate.  All of that.

8  Q.  They noted that they did a cranial nerve test; isn't that

9  correct?

10  A.  I don't know what that is.

11  Q.  That is what it says on the medical record?

12  A.  That is what it says here.

13  Q.  Okay.  Let's turn to page 616.  Let me know when you have

14  had a chance to look at the page.

15  A.  I have it.

16  Q.  Do you see where it says, Disposition?

17  A.  Yeah.

18  Q.  Do you see where it says, Left against medical advice?

19  A.  Yes.

20  Q.  Yes?

21  A.  Yes, I see.

22  Q.  That means you left against what the doctors were telling

23  you; right?

24  A.  Yes.

25  Q.  Then do you see where it says, AMA reason?

1   A.  Yes.

2   Q.  You see where it says, I just want to leave.  I don't need

3   treatment.  I am fine?

4   A.  Yes.

5   Q.  So you told them that you were fine; right?

6   A.  Yes.

7   Q.  Okay.  That was despite the fact that you claim that just

8   20 minutes prior you had been hit repeatedly?

9   A.  Yes.

10  Q.  Despite the fact that you claim you were Tased repeatedly

11  only a couple minutes prior to this; right?

12  A.  Yes.

13  Q.  That was despite the fact that you were claim that you as

14  you stated on direct examination, Every step I took I was in

15  pain; right?

16  A.  Yes.

17  Q.  You stated on direct examination, Every time I had to go

18  somewhere, I was in pain; right?

19  A.  Yes.

20  Q.  So besides all of that, you told the doctors at the

21  hospital, I am fine; right?

22  A.  Yes.

23  Q.  I am showing you the last two page -- well, the second to

24  last page of this document.  Let me know when you have had a

25  chance to finish reading and you can go over to the next page

1    if you want.

2              Are you finished?

3    A.  Is who finished?  I am waiting on you.

4    Q.  I thought you were looking it over.  I apologize.

5              Do you see where it says in the comment section,

6    Presumptive diagnosis?

7    A.  Yes.

8    Q.  Actually, I am sorry.  Going back to the full page, what

9    does the top of this page say?  Do you see where it says,

10   Voluntary hospital EMS provider, New York City 911 system

11   provider?

12   A.  Yes.

13   Q.  Do you see that?

14   A.  It says NYC.

15   Q.  I apologize.  NYC medical provider.

16             Do you see here -- this is your name, Neal

17   Christopher; right?

18   A.  Yes.

19   Q.  This is the report that was generated from your treatment

20   by the EMS workers; right?

21   A.  Yes.  I have to say.

22   Q.  So presumptive diagnosis -- some of the stuff I will not

23   know how to read, but I will read the stuff that we can read

24   along with each other.

25             Soft tissue injury.  Skipping to ambulatory on scene

1   NYPD custody.  Patient CC:  I was hit in the head with a

2   bottle.  Patient states his stepdaughter hit him in the head.

3   See, a bottle.  7 CM deep LAC to head.  Negative LOC.  Denies

4   head, neck and back pain.

5           Do you see where it says, Denies head, neck and back

6   pain?

7           MR. DOGRAMACI:  Objection, your Honor.  That is close

8   to what it says.

9   Q.  DNS test neck and back pain; right?

10  A.  Yes, I see it.

11  Q.  DNS means denies; right?

12  A.  I don't know what that stands for.

13  Q.  Patient was Tasered.

14          Do you see that?

15  A.  I see PT was Tased.

16  Q.  That is referring to you; isn't it?

17  A.  I guess.  I don't know.  I didn't write this report.  I

18  don't know what is going on in there and what it is referring

19  to.

20  Q.  You are the one that claims you were Tasered that night;

21  right?

22  A.  I was Tasered.

23  Q.  So you were the one Tasered that night; right?

24  A.  Yes.

25  Q.  This medical record has your name on it, Mr. Christopher

1   Neal?

2   A.  Yes.

3   Q.  That is your date of birth -- your year of birth?

4   A.  Yes.

5   Q.  So this document down here is referring to you, isn't it?

6   A.  I guess.

7   Q.  Well, it says they are talking about the diagnosis of the

8   patient.  The patient is you; right?

9   A.  Yes.

10  Q.  So this area here is talking about your diagnosis; isn't

11  it?

12  A.  I guess, yes.

13  Q.  So after it says, PT was Tasered it says, DNS further

14  symptoms injuries.

15          Do you see that?

16  A.  I can't see it too good because --

17  Q.  You have the paper in front of you, a copy.

18          Do you want to take a look at it?

19  A.  This screen is actually better than this -- than the paper.

20          THE COURT:  Can you point to where you want him to

21  look?

22          MS. DECASTRO:  Yes.

23          THE COURT:  Thank you.

24  A.  Yes, I see.

25  Q.  You see where it says, DNS further symptoms injuries?

1   A.  Yes.

2   Q.  It states that immediately after it talks about you being

3   Tasered; right?

4   A.  Yes.

5   Q.  So in fact you denied that you had any injuries related to

6   that Taser, isn't that a fact?

7   A.  I wouldn't say that, no.

8   Q.  You would not say that?

9   A.  No.

10  Q.  This is -- you saw the EMTs how long after your arrest?

11  A.  You talking about the ambulance?

12  Q.  The ambulance.

13  A.  I told you before I don't know the time frame.  All I know

14  I was taken downstairs.  Stood right there.  And then I -- I

15  said I was put in a van.  Remember, I didn't say I was put in

16  an ambulance.  I said I was put in a van.  I didn't know, but

17  now we know it was an ambulance I was put in.  I was put in the

18  ambulance.

19  Q.  Okay.  Let me show you on the next page.

20  A.  Yes.

21  Q.  We'll go back to that, but let me show you this here.

22          See where it says, 0214?

23  A.  All right.

24  Q.  What does it say immediately on top of that?

25  A.  On top of where it says 0214?

1    Q.   Yes.

2    A.   It says, 0330.

3    Q.   Sorry.  The little words at the top.  Doesn't that say, On

4    scene?

5    A.   I can't see that.

6    Q.   You cannot see that?

7    A.   No.

8    Q.   Let's zoom in.

9              Can you see it now?

10   A.   Yeah.  I can see it now.

11   Q.   That means that the ambulance was on scene at 0214; right?

12   A.   I guess.  It says on scene.

13   Q.   And then do you see where it states right here to the right

14   of that 0228?

15   A.   Yes.

16   Q.   What does that say?

17   A.   I know -- I can make out the LE, but I would have to say

18   that is left scene.

19   Q.   That means left scene; right?

20   A.   Yes.

21   Q.   So that means that you were treated with the EMS workers on

22   scene from 0214 to 0228; right?  That is before you left the

23   scene; right?

24   A.   Yes.

25              MR. DOGRAMACI:  Objection.

1          THE COURT:  Overruled.

2     Q.  Right?  That is what that means?

3     A.  Yeah.  They were wrapping my head.

4     Q.  So that is on scene.

5          Then after that when you left scene is when you went

6     to the hospital; right?

7     A.  Yes.  They drove us to the hospital.

8     Q.  Going back to the Lincoln medical records -- or do you

9     remember when we looked at the medical records and it says you

10    were admitted at to 0238?

11    A.  Yes.

12    Q.  You were also with the EMS workers from 0214 to 0238;

13    right?

14    A.  I would have to say yes.  I would have to say I was with

15    them from 008 to 028.  Because once they drop you off in the

16    hospital, the medical staff takes over.

17    Q.  You said 0208?

18    A.  That is what it says over here, 0208.

19    Q.  So you are saying now --

20    A.  It should have been 0214.  Excuse me.

21    Q.  So you were them 0214 to 0238?

22    A.  It says 0228.

23    Q.  This is when you left the your house; right?

24    A.  Uh-huh.

25    Q.  Then you got to the hospital at -- let me show you, 0238?

1   A.  Yeah.

2   Q.  So you were with them for a little bit of time; right?

3   A.  Yes.

4   Q.  You were them and you were discussing what had happened to

5   you; right?

6   A.  I wouldn't say that I was discussing with them.  They were

7   wrapping my head.  They asked me questions on what happened.  I

8   told them I was hit in the head with a bottle.  He started

9   wrapping my head.

10  Q.  Is it your claim now that you actually told the EMS workers

11  about the pain that you suffered?

12  A.  I told them I was hit in the head with a bottle.

13  Q.  Did you tell them about the fact that you had holes up and

14  down your back?

15  A.  I didn't know I had holes up and down my back.  I didn't

16  know I had holes up and down my back.

17  Q.  You felt those holes, didn't you?

18  A.  I didn't -- I can't say I didn't feel them.  I know I was

19  in pain.  I know that much.

20  Q.  You know you were in pain?

21  A.  And I was agitated.  I was in pain and agitated and I just

22  wanted to get out.  I wanted to just get it out.

23  Q.  They actually asked you whether you about whether you

24  suffered any injuries related to the Taser and you said no?

25  A.  No.

1    Q.  Right?

2    A.  Yes.

3    Q.  You also didn't tell them about this claim that you had

4    that you were hit with a baton multiple times; right?

5    A.  Yes.

6    Q.  Yes, you did not tell them; right?

7    A.  Yes, I did not tell them.

8    Q.  Now, let's go to the last page.

9            Do you see at the bottom of that page where I am

10   pointing to on the screen?

11   A.  Yes.

12   Q.  Do you see where it says, Pain DNS?

13   A.  Yes.

14   Q.  That means that you denied that you were in any pain when

15   the ambulance workers asked you; right?

16           MR. DOGRAMACI:  Objection.

17           THE COURT:  Sustained.

18   Q.  Isn't it a fact that you told the ambulance workers that

19   you were not in pain?

20   A.  I can't recall.

21   Q.  You cannot recall whether you said, No, I am not in pain to

22   them?

23   A.  No.

24   Q.  Well, if you were in so much pain, wouldn't that be

25   something that you would tell a medical professional about?

1    A.  No.  I am in pain now, but you wouldn't know it.

2    Q.  When you are in front of a medical professional and they

3    are asking you if you are in pain, wouldn't it be smart to say

4    you are in pain so you could get medical treatment?

5    A.  It would be smart to let them know you are in pain.  Yes,

6    it would.

7    Q.  Now, you claim that you declined medical treatment because

8    you wanted to get out of central booking quickly; that is your

9    argument?

10   A.  Yes.

11   Q.  But you were released the next day, right, after this

12   happened to you?

13   A.  I was released that morning.

14   Q.  That morning.

15        You didn't go to the hospital of your release, did

16   you?

17   A.  No.

18   Q.  You could have gone to the hospital; isn't that a fact?

19   A.  No.

20   Q.  Could not have gone to the hospital?

21   A.  No.

22   Q.  Why not?

23   A.  Because I had other priorities.  While in central booking--

24        MS. DECASTRO:  Your Honor, at this point -- he is

25   going to get into -- can we have a side bar discussion?

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MS. DECASTRO:  He just said he was innocent bringing

3    up the lawfulness of the arrest and also he is about to start

4    talking about the thing we talked about yesterday where he

5    claimed he was robbed.  He is trying to back-door that in, too.

6          MR. DOGRAMACI:  I didn't hear it.

7          THE COURT:  Could you please, Jennifer, read me his

8    last answer?

9          If anyone wants to use the rest room or stretch, feel

10   free to do so.

11         (Record read)

12         MS. DECASTRO:  We both heard it, but he is about to

13   start talking about the fact when in central booking he claims

14   he was robbed of his possessions and that opens the door about

15   the order of protection and how he violated the next day.  That

16   is something we were looking to get into.

17         THE COURT:  Don't you go there.

18         MS. DECASTRO:  I just wanted to cut him off before he

19   did it.

20         THE COURT:  So why don't we move onto something

21   different.  Does that make sense?

22         MR. DOGRAMACI:  Yeah.

23         (Continued on next page)

24

25

IAA6NEA1                    Neal - cross

1             (Recess)

2             (In open court; jury present)

3             THE COURT:  Whatever you are ready.

4      BY MS. DECASTRO:

5      Q.  If you had gone to the hospital after your release, all

6      these injuries that you claim would have been noted somewhere,

7      wouldn't they?

8      A.  I guess, yes.

9             MR. DOGRAMACI:  Objection.

10            THE COURT:  Sustained.

11            MS. DECASTRO:  One moment, your Honor?

12            THE COURT:  Yes.

13            (Pause)

14            MS. DECASTRO:  The only medical treatment that you

15     claim you received was from a home attendant; right?

16     A.  Yes.  Jacquelyn Sistrunk, S-i-s-t-r-u-n-k.

17     Q.  At the time that you saw her, you had already noticed those

18     holes that you claim to have had up and down your back; right?

19            MR. DOGRAMACI:  Objection, mischaracterizes.

20            THE COURT:  Overruled.

21     A.  Yes.

22     Q.  So after that point is when you went to go see her; right?

23     A.  I wouldn't -- I went to go see her to get a coat because I

24     had no property where I was at and get some money from her.

25     That is my deceased son's mother.

1           MS. DECASTRO:  Your Honor --

2           THE COURT:  Why don't you move on.

3   Q.  So you didn't get any treatment from this medical attendant

4   from the multiple Taser prongs that you claim to have lodged in

5   your back; right?

6   A.  I didn't what?

7   Q.  Get any medical attention from this home attendant for the

8   multiple holes you had lodged -- multiple holes you claim to

9   have had in your back?

10  A.  As I testified she gave me pain pills.  She fixed the cut

11  on my head.  That is the only attention I got was pain pills.

12  She brought my Tylenol 3.

13  Q.  She did not treat you for those holes that you claim you

14  had in your back; isn't that a fact?

15  A.  She gave my Tylenol 3.

16  Q.  You did not show her those holes that you claim that you

17  had down your back; right?

18  A.  No.  The only person who saw the holes was Tamba.

19  Q.  She did not put any aloe vera in those holes; right?

20  A.  No.

21  Q.  She did put aloe vera to the open laceration you had to

22  your head; right?

23  A.  Yes.  It made no sense to put -- like, holes, you make it

24  seem like holes.  No, it was like -- you get hit with Taser or

25  something, it is not a hole.  Like, a big hole.  It is like an

1   indentation.

2   Q.  In fact, the only complaint you made to her about the

3   interaction you had with my clients was that you were sore;

4   isn't that a fact?

5   A.  I told her I was in pain and I was sore.

6   Q.  You also didn't take any pictures of those supposed

7   multiple holes you had down your back; right?

8   A.  No.  I couldn't take any pictures because prior to that me

9   getting out, the reason why I didn't go to the hospital is I

10  had to go home because my eldest daughter, Qwadaisha Archer and

11  Kianna Barnes were in the apartment I was staying in and took

12  my phone.

13          MS. DECASTRO:  Your Honor --

14  Q.  You could not take pictures because why?  You didn't have a

15  camera?

16  A.  I didn't have a phone.

17  Q.  Isn't it a fact that you actually took your stepson's phone

18  after the --

19          MR. DOGRAMACI:  Objection.  Objection.  Objection,

20  your Honor.

21          THE COURT:  I will allow it.  Just as to the phone.

22  Q.  You had a phone after the incident; right?  Immediately

23  after actually?

24  A.  Not immediately.

25  Q.  You had it the next day, didn't you?

1    A.  Yes.

2    Q.  You could have taken pictures with that phone; right?

3    A.  Could have, but I wasn't thinking about that.  I was

4    thinking about taking this medication and finding somewhere to

5    stay now and to get my clothes.

6    Q.  You did not take any pictures, right, even though you

7    could?

8    A.  No.  No, I didn't take any pictures.

9    Q.  You claim that the emotional injuries that you are still

10   dealing with is that you are reluctant to go back to the area

11   where this happened; right?

12   A.  I wouldn't say reluctant to go back to the area because I

13   still have family over there in that area.

14   Q.  Let me direct you to your deposition testimony at page 146,

15   lines 14 to 22.

16   A.  What pages?

17   Q.  Page 146, lines 13 to 22.

18            MR. DOGRAMACI:  No objection, your Honor.

19            THE COURT:  All right.

20   Q.  Were you asked these questions and did you give these

21   answers at your deposition:

22   "Q.  Did you suffer any psychological injuries as a result this

23   incident?

24   "A.  Well, I am reluctant to even go back in that area ever

25   again.  I don't want to be around there.  Like, that precinct."

1       Were you asked those questions and did you give those

2   answers?

3   A.  Yes.

4   Q.  So you were reluctant to go back to that area; right?

5   A.  When you say "go back," I pass through there; but to go

6   back and hang out like I used to, no.

7   Q.  Those were your --

8   A.  I don't hang out in that area.

9   Q.  Those were your words you used at the deposition?

10      MR. DOGRAMACI:  Your Honor, for context I thought we

11  were going to read through line 22.  If we can have the whole

12  thing read --

13      THE COURT:  Do you have an objection to reading to

14  line 22?

15      MS. DECASTRO:  No objection.

16  Q.  So:

17  "Q.  Did you suffer any psychological injuries as a result of

18  this incident?

19  "A.  Well, I am reluctant to even go back in that area ever

20  again.  I don't want to be around there.  Like, that precinct.

21  For some reason it feels like I feel like it is a witch hunt so

22  I don't even go back because my wife lives in that area now,

23  but hopefully I am divorced and I don't have to go in that

24  area.  I don't want to be nowhere near them -- nowhere near

25  them officers.  I don't want to be placed in that predicament

1    again."

2         Were you asked those questions and did you give those

3    answers?

4    A.  Yes, I did.

5    Q.  Those were your words that you were reluctant to go back to

6    that area; isn't that a fact?

7    A.  Yes.

8    Q.  That is because according to you you are afraid of police;

9    right?

10   A.  I said I am reluctant to be around them and, yes, they do

11   scare me.

12   Q.  In fact, you're a cautious man now; right?

13   A.  Yes.  When I go around them, yes, I am.

14   Q.  Yet that caution of having interaction with police and with

15   anyone in uniform in fact didn't stop you from committing a

16   crime, a felony, in 2013; right?

17        MR. DOGRAMACI:  Objection.

18        THE COURT:  Overruled.

19   A.  Well --

20   Q.  Did it or did it not stop you?

21        THE COURT:  Did you mean 2015?

22        MS. DECASTRO:  The arrest was in 2013.

23        THE COURT:  Okay.

24        MR. DOGRAMACI:  Your Honor, if I could be heard?

25        THE COURT:  Okay.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Tell me what your question was again.

3          MS. DECASTRO:  He is saying his psychological injuries

4   are related to the fact that he is afraid of police now.  My

5   question was:  Isn't it a fact that that injury didn't stop you

6   from committing a crime in 2013, a felony.  The crime was

7   committed in 2013.  The conviction was in 2015.

8          MR. DOGRAMACI:  The conviction was allowed for the

9   limited purpose of going to his truthfulness, his credibility

10  as a witness, whether someone who had committed a crime or

11  someone would tell the truth on the stand.  The jury should be

12  give a limited instruction that is the only reason it is

13  allowed to consider it.

14         THE COURT:  He testified that he is so traumatized by

15  this event that he is not going to do anything to get near

16  police again.  I think he had similar testimony yesterday where

17  he talked about being on the straight and narrow and being so

18  careful because he is so scared of police.  I think it is fair

19  to ask that question and I don't think it is unduly prejudicial

20  because the convictions are already in evidence.  It has

21  already been tossed about.  I don't think there is any real

22  harm.

23         MR. DOGRAMACI:  Can we put some boundaries about how

24  much detail?

25         THE COURT:  Yes.  There is no need to go into any more

1   detail than there already is about it.  There is no need to get

2   into the specifics of the type of drugs or anything.

3              MS. DECASTRO:  I wasn't trying to get into that.  If

4   he denies he committed the crime, I was going to go into the

5   question about the plea allocution.  You sat in front of a

6   judge and you --

7              THE COURT:  He admitted that.

8              MS. DECASTRO:  If he denies it.  Only if he denies it.

9              MR. DOGRAMACI:  There is no reason to ask him whether

10  he actually committed the crime.

11             MS. DECASTRO:  Not committed a crime, that he plead

12  guilty in a courtroom.  That would be perjury if he says now --

13             THE COURT:  If he really says he didn't commit it

14  after he admitted it yesterday, I would be surprised.

15             MS. DECASTRO:  Only if he says that.

16             THE COURT:  The point as I understand it is that if he

17  is saying he is so scared of police, nonetheless he engaged in

18  criminal activity; isn't that right?  And you engaged in

19  criminal activity and there is a likelihood of being arrested

20  by police.  You don't need to go anywhere beyond that line of

21  questioning.  You don't have to use my words.  That is the

22  idea.

23             MS. DECASTRO:  If he opens the door to say I didn't

24  commit that crime, it goes directly to his credibility.

25             THE COURT:  If in fact he does do that, you can

1    cross-examine him but I don't think so.

2              MR. DOGRAMACI:  For him to be asked did you commit

3    that crime, there is no reason for that question.

4              MS. DECASTRO:  I am not going to ask him.  I am going

5    did you commit a crime that led you to be -- sorry.  I can

6    craft the question that it is.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury present)

2    BY MS. DECASTRO:

3    Q.  Despite your fear of any interaction with police, you

4    committed a crime; right?

5    A.  Yes.

6    Q.  Committed a crime that you knew could lead to an

7    interaction with police; right?

8    A.  Well, is that a yes or no?

9            THE COURT:  Yes.  If you commit a crime are you likely

10   to be arrested by the police as a result?

11           THE WITNESS:  Yes.

12   A.  Yes.  Nobody is expecting --

13   Q.  I can't hear you?

14   A.  When you are doing wrong, nobody -- you are not expecting

15   any court.

16   Q.  Right.

17   A.  It is a possibility.  It is always a possibility, but you

18   are not expecting any court.

19   Q.  So you are not actually a cautious man then; right?

20   A.  Well, I am.  Now I am.  I am very cautious.  I don't do

21   anything wrong anymore.

22   Q.  You testified on direct examination that you are still

23   suffering from back pain even today; right?

24   A.  Yes.  My back hurts now, which you would never know.

25   Q.  You have testified on direct examination also that you had

1   previously injured your back; right?

2   A.  Yes.

3   Q.  In fact, prior to the incident that is at question here,

4   you were receiving medical treatment for your back; right?

5   A.  I haven't -- I hadn't received medical treatment for my

6   back I think in like a year -- a year or two.

7   Q.  Your testimony is that you had not received treatment to

8   for your back --

9   A.  About a year.

10  Q.  -- in a year prior to the incident?

11  A.  I believe so.  I am not too sure about that.

12  Q.  Isn't it a fact that you were actually being treated by Dr.

13  Alla only a couple of months prior to this incident for your

14  back injury?

15  A.  I wouldn't say a couple months.  I might have seen him,

16  like, whenever my back got stiff.  I might have went to see him

17  to get some pain med, but to see him -- I mean, I was mainly

18  going about my knee -- my left knee.  I may have told them I

19  was being seen about my knee about the year my back tightened

20  up.  Like I said before, when the weather changes, my back

21  starts -- my back starts to -- starts to hurt.  My lower back.

22  Q.  You said you were also seeing him for left knee pain;

23  right?

24  A.  Right.

25  Q.  And he was your doctor at the time; right?

1   A.  Yes.

2   Q.  You actually went to see him a couple of times prior to the

3   date of incident; right?  A couple times -- in the year from

4   January to November of 2012 you saw him more than four times;

5   right?

6   A.  I wouldn't -- approximate number I wouldn't know.

7   Q.  But you saw him a couple of times in that time period;

8   right?

9   A.  I would have to say yes.

10          MS. DECASTRO:  Your Honor, at this time I move Dr.

11  Alla's medical records.  They are certified medical records.

12  They are previously marked for identification as Defendant's

13  Exhibit C.

14          MR. DOGRAMACI:  No objection.

15          THE COURT:  C will be admitted.

16          (Defendant's Exhibit C received in evidence)

17  BY MS. DECASTRO:

18  Q.  Do you want a copy of this?  A physical copy?

19          Yes or no?  I am sorry.  I cannot hear you.

20          MR. DOGRAMACI:  We would ask that the witness be

21  provided a copy.

22          THE COURT:  If you want a paper copy, let us know.

23  BY MS. DECASTRO:

24  Q.  Mr. Neal, I am handing you what is in evidence as Exhibit

25  C.

1    A.  Thank you.

2    Q.  When you get a chance to look at it, let me know?

3    A.  I cannot see that, but I can see this on the screen.

4    Q.  You cannot see the hand copy I just gave you?

5    A.  No.  It is too small.

6    Q.  I can zoom it in for you.

7    A.  The font is real small.

8              That's good.

9    Q.  Do you see at the top right corner where it says, Neal

10   Christopher?

11   A.  Yes.

12   Q.  Do you see a doctor's name noted there?

13   A.  Yes.

14   Q.  That is Dr. Vijay K. Alla.

15   A.  Yes.  Pronounced Vijay.

16   Q.  Vijay K. Alla?

17   A.  Yes.

18   Q.  That is the doctor that you were seeing immediately prior

19   to this incident; right?

20   A.  Immediately prior to the incident.

21   Q.  This was your doctor?

22   A.  Yes.  I seen him in January -- in January that year.

23   Q.  It is your testimony you hadn't seen him since January of

24   2012?

25   A.  Well, he is not my doctor anymore.

1   Q.  I am talking about in 2012.  Was he your doctor?

2   A.  Yes.

3   Q.  Let's turn to the last -- second to last page on the

4   document.

5           What is the date on that page?

6   A.  It's -- looks like 11-12-2012.

7   Q.  That was how many days prior to this incident?  How many

8   days prior to this incident was that?

9   A.  I would have to see the date of the incident.

10  Q.  You don't remember what the date of the incident is now?

11  A.  No.

12  Q.  If I told you it was November 23rd of 2012, would that

13  refresh your recollection?

14  A.  Yes.

15  Q.  That was how many days prior to November 23rd of 2012?

16  A.  What's that?  11 days.  Almost two weeks.

17  Q.  I am sorry.  How many days?  11 days; is that right?

18  A.  Yes.

19  Q.  So you went to go see Dr. Alla a mere 11 days prior to this

20  incident; right?

21  A.  Yes.

22  Q.  This is a doctor that we discussed before had been treating

23  you for your back; isn't that a fact?

24  A.  He treated me, period.  Not only for my back.  For my knee,

25  my toes, my elbow.

1    Q.  Mr. Neal, let's turn to the page where it is Bates stamped

2    at the bottom 267.

3         Do you see that?  Do you see what the treatment date

4    there is?

5    A.  4-19-2012.

6    Q.  Do you see the section where it says, History of present

7    illness?

8    A.  Yes.  It is across from where it says, Past medical

9    history.

10   Q.  So your past medical history says back pain?

11   A.  Uh-huh.

12   Q.  Meaning that you had gone to see him before for back pain?

13   A.  Yeah.  And cough.

14   Q.  And cough; right?

15   A.  Uh-huh.

16   Q.  That was prior to this date, the 4-19-2012 date; right?

17   A.  Yes.

18   Q.  Do you see here this is where you're noting -- they are

19   noting about what you were there for; right?  You were

20   complaining that you had pain at the lower back pain, which is

21   sharp in nature and slightly radiating to both legs and is of

22   eight to 10 in severity.

23        Do you see that?

24   A.  Uh-huh.

25   Q.  So to this doctor you told him how much pain you were in;

1    right?

2    A.   Yes.

3    Q.   So you went to him on 4-10 of 2012 -- I mean 4-19-2012 for

4    than and you also went to him again for back pain after that;

5    right?

6    A.   That is not the only thing I went to him for.

7    Q.   You also went to him for back pain after?

8    A.   There was a whole bunch of pain.  My toe also stated in

9    there.

10              MS. DECASTRO:  One moment, your Honor.

11              THE COURT:  Sure.

12              (Pause)

13   Q.   Yet after this incident where you were released the same

14   day on November 23rd of 2012, you never saw Dr. Alla about the

15   back pain that you complain you suffered because of my clients;

16   right?

17   A.   Yes.

18   Q.   You did not see Dr. Alla; right?

19              You did not go to him and say, I have back pain?

20   A.   Yes.  Like I stated before there were other mitigating

21   circumstances that had me -- that had me addressing

22   immediately.  Like my clothes.

23   Q.   By immediately I am talking in the weeks after you did not

24   see him?

25   A.   No.

1  Q.  In the years after, you did not see him?

2  A.  No.  I was homeless.  I had to go into the shelter.

3  Q.  You did not --

4  A.  No.

5  Q.  But you did not -- not only did you not see him, you also

6  did not see anyone else; right?

7  A.  No.

8  Q.  Okay.  But today sitting here you are claiming literally

9  six years later that you are still experiencing that back pain,

10  aren't you?

11  A.  I still have back pain, ma'am.  I am sitting here with back

12  pain.

13  Q.  Okay.  Let's go back to the Lincoln Hospital medical

14  records, Defendant's Exhibit A.  Do you still have that in

15  front of you?

16       Go to page 6 of that document.

17  A.  It's not numbered.

18  Q.  You can turn to the page to page 6, please.

19       Did you find page 6?

20  A.  This.  I have it.

21  Q.  This part here where it says, Pain score.  Do you see how

22  it says, No pain present?

23  A.  Yes.

24  Q.  You told medical staff that you did not have any pain;

25  isn't that a fact?

1    A.  Like I stated before, yes, and I was agitated and wanted to

2    get out of there.  So I told them whatever was needed for me to

3    get out of there.

4    Q.  You did say no pain; right?

5    A.  Yes.

6              MS. DECASTRO:  No further questions.

7              THE COURT:  Redirect.

8              MR. DOGRAMACI:  Just a little bit, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. DOGRAMACI:

11   Q.  Mr. Neal, when you were being examined by defense

12   counsel -- and if you cannot hear me, please just let me know.

13   I know it was a problem yesterday.

14             You were asked by defense counsel about a part of your

15   deposition.  It was at page 114, lines 13 through 18 where you

16   answered the question what, if anything, happened after you got

17   Tased, and at that point in the deposition your answer didn't

18   mention getting punched.

19             MR. DOGRAMACI:  I would like to read to the witness to

20   point out some other parts of the deposition.  I am going to

21   start with page 156, lines 2 to 4 if there is no objection.

22             MS. DECASTRO:  There is an objection to question at

23   line 2.

24             MR. DOGRAMACI:  Okay.  We can start at page 155, line

25   20.

1          (Pause)

2          MS. DECASTRO:  That's fine.

3   Q.  So we're on page 155, line 20.  Just let us know if you

4   remember this from your deposition, Mr. Neal.

5          You were asked:

6   "Q.  What is the basis of your claim against Officer

7   Garciarivas?"

8          You answered, "He is another one.  After I told these

9   officers, like, that I was hit way bottle and it is clearly

10  seen I was hit with a bottle and I wanted this person arrested,

11  nobody arrested them.  I am not sure what his action was or

12  where he was at when the other two officers, Rodriguez and

13  Maldonado, when they were grabbing me.  They were the officers

14  who hit me, who punched me in the stomach and in the ribs."

15         Do you remember that part of your deposition?

16  A.  Yes.

17  Q.  And page 120, line 21 to 121, line 12--

18         MS. DECASTRO:  What was the lines?

19         MR. DOGRAMACI:  From line 21 of page 120 to line 12 of

20  the next page.

21         MS. DECASTRO:  That's fine.

22  Q.  So I am going to read it, Mr. Neal, and the only question

23  is whether you remember this.

24         You were asked:

25  "Q.  I am not talking about the Tasing yet.  The question was

1    unclear.  You said you got hit by multiple officers?

2    "A.  Yes.

3    "Q.  And you said you were punched specifically; right?

4    "A.  Yes.  I felt punches.

5    "Q.  What part of your body was being punched?

6    "A.  My stomach.  A couple times it was my ribs.

7    "Q.  Anywhere else?

8    "A.  I don't know who punched me.

9    "Q.  Anywhere else?

10   "A.  Ma'am?

11   "Q.  Anywhere else?

12   "A.  A couple shots to the stomach and ribs.

13   "Q.  Did that force cause you pain?

14   "A.  Of course it did."

15          Do you remember that?

16   A.  Yes.

17   Q.  So you did in your deposition testify about being punched;

18   right?

19   A.  Yes.  Yes, I did.

20   Q.  Now, you were asked at length about what happened when you

21   went to Lincoln Hospital immediately after the arrest, and I

22   want to give you an opportunity to explain fully in one shot

23   why it is that you were not examined at that hospital.

24          Would you please just give the explanation of why it

25   is why you went to that hospital you said the things you said

1   to the doctors there and you were not examined.

2   A.  I didn't -- I was agitated, one.  I am bleeding.  Hit in

3   the head with a bottle.  Mark on me for the rest of my life.

4   Going -- going through the court system, it's a horrible thing.

5   I wouldn't wish that on my worst enemy.  You have to sit there

6   for hours.  You have people -- you have no privacy to urine or

7   defecate.  It smells.  You are around other individuals.  Some

8   of them have lice.  Some of them have bed bugs.  You know, it

9   is filthy in there.  There are mice running around.

10          So, no, I knew that I had to go through this process.

11  No, I want to get in and I want to get out.  I know I didn't do

12  anything wrong.  I wanted out of there.  I don't want to be

13  sitting in there.  It is a filthy, dirty, nasty place.

14          So to expediate (sic) getting out of the hospital, I

15  told them what I was necessary for me for get out of there

16  quick.  Was it the right thing to do?  No.  It was stupid.  Was

17  I stewed at that time?  Yes, I was.  But, like I said, when I

18  got on the phone -- they also have phones there -- and I called

19  Tamba and she told me what she told me that my eldest daughter

20  and --

21  Q.  Wait.  Wait.  Just stick with the reason why --

22  A.  That is one of the reasons, though.

23  Q.  Okay.

24          MS. DECASTRO:  Your Honor, objection.

25          THE COURT:  Do you want to move on?

1              MR. DOGRAMACI:  Okay.  Well, if I could ask one more

2      specific question about this.

3      Q.  What is the connection between the time you spend in

4      Lincoln Hospital and the time you spend with vermin and bed

5      bugs as just put it?

6              MS. DECASTRO:  Objection.

7              THE COURT:  Sustained.

8              MR. DOGRAMACI:  Your Honor, the witness has never had

9      a chance to explain that connection.

10              MS. DECASTRO:  He explained it at length.

11              MR. DOGRAMACI:  No, he has not.

12              THE COURT:  Let's not argue in front of jury.  If you

13      wanted to rephrase the question, go ahead.

14      Q.  Why did you believe that by getting out of Lincoln Hospital

15      quickly you would save yourself time with beg bugs and vermin?

16              MS. DECASTRO:  This is opening the door.  Objection.

17              MR. DOGRAMACI:  May I be heard?

18              THE COURT:  This is the last side bar of this morning

19      because it is just too many.

20              (Continued on next page)

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  He just testified at length about the bed

3     bugs and why he wanted to get out and why he didn't want to

4     stay.  I don't know what the connection is.

5          MR. DOGRAMACI:  That is what I wanted him to say.  The

6     later it got at night the more -- to his understanding is that

7     the more people would be lined up in the court system and

8     therefore if he ended up going to court in order to be

9     arraigned or whatever it is later in that morning, he would end

10    up spending more time there because he would end up at the back

11    of line.  His belief is he needed to get straight to court

12    immediately before the court got filled up with people getting

13    arrested that night so that he could move through quickly.  I

14    was not allowed to bring that out on direct because defendants

15    objected.  So my thought was let's see how big a deal they make

16    out of these medical records.  They made a huge deal out of it.

17    I should be able to get this explanation from him.

18         THE COURT:  First of all, it is appropriate to ask

19    questions about medical records where you are seeking damages.

20         MS. DECASTRO:  Your Honor, he is trying to draw

21    sympathy from the jury about central booking.  What the jury

22    doesn't know is he has been arrested several times and been to

23    central booking.

24         THE COURT:  Look, do you have a problem with Mr.

25    Dogramaci leading a little bit and asking a question does the

1  amount of time you spend if you got to central booking sooner,

2  did you think you would be out sooner.

3          MS. DECASTRO:  I think it is completely irrelevant and

4  prejudicial.

5          THE COURT:  Why?

6          MS. DECASTRO:  Because he didn't seek medical

7  treatment even after he got out.

8          THE COURT:  I know.  Just let him make his point about

9  why he didn't make these -- frankly, I think he has already

10  said it numerous times.

11         I will let you lead and ask one question about the

12  timing.  Then if you want to ask about it again, you can.  We

13  don't need to get into all this other stuff.

14         MS. DECASTRO:  Can we ask about how he knows about

15  central booking?

16         THE COURT:  Why?

17         MS. DECASTRO:  Because he is painting it to be a

18  horrible experience -- mice, lice.  He knows the jury is not

19  going to understand why he knows that.

20         THE COURT:  They know he has been arrested.  They know

21  he has been in central booking.

22         MS. DECASTRO:  They don't know he was arrested prior

23  to this incident.

24         THE COURT:  That's too prejudicial.

25              (Continued on next page)

1          (In open court; jury present)

2          THE COURT:  Go ahead.

3     BY MR. DOGRAMACI:

4     Q.  Mr. Neal, your understanding was that during the time that

5     you spent at Lincoln Hospital, more and more people were

6     getting arrested and arriving at central booking and if you had

7     arrived at central booking later that morning, you would have

8     ended up spending in connection with that much more time with

9     the lice and bed bugs --

10         THE COURT:  Leave out the lice and bed bugs.

11    Q.  You would have spent much more time in detention; correct?

12    A.  Yes.

13         THE COURT:  Let's move on.

14    Q.  You were also asked a lot of questions about as defense

15    counsel repeatedly put it the holes in your back and I want to

16    give you an opportunity to really precisely describe these

17    things that were repeatedly called holes.

18         Was it in fact your skin actually punctured?

19    A.  No.

20    Q.  So what are these things that have been called holes?

21    A.  They are more like -- like I said, indentations.  Like

22    something laches on.  For instance -- how can I put it?  Like a

23    clip or something when you put it on your finger how it leaves

24    a little mark.  Take something -- like my ID that I clip this

25    on here, if put it on and latches on your finger and put it off

IAA6NEA1                    Neal - recross

1   and you can see the marks on it, it is like that.

2   Q.  Okay.  You were also on cross asked questions about times

3   before Thanksgiving 2012 when you were treated for back pain.

4           I want to ask you in this lawsuit are you seeking any

5   compensation for any injury that you had before Thanksgiving

6   2012?

7   A.  No.

8           MS. DECASTRO:  Objection.

9           THE COURT:  Overruled.

10          MR. DOGRAMACI:  That's all.

11          THE COURT:  Any additional questions?

12          MS. DECASTRO:  Just two briefly, your Honor.

13          THE COURT:  Sure.

14  RECROSS-EXAMINATION

15  BY MS. DECASTRO:

16  Q.  Mr. Neal, you are sitting here today claiming that you did

17  not have holes in your back; is that right?

18  A.  No.

19  Q.  Let's look at your deposition testimony at page 141, lines

20  7 to 9.

21          Were you asked these questions and did you give these

22  answers:

23  "Q.  What did you say was sore?

24  "A.  I told her my back was hurting.  I don't remember if I

25  showed her the Taser holes in my back."

1         Were you asked those questions -- asked that question

2    and did you give that answer?

3    A.  Yes.

4    Q.  So again you're the one that characterized it as a hole not

5    me; right?

6    A.  Yes.

7         MS. DECASTRO:  Nothing further, your Honor.

8         THE COURT:  Thank you.

9         You can step down, Mr. Neal.

10        MR. DOGRAMACI:  Well --

11        THE COURT:  Did you have an additional question.

12        MR. DOGRAMACI:  I want to explain what he meant by

13   that point in his deposition.

14        THE COURT:  Go ahead.

15   REDIRECT EXAMINATION

16   BY MR. DOGRAMACI:

17   Q.  Mr. Neal, the bit that was just read to you from your

18   deposition where you said, I don't remember if I showed her the

19   Taser holes in my back, what did you mean by those words at

20   that point in your deposition?

21   A.  By holes that is what I meant, the indentation.  Because it

22   is not like -- like this.  It creates like a little

23   indentation.  So it is like a little -- to me it is like a

24   little hole.  It not actually a hole, but it is indentation.

25   That is what I meant by hole.

1   Q.  You meant the same thing you always meant when you have

2   referred to holes; right?

3   A.  Yes.

4           MS. DECASTRO:  Objection.

5           THE COURT:  Overruled.

6           You can step down.  Thank you.

7           (Witness excused)

8           THE COURT:  Mr. Dogramaci, you can call your next

9   witness.

10          MR. DOGRAMACI:  Plaintiff calls Defendant Rodriguez.

11          THE DEPUTY CLERK:  Please raise your right hand.

12   JUAN RODRIGUEZ,

13       called as a witness by the Plaintiff,

14       having been duly sworn, testified as follows:

15          THE DEPUTY CLERK:  Please state and spell your name

16   for the record.

17          THE WITNESS:  Juan Rodriguez.

18   DIRECT EXAMINATION

19   BY MR. DOGRAMACI:

20   Q.  Good morning, Mr. Rodriguez.

21   A.  Good morning.

22   Q.  On November 23rd, 2012 you responded to 805 156th Street in

23   the Bronx in response to a radio run and 911 call regarding an

24   assault; correct?

25   A.  I did.

IAA6NEA1                    Rodriguez - cross

1   Q.  And on that night Mr. Neal was arrested; correct?

2   A.  Yes, sir.

3   Q.  And you were in the apartment when Mr. Neal was arrested;

4   correct?

5   A.  Yes, I was.

6   Q.  You were in uniform acting as a police uniform; correct?

7   A.  Yes.

8   Q.  You saw the arrest; correct?

9   A.  Yes, I did.

10  Q.  You saw him get Tased; correct?

11  A.  No.

12          MR. DOGRAMACI:  No further questions.

13          THE COURT:  Cross-examination?

14          MS. DECASTRO:  Can we have one moment?

15          THE COURT:  Sure.

16          (Pause)

17  CROSS-EXAMINATION

18  BY MS. DECASTRO:

19  Q.  Good afternoon, Detective Rodriguez.

20  A.  Good afternoon.

21  Q.  Can you introduce yourself to the jury, please?

22  A.  My name is Juan Rodriguez.

23  Q.  By whom are you currently employed?

24  A.  NYPD.

25  Q.  How long have you been with the New York City Police

1   Department?

2   A.  12 years.

3   Q.  Can you briefly walk us through your assignments with the

4   New York City Police Department?

5   A.  I became a police officer in 2007.  I was assigned to the

6   40 precinct.  After that I was assigned to the 43 precinct

7   detective squad where I am currently assigned as a detective

8   investigator.

9   Q.  So you currently are a detective in the 43 squad?

10  A.  Yes, I am.

11  Q.  Turning your attention to the events that occurred on

12  November 23rd of 2012.

13          Were you working on that day?

14  A.  Yes, I was.

15  Q.  Where were you working?

16  A.  I was currently assigned at that time to the 40 precinct.

17  Q.  What area does the 40 precinct cover?

18  A.  It covers the Monroe, Patterson, anywhere from 132nd Street

19  all the way to 161st Street.

20  Q.  Where in the city is that?

21  A.  In the Bronx.

22  Q.  What was your rank on that day?

23  A.  I was a police officer.

24  Q.  What was your assignment on that day?

25  A.  I was working as midnight conditions.

1   Q.  What is conditions?

2   A.  Well, we try to respond to the heavy jobs -- shootings,

3   slashings, heavy domestic incidents.

4   Q.  Were you working with anyone else on that day?

5   A.  I was.

6   Q.  Who were you working with?

7   A.  I was working with Lieutenant Camhi and Officer Garciarivas

8   and also Officer Maldonado, who is not here present right now.

9   Q.  Were you working as part of a team with these people?

10  A.  Yes, I was.

11  Q.  Were you working in uniform on that day?

12  A.  Yes.

13  Q.  Did there come a time that you responded to 805 East 156th

14  Street in the Bronx?

15  A.  Yes, I did.

16  Q.  Why did you respond to that location?

17  A.  We responded to a domestic incident where allegedly it was

18  a male with a firearm making threats.

19  Q.  Did there come a time that you actually arrived to that

20  location?

21  A.  Yes.

22  Q.  What, if anything, did you observe as you were arriving

23  there?

24  A.  Upon arrival at the location before we were able to stop, I

25  observed now what we identified as Mr. Christopher Neal.  He

1   was outside, bleeding from his head.  And as soon as he

2   observed the van, he took off running inside the location, 805.

3   Q.  Were you able to eventually park your car and get out?

4   A.  Yes.

5   Q.  What did you do after you got out of your vehicle?

6   A.  Once I stepped out of the vehicle, I was approached by a

7   female approximately 18 years old who had a bruise on her lip

8   and who informed me that the guy --

9           MR. DOGRAMACI:  Objection.  Objection.

10          THE COURT:  Overruled.

11          This is just being admitted -- what was said to the

12   detective for the affect that it had on him.  It is not being

13   admitted for the truth of the matter.

14          You may proceed.

15  Q.  You may continue, Detective.

16  A.  I was approached by approximately 18-year-old female, who I

17  remember by the name Kianna Barnes, who stated that

18  Mr. Christopher Neal punched her with a closed fist by her lip

19  and he was make threats with a firearm.

20  Q.  Did you do anything after you spoke to this female?

21  A.  Yes.  Also, she informed me that Mr. Neal was on parole.

22  So then I request for Mr. -- Ms. Barnes to take me to the

23  apartment where Mr. Neal was staying and she directed me to the

24  apartment.

25  Q.  What, if anything, did you do once you got to the

1    apartment?

2    A.   I entered the apartment.  It was a very long, narrow

3    hallway.  And when I entered the location, Lieutenant Camhi was

4    in the kitchen with Mr. Neal trying to make him comply about

5    the reason why we were there at the apartment.

6    Q.   What happened after that?

7    A.   After talking to him for a couple of minutes, he did not

8    want to comply with us and resisted arrest.  He proceeded to

9    push us away, push us around.  I mean, he was much bigger than

10   he looks today.

11   Q.   When you say he was pushing us around, do you mean you or

12   other officers?

13   A.   He was pushing me, he was pushing Lieutenant Camhi, and he

14   was pushing Lieutenant Kaiser.

15   Q.   What happened after that?

16   A.   Once he -- we were trying to engage him to arrest him.  He

17   was retrieving backwards and he was -- he got into this bedroom

18   that was adjacent to the kitchen and a dog -- a pit bull came

19   out of the room that attacked me first.  I jumped on top of

20   the -- on top of the stove because I am afraid of dogs.  So he

21   bit my right foot and he got a good grip of it.  It took a

22   couple of seconds before Officer Garciarivas was able to remove

23   the dog from my leg and then I proceeded to -- once the dog

24   left the kitchen area, I was able to go into the room where --

25   the bedroom where I observed Mr. Neal on the bed facing down

1   locking his arms under his body and refusing to be rear cuffed

2   by Lieutenant Camhi and Lieutenant Kaiser.

3   Q.  So when you ended up in the kitchen, do you know where

4   plaintiff was with the other officers?

5   A.  Yeah.  He was in the middle of the kitchen.

6   Q.  After the -- when you were in the kitchen with the dog, I

7   apologize, where were the other officers?  I mean, Lieutenant

8   Kaiser and Lieutenant Camhi?

9   A.  Once the dog bit my right foot, they went into the

10  bedroom -- the closest bedroom to the kitchen.

11  Q.  What did this dog look like that bit your boot -- I mean

12  bit your foot?

13  A.  The bit bull?

14  Q.  Yes.

15  A.  How he look?

16  Q.  Yes.

17  A.  He looked big to me.

18  Q.  Did you think that any of this was funny?

19  A.  No, it wasn't.

20          MR. DOGRAMACI:  Objection.

21          THE COURT:  Overruled.

22  Q.  Did you think any of this was funny?

23  A.  No, it wasn't.

24  Q.  Did you laugh at any point while you were in that

25  apartment?

1   A.  No, I didn't.

2   Q.  You said you helped place plaintiff in handcuffs in the

3   bedroom?

4   A.  Yes, I did.

5   Q.  At any point did you see anyone strike plaintiff with a

6   baton?

7           MR. DOGRAMACI:  Objection.

8   A.  No.

9           THE COURT:  Overruled.

10  Q.  Did you see anyone strike plaintiff with a baton?

11  A.  No, I didn't.

12  Q.  Did you see anyone punch plaintiff?

13  A.  No.

14  Q.  Did you ever punch plaintiff?

15  A.  No, I didn't.

16  Q.  Did you ever see anybody punch plaintiff?

17  A.  No.

18  Q.  Did you ever Tase plaintiff?

19  A.  I wouldn't be able to do it because I don't have the

20  training or never been trained to use a Taser.

21  Q.  So you did not have a Taser on you that night; right?

22  A.  No.

23  Q.  At any point on November 23rd, 2012 did you offer plaintiff

24  medical attention?

25  A.  Yes, we did.

1   Q.  Did he -- what happened after plaintiff was handcuffed?

2   A.  After Mr. Neal was in handcuffs, we proceeded to take him

3   downstairs where he EMS was already on the scene.  They

4   proceeded to treat his wound on his head.  And then while we

5   were downstairs, he specifically told me that he wanted to

6   go -- he didn't want any medical attention because he wanted

7   the judge to see him with the injury.

8   Q.  What did you take that to mean?

9           MR. DOGRAMACI:  Objection.

10          THE COURT:  Overruled.

11          You can say what your understanding was.

12  A.  To my understanding he wanted the judge to feel some kind

13  of pity for him in regards to the injury.

14  Q.  Did you go anywhere after plaintiff's arrest?

15  A.  I went to Lincoln Hospital with him.

16  Q.  What, if anything, did you do after Lincoln Hospital?

17  A.  After Lincoln Hospital I proceeded to go to the 40 precinct

18  to continue the arrest processing.

19          MS. DECASTRO:  Your Honor, can I have one moment to

20  confer?

21          THE COURT:  Yes.

22          (Pause)

23          MS. DECASTRO:  Nothing else, your Honor.

24          THE COURT:  Ladies and gentlemen, why don't we take a

25  half hour break that we discussed earlier now.  Keep an open

1    mind.  Don't discuss the case.

2            I have an unrelated proceeding right now so I am going

3    to stop a few minutes earlier.  I will see you in a half hour.

4            Thank you.

5            You can step down.  Thank you.

6            (Jury excused)

7            THE COURT:  Folks, I have a criminal proceeding right

8    now.  You don't have to move everything from your desk, but

9    just clean it up a little bit and keep in mind some other folks

10   are going to sit at the tables for a few moments.

11           Thank you.

12           (Recess)

13           (In open court; jury present)

14           THE COURT:  Everyone can be seated.

15           You may proceed.

16   REDIRECT EXAMINATION

17   BY MR. DOGRAMACI:

18   Q.  Officer Rodriguez, I want to ask you about when the dog had

19   its mouth on your -- which part of you did it bite?

20   A.  Can you repeat the question, please?

21   Q.  What part of your body did the dog bite?

22   A.  My right foot.

23   Q.  How long did it have its mouth on your foot?

24   A.  A few seconds.

25   Q.  Which of the police officers took the dog off your foot?

IAA6NEAL1A                    Rodriguez - redirect

1   A.  Officer Garciarivas.

2   Q.  How did Officer Garciarivas do that?

3   A.  He struck the dog.

4   Q.  And then what happened?

5   A.  The dog left the kitchen area.

6   Q.  The dog did that on its own?

7   A.  Yes.

8   Q.  Where did the dog go?

9   A.  I don't know.  Outside the kitchen area.

10              MR. DOGRAMACI:  Thank you.

11              THE WITNESS:  You're welcome.

12              MS. DECASTRO:  Nothing further.

13              THE COURT:  You can step down.  Thank you.

14              (Witness excused)

15              THE COURT:  You can call your next witness.

16              MR. DOGRAMACI:  Plaintiff calls Officer Coty Green.

17              THE DEPUTY CLERK:  Please raise your right hand.

18              There is water if you want.

19    COTY GREEN,

20         called as a witness by the Plaintiff,

21         having been duly sworn, testified as follows:

22              THE DEPUTY CLERK:  You may be seated.

23              Please state your name for the record and spell it

24              THE WITNESS:  Coty Green.  C-o-t-y, G-r-e-e-n.

25    DIRECT EXAMINATION

1    BY MR. DOGRAMACI:

2    Q.  Hello, Officer Green.

3    A.  Hello.

4    Q.  On November 23rd, 2012 you responded to 805 East 156th

5    Street in the Bronx in response to a radio run and 911 call

6    regarding an assault; correct?

7    A.  Yes, as a backup.

8    Q.  I am sorry?

9    A.  Hello.  Hello.  Can you hear me?

10   Q.  I can.

11   A.  Yes, as a backup.

12   Q.  On that night Mr. Neal was arrested; correct?

13   A.  Yes.

14   Q.  You were in the apartment when Mr. Neal was arrested;

15   correct?

16   A.  Yes.

17   Q.  You were in uniform acting as a police officer; correct?

18   A.  Yes.

19   Q.  You saw the arrest; correct?

20   A.  Yes.

21   Q.  You saw Mr. Neal get Tased; correct?

22   A.  No.

23         MR. DOGRAMACI:  No further questions.

24         THE COURT:  All right.

25         Cross-examination?

IAA6NEAL1A                    Green - cross

1          MS. DECASTRO:  One moment, your Honor.

2          THE COURT:  Sure.

3          (Pause)

4    CROSS-EXAMINATION

5    BY MR. MANNINGHAM:

6    Q.  Good afternoon, Officer Green.

7    A.  Good afternoon.

8    Q.  You said you were working on November 23rd, 2012; correct?

9    A.  Yes.

10   Q.  Were you working with anyone?

11   A.  Yes?

12   Q.  Who?

13   A.  Sergeant Wilson.  At the time he was a police officer.

14   Q.  When you responded to the location, why did you respond?

15   A.  We went as a backup to that domestic dispute with a

16   firearm.

17   Q.  When you got to the location, what, if anything, did you

18   do?

19   A.  Once we got to the location, we got out the car and went

20   upstairs.  Once I got into the apartment -- by the apartment,

21   directly in front of me I saw Officer Rodriguez sitting on a

22   counter trying to get away from a dog.  The dog then turned

23   around and came towards me and bit me on my right foot.  After

24   that I kicked the dog off.  I don't know where the dog went

25   after that.  I tried to get into the room where they were

IAA6NEAL1A                    Green - cross

1    trying to get Mr. Neal in handcuffs.  I never made it in.

2    Q.  When was the first time you saw Mr. Neal?

3    A.  When they were bringing him out in handcuffs.

4    Q.  Did you at any point touch Mr. Neal?

5    A.  No.

6    Q.  Did you see Sergeant Kaiser discharge the Taser?

7    A.  No.

8    Q.  Did you hear Sergeant Kaiser discharge the Taser?

9    A.  No.

10   Q.  Did you see anyone hit the plaintiff?

11   A.  No.

12   Q.  Did you see anyone use a baton or an expandable baton on

13   the plaintiff?

14   A.  No.

15           MR. MANNINGHAM:  One moment, your Honor.

16           (Pause)

17   BY MR. MANNINGHAM:

18   Q.  Did you ever hit Mr. Neal --

19   A.  No.

20   Q.  -- with a baton?

21   A.  No.

22   Q.  Did you hit him with anything?

23           MR. DOGRAMACI:  Objection to the many leading

24   questions.

25           THE COURT:  Overruled.

IAA6NEAL1A                    Green - cross

1            You can answer.

2    A.  No.

3    Q.  Did you use a Taser on Mr. Neal?

4    A.  No.

5    Q.  Did you have a Taser on that day?

6    A.  No.  During that time police officers weren't assigned

7    Tasers.  They weren't only assigned to bosses.

8    Q.  Did you laugh at any point when you were at that location?

9    A.  No.

10   Q.  Did you think this was funny at all?

11   A.  No.

12   Q.  Did you ever punch Mr. Neal?

13   A.  No.

14           MR. MANNINGHAM:  Nothing further.

15           THE COURT:  Anything else, Mr. Dogramaci or Mr.

16   Higgins?

17           MR. DOGRAMACI:  No, your Honor.

18           THE COURT:  You can step down.  Thank you.

19           (Witness excused)

20           MR. DOGRAMACI:  Your Honor, the plaintiff calls

21   Officer Garciarivas.

22           THE DEPUTY CLERK:  Please raise your right hand.

23    BAUDILO GARCIARIVAS,

24       called as a witness by the Plaintiff,

25       having been duly sworn, testified as follows:

IAA6NEAL1A                  Garciarivas - direct

1        THE DEPUTY CLERK:  Please state and spell your name

2   for the record and move the microphone towards you.

3        THE WITNESS:  Baudilio Garciarivas.  B-a-u-d-i-l-i-o,

4   G-a-r-c-i-a-r-i-v-a-s.

5   DIRECT EXAMINATION

6   BY MR. DOGRAMACI:

7   Q.  Hello, Officer Garciarivas.

8   A.  Hello.

9   Q.  On November 23rd, 2012, you responded to 805 East 156th

10  Street in the Bronx in response to a radio run and 911 call

11  regarding an assault; correct?

12  A.  Yes.

13  Q.  On that night Mr. Neal was arrested; correct?

14  A.  Yes.

15  Q.  You were in the apartment when Mr. Neal was arrested;

16  correct?

17  A.  Yes.  I was in the apartment, but not in the room where he

18  was arrested.

19  Q.  You were in uniform acting as a police officer; correct?

20  A.  Correct.

21  Q.  Which room were you in?

22  A.  I was in the kitchen.

23  Q.  You saw the Tasing; correct?

24  A.  No.

25        MR. DOGRAMACI:  Just one moment, your Honor.

IAA6NEAL1A                    Garciarivas - cross

1          (Pause)

2          MR. DOGRAMACI:  That's all, your Honor.

3          THE COURT:  Thank you.

4          Anything from defense counsel.

5    CROSS-EXAMINATION

6    BY MR. MANNINGHAM:

7    Q.  Good afternoon.

8          What was your rank on November 23rd, 2012?

9    A.  I was a police officer.

10   Q.  You were working that day with Officers Rodriguez and

11   Camhi; correct?

12   A.  Correct.

13   Q.  When you responded to 805 East 156th Street, what, if

14   anything, did you do?

15   A.  I went in front of the building and I saw plaintiff yelling

16   and I went upstairs.

17   Q.  When you got upstairs, what, if anything, did you do?

18   A.  When I got upstairs at some point I ended up in the kitchen

19   area.

20   Q.  When you got to the kitchen, what, if anything, did you do?

21   A.  When I got to the kitchen area, I at some point I saw

22   Sergeant Kaiser, Sergeant Camhi and the plaintiff in the

23   hallway area.

24   Q.  Why did you go to the kitchen?

25   A.  I went to the kitchen area to secure the room just in case

1    there was a weapon that can be used against us.

2    Q.   What happened next?

3    A.   After that the dog came out straight to Rodriguez.

4    Barking, started biting him.  And after that I hit the dog and

5    the dog ran away.

6    Q.   What did you hit the dog with?

7    A.   I hit the dog with a baton.

8    Q.   Why did you do that?

9    A.   Just to get him off his foot.

10   Q.   Was the dog letting go of the foot?

11   A.   No.

12   Q.   Did you see Sergeant Kaiser shoot the Taser?

13   A.   No.

14   Q.   Did you hear Sergeant Kaiser shoot the Taser?

15   A.   No.

16   Q.   Why not?

17   A.   I was in the kitchen area dealing with the dog.

18   Q.   You were dealing with the dog when the Taser was --

19   A.   Correct.

20   Q.   After the dog -- after you hit the dog, what happened next?

21   A.   After the dog I remember just being in the hallway and

22   seeing the plaintiff already handcuffed.

23   Q.   Did you touch the plaintiff?

24   A.   No.

25   Q.   Did you help escort him outside?

IAA6NEAL1A                    Garciarivas - cross

1    A.  No.

2    Q.  Was he walking on his own?

3    A.  Yes.

4    Q.  Did you find this incident funny at all?

5    A.  No.

6    Q.  Did you laugh at any point while you were at that location?

7    A.  No.

8    Q.  Did you have a Taser on you on that day?

9    A.  No.

10   Q.  After you hit the dog, what did the dog do?

11   A.  The dog just ran away.  I don't know where he went.

12   Q.  Did you see anyone use a baton on the plaintiff?

13   A.  No.

14   Q.  Did you see anyone hit the plaintiff with any object?

15   A.  No.

16   Q.  Did you see anyone punch the plaintiff?

17   A.  No.

18   Q.  Did you see anyone kick the plaintiff?

19   A.  No.

20   Q.  Did you hit the plaintiff at any point?

21   A.  No.

22   Q.  Did you ever physically touch the plaintiff?

23   A.  No.

24            MR. MANNINGHAM:  Nothing further, your Honor.

25            THE COURT:  Thank you.

IAA6NEAL1A                    Garciarivas – redirect

1    REDIRECT EXAMINATION

2    BY MR. DOGRAMACI:

3    Q.   Officer Garciarivas, where did you see the dog come from?

4    A.   The dog came from a room.

5    Q.   From another room?

6    A.   Yes.

7    Q.   And had the door to that room been closed?

8    A.   The door was open.

9    Q.   So was the door to that room open the entire time you were

10   in the apartment?

11   A.   The door -- when I saw the door -- I mean, when I saw the

12   dog come out, the door was opened.  I don't remember seeing the

13   door closed prior to that.

14   Q.   Okay.

15             MR. DOGRAMACI:  That's all.  Thank you.

16             THE COURT:  Anything else, Mr. Manningham?

17             MR. MANNINGHAM:  Nothing further, your Honor.

18             THE COURT:  You can step down.  Thank you.

19             (Witness excused)

20             MR. DOGRAMACI:  Plaintiff calls Lieutenant Camhi.

21             THE DEPUTY CLERK:  Please raise your hand.

22    DAVID CAMHI,

23       called as a witness by the Plaintiff,

24       having been duly sworn, testified as follows:

25             THE DEPUTY CLERK:  You may be seated.

1          Please state and spell your name for the record.

2          THE WITNESS:  David Camhi, C-a-m-h-i.

3    DIRECT EXAMINATION

4    BY MR. DOGRAMACI:

5    Q.  Sir, is your rank in the police department lieutenant?

6    A.  Currently, yes.

7    Q.  Thank you.

8          Lieutenant Camhi, on November 23rd, 2012, you

9    responded to 805 East 156th Street in the Bronx in response to

10   a radio run and 911 call regarding an assault; correct?

11   A.  Yes.  Domestic assault with a firearm.

12   Q.  On that night Mr. Neal was arrested; correct?

13   A.  Yes.

14   Q.  You were in the apartment when Mr. Neal was arrested;

15   correct?

16   A.  Yes.

17   Q.  You were in uniform acting as a police officer; correct?

18   A.  As sergeant, yes.

19   Q.  You saw the arrest; correct?

20   A.  Yes.

21   Q.  You saw the Tasing of Mr. Neal; correct?

22   A.  I didn't see the Tasing.  I heard the discharge.

23   Q.  Okay.  Where were you when you heard the discharge?

24   A.  In front and to the right side of Mr. Neal.

25   Q.  About how far from him were you?

IAA6NEAL1A                    Camhi - cross

1    A.  He was holding onto me so in arm's length.

2                MR. DOGRAMACI:  No further questions.

3                THE COURT:  All right.

4    CROSS-EXAMINATION

5    BY MS. DECASTRO:

6    Q.  Good afternoon, Lieutenant Camhi.

7    A.  Good afternoon.

8    Q.  You just stated that you are currently a lieutenant with

9    the New York City Police Department?

10   A.  Yes.

11   Q.  What precinct do you work out of?

12   A.  Bronx narcotics.

13   Q.  Can you walk us briefly through your assignments with the

14   New York City Police Department?

15   A.  Yes.  Upon completion --

16                MR. DOGRAMACI:  Objection.  Time frame?

17                THE COURT:  Can you specify the time frame, please?

18   Q.  From the beginning to the end.  Well, to now.  To now.  I

19   am sorry.

20   A.  Sure.  Upon completion of the academy I was assigned to

21   police service area seven.  It covers housing, 40 and 42

22   precincts.  Upon completion of my field training there, I was

23   assigned to police service area eight, which covers housing, 43

24   45 and 47 precincts.  Upon promotion to sergeant, I was

25   assigned to the 40 precinct.  Upon promotion to lieutenant, I

1    was assigned to the 107 precinct in Queens and then I requested

2    transfer for Bronx narcotics where I am currently assigned.

3    Q.  Thank you.

4            I would like to turn your attention to the events that

5    occurred on November 23rd of 2012.

6            Were you working on that day?

7    A.  Yes.

8    Q.  How did you come to be at that 805 East 156th Street?

9    A.  We received a radio run, which is a 911 call dispatch to

10   us.  It was received in regards to a domestic dispute with a

11   firearm at that location.  In the radio run it had mentioned a

12   male was assaulting and threatening a female with a firearm.

13   In addition it also named the suspect in that radio run as a

14   Christopher Neal and further stated in there that that

15   individual was on parole.

16           As we were going, an additional call came in from a

17   separate female caller but still that the same location

18   reiterating the same facts that a male at that location fitting

19   the same description as provided in the first call was

20   threatening and assaulting a female with a firearm.

21           A third call came in during that time stating that a

22   male fitting the description from the previous two calls and

23   this was from a separate caller was bleeding from the head in

24   front of the location.  All three calls stated that this was in

25   front of the location stated 805 East 156th Street.

1   Q.  I am going to show you what has been marked as Defendant's

2   Exhibit B for identification.  It is a three-page document not

3   to be published to the jury.

4          Showing you what has been marked for identification as

5   the first page of Defendant's Exhibit B, do you recognize this

6   document?

7   A.  Yes.  It's a Sprint printout.

8   Q.  How do you recognize this to be a Sprint printout?

9   A.  I have seen them in the past.  This was the type of radio

10  dispatch that we used at that time.

11  Q.  Is this a document that is made in the regular course of

12  NYPD business?

13  A.  Yes.  It is typed out by a dispatcher that receives the 911

14  call and then routed to a dispatcher who radios to units out in

15  the street.

16  Q.  So the information contained in this document is created at

17  or near the time of the incident -- of the transmission; right?

18  A.  Correct.  It is realtime, yes.

19  Q.  Does this document reflect the radio communications for the

20  incident?

21          It is actually three separate radio pages.  Let me

22  show you each three of them.  This is the first page.

23  A.  Okay.

24  Q.  Can you see it?

25  A.  Yes.

1    Q.  This is the second page.

2    A.  Yes.

3    Q.  And then this the third page.

4    A.  Yes.

5    Q.  Okay.

6         MS. DECASTRO:  At this time I move to -- I ask to move

7    Defendant's Exhibit B into evidence.

8         MR. DOGRAMACI:  Your Honor, I believe there is going

9    to be a limiting instruction.

10        THE COURT:  There is and I am prepared to give it.  I

11   am going admit the exhibit in evidence.

12        Folks, I am going to note that consistent with the

13   rules of evidence, these statements from the 911 calls are

14   being heard -- being admitted for any affect they may have had

15   on the officers who heard them and not for the truth of the

16   matter asserted within the statements themselves.  It is being

17   admitted for the limited purpose of the affect it had on the

18   officers who heard them at the time.

19        You may proceed.

20   BY MS. DECASTRO:

21   Q.  Lieutenant Camhi, I am going to show you the first page of

22   Defendant's B.

23        Can you tell this jury -- can you explain to the jury

24   what this document reflects?

25   A.  This reflects the summarize --

1    Q.  I think you should be able to circle areas.  Oh, we can't.

2          You tell me what it reflects and I can point where it

3    is.

4    A.  It is a summarized version of the call coming into the 911

5    dispatcher.  You will see at, I guess, the third time down 0205

6    it says, 40 SP 7.  That would will be the 40 Conditions Unit,

7    which I was the supervisor of at the time.

8          Below that, 0205, it states another call.  Female

9    complainant states, Mother's boyfriend trying to shoot her

10   sister.  Male black wearing all gray sweatsuit with black hat.

11   States they are both in front of the location.

12   Q.  Do you see the area immediately to the left of that?

13   A.  Yes.

14   Q.  What does that reflect?

15   A.  The speaking of the D1 10C or the times?

16   Q.  I apologize.  The times that reflects -- the section I am

17   pointing to, the third column to the right?

18   A.  Yes.  Those are the times.  0205.  So 2:05 in the a.m., in

19   the morning.

20   Q.  Does this report reflect when the first call came through?

21   A.  Yes.  This was the first call that came in.

22   Q.  What time does that state?

23   A.  0204.

24   Q.  Is there anything else that you note on this report?

25   A.  Below that it is just 40 Henry, 40 sergeant leaving a

1    previous job and responding to this as well.  Below that at

2    0206 it states, Perp's name is Christopher Neal.  Female caller

3    Gillard call back, and that is the call back number for the

4    person that is calling 911.

5    Q.  That number corresponds to the number of the original

6    caller?

7    A.  Yes.  This is the initial call.

8    Q.  Can you point to the jury where you can see the number that

9    originally came -- well, where on this document can you see the

10   number that originally called?

11   A.  The very top line 0204 hours.  Above that you will see the

12   phone call 917-200-3993.

13   Q.  You can continue down the document.

14   A.  Sure.  Further down those are these radio codes stating

15   that 40 Henry had arrived at the location at 0207.  Below that

16   at 0208 states female caller states that perp is on parole.

17   Q.  What about the rest of the information?

18   A.  Lower down it states 0221 40 Conditions Unit that I was in

19   charge of is stating there is an under, which is our code for

20   an arrest at the location.  No firearm would be no firearms

21   discharged by us.  And no injuries to MOS would be no injuries

22   to any of the officers that are at the location.  And then all

23   MOS accounted for, which means all officers on the scene are

24   uninjured and okay.

25   Q.  What about the line after that?

1    A.  At 0221 that states two under, which would mean two arrests

2    at the location.

3    Q.  So that means that you radioed that you had got -- made two

4    arrests at 0221?

5    A.  Correct.  I was notifying the dispatcher that we had two

6    arrests at that location.

7    Q.  What does the rest of the information below?

8    A.  That is just showing at 0222 40 Henry had left the

9    location.  Then it seems that they later on dispatcher

10   contacted the sergeant and just indicated that he was also 98

11   from the location, which means he left the location.

12   Q.  Go ahead.

13   A.  At 0722 the dispatcher I am assuming had realized they

14   hadn't finalized the job in the computer so they raised 40

15   Conditions for a final, which is 92 Frank, which is a

16   family-related arrest.

17   Q.  You were the Conditions sergeant; right?

18   A.  Correct.

19   Q.  So the column to the left of the times, what does that

20   column reflect?

21   A.  Those are codes for -- the dispatcher's codes.

22   Q.  Now I am going to show you the second page of Defendant's

23   Exhibit B.

24   A.  Okay.

25   Q.  How is this -- what is the difference between this one and

1   the one I just showed you?

2   A.  This call came in approximately a minute later.  It came in

3   from another separate female caller, but the ANI/ALI indicates

4   the location where the call came from.  It is the same location

5   but it is a separate phone number.

6   Q.  How can you tell from this report that it is a separate

7   phone number?  Where do you see?

8   A.  The phone number is listed in the first paragraph as the

9   917-736-4778.

10  Q.  Is that where I am pointing to?

11  A.  Yeah.  Second line count next to the word Sprint.

12  Q.  So looking at the two reports together, these -- we looked

13  at the first one where it had the 917-200-3993.  That was the

14  different caller than this caller; right?

15  A.  Yes.  Two separate female callers.

16  Q.  Can you read for the jury what that -- the section for the

17  jury?

18  A.  It states, At 0205 stepfather has the gun, wearing all

19  gray.  States, He hit her mom, private house, third floor.

20  States the cell phone number or the phone number.  Below that

21  0206 that is the 40 Conditions Unit most likely myself just

22  advising a final in regards to the job.  Under that 0330

23  central was finalizing this job in the computer.  So I advised

24  her authority of conditions sergeant, which was myself, that

25  this job was one in the same with the previous job that came

1    over from the female all caller at 0204.  It is basically

2    linking the jobs together in the system that they are all one

3    job in the same.

4    Q.  Just to be clear this job you linked as part of this job;

5    right?

6    A.  Correct.

7    Q.  Now I am going to show you the last page of Exhibit B.

8            Can you explain this one for the jury?

9    A.  Yes.  This is a third call being directed to that location.

10   This job came in at 0206.  The top line states, Male hit in the

11   head with object.  Below that is that the job is being

12   dispatched to an EMS unit.  They are on the same system, but

13   they will be dispatched to that location as well.  Under that

14   it just states that the male complainant wants to speak to EMS.

15   Q.  Then below that do you see where EMS -- does it know when

16   EMS is on scene?

17   A.  Yes.  0214 states that EMS is on scene, and that is the

18   ambulance number next to it.

19   Q.  So what if -- did this call come after the calls of the two

20   female callers?

21   A.  Yes.  This was the last call.

22   Q.  How do we know that?

23   A.  By the initial time.  The first job came in at 0204.

24   Second call from the other female came in at 0205.  This last

25   call came in at 0206.

IAA6NEAL1A                    Camhi - cross

1   Q.  These transmissions that we went over, did you hear those

2   over the radio?

3   A.  Yes.

4   Q.  You heard those over the radio on November 23rd of 2012;

5   right?

6   A.  Yes.

7   Q.  Now, at some point you arrived that the location?

8   A.  Yes.

9   Q.  What, if anything, did you do when you got there?

10  A.  We pulled up at the location.  I was in a van with other

11  officers -- Rodriguez, Maldonado and Garciarivas.  As we pulled

12  up to the location, I observed a male who appeared to be

13  bleeding run to the front of the building.  We exited the

14  vehicle.  We ran to the front of that building up on to the

15  stoop.  As I arrived on the stoop, I observed blood on the

16  stoop and the entry of the building.  In front of the building

17  we also observed a female with injuries to her face.

18  Q.  What did you do after -- did you also speak to the female?

19  A.  I spoke to the female, asked her what occurred.  She stated

20  that a male had assaulted her and in addition had threatened

21  her with a firearm.  She then provided a brief description

22  which matched the description from the radio run and she

23  provided the location of that individual that he was upstairs

24  and reiterated his name as Christopher Neal.

25            MR. DOGRAMACI:  Your Honor, if I could ask that the

1    limiting instruction be applied.

2              THE COURT:  Again, this is what is called hearsay.

3    They are statements that I am admitting not for the matter

4    asserted, but for the affect it had on the -- detective or

5    lieutenant?

6              THE WITNESS:  Lieutenant.

7              THE COURT:  For the affect it had on the lieutenant or

8    any other officers who heard that statement.

9    BY MS. DECASTRO:

10   Q.  What, if anything, did you do after speaking to this

11   female?

12   A.  After speaking with her, I entered the lobby of that

13   location and I proceeded up to the stairs by myself at the time

14   while walking noticing trace amounts of blood on the stairs

15   going up.

16             I proceeded up to the floor that I was notified of.

17   As I walked up to that flight, I noticed a pit bull running on

18   the landing of that floor.  As I got closer to that floor, I

19   saw the pit bull run into the apartment.  I walked up to the

20   entryway.  The door was opened to this apartment.  I saw the

21   pit ball inside the apartment in a long hallway and I saw a

22   female standing there.

23             I spoke to the female from outside the apartment and

24   asked her, Can you please secure the dog into another room.

25   She said, Yes.  She took the dog and put it into a side room at

1    the end of the hallway.  As she was doing that, I asked her,

2    Can I come in?  She said, Yeah.  In one way or another, she

3    said yes.

4            I entered into the room -- into the hallway.  As I am

5    walking in the hallway, I saw an individual at the end of the

6    hallway that fit the description provided over the radio as

7    well as the woman downstairs.  He was holding something to his

8    head.  He was visibly bleeding.  As I saw him, he moved back

9    behind a wall into whatever room he was standing at the time.

10   I slowly proceeded down the hallway.  As I was walking down the

11   hallway, he reappeared in the hallway that he was standing in.

12   I walked to the end.

13           It appeared he was in the kitchen of the apartment.  I

14   entered the kitchen.  It was just myself and him in the

15   kitchen.  It appeared he was trying to watch a significant

16   wound that was to the top near the front of his head.  I

17   proceeded to talk to him.  I stated that I had arrived due to

18   something that happened downstairs or outside, could he tell me

19   what was going on, what happened.  I was just trying to create

20   a dialogue with him.

21           He was belligerent.  He was angry.  He didn't want to

22   speak with me.  Then I offered medical assistance.  I told him

23   that you have a significant laceration to your heard.  You are

24   bleeding pretty bad.  We have an ambulance coming.  I can get

25   you some assistance.

1          During this time that I am speaking with him, I am

2    also scanning the apartment from where I walked through the

3    hallway as well as the kitchen for any possible firearms since

4    it was mentioned.  I am making sure that I didn't observe any

5    firearm in the general area.  I am also keeping in mind that it

6    was mentioned that this individual was on parole.  So that is

7    going to heighten my concern in regards to a firearm and in

8    regards to possible fighting.

9          Most individuals that are on parole don't want contact

10   with the police and do not want to be arrested or they will be

11   violated and sent back.

12              MR. DOGRAMACI:  Objection.

13              THE COURT:  Overruled.

14              MS. DECASTRO:  Continue.

15              THE COURT:  I am admitting this for your state of

16   mind -- the witness's state of mind.

17   A.  While I am scanning the room, I observe there are knives in

18   the sink.  There are knives on the washboard on the counter

19   near him while he is washing.  I continue the dialogue with

20   him.  Mr. Neal at that time was larger than he appears now and

21   significantly larger than myself.  As I stated before I was

22   alone with him in the kitchen.

23          I waited until I heard other officers -- until I could

24   hear other officers coming up.  As I heard that, I continued to

25   speak to Mr. Neal.  I saw uniforms in the doorway.  I wasn't

1    able to tell who it was.  I glanced over and noticed a uniform

2    in the doorway knowing that somebody had come to the apartment.

3    I let Mr. Neal walk past me out of the kitchen into the

4    hallway.  My idea was that he was going to be away from any

5    type of weapons that could be possible harm to me, other

6    officers.  So letting him exit the kitchen was the safest thing

7    not only for me but the other officers and Mr. Neal.

8            At this time he was in the beginning of the hallway

9    closest to the kitchen.  I was standing with my back to the

10   kitchen in the doorway and other officer, Sergeant Kaiser, was

11   at the other end of the hallway at the entryway way of the

12   apartment.

13   Q.  What, if anything -- well, go back for a second.  At any

14   point did plaintiff present to you identification?

15   A.  No.

16   Q.  What happened after you saw Sergeant Kaiser at the doorway?

17   A.  When I saw Sergeant Kaiser, Mr. Neal had walked past me.

18   He was still in arm's reach of me.  At that point I reached out

19   for Mr. Neal's right arm with my right arm and stated, Get your

20   hand behind your back.  When I tried to do that, Mr. Neal

21   pushed my arms away then he -- the best way to describe it

22   would be stiff armed me, which is he stuck his arm straight out

23   into my chest, pushing me back against the wall in that

24   hallway.  I stepped into the hallway slightly in front of him.

25   He pushed me against the wall then grabbed my uniform and

1    slammed me into the wall.  I lost my grip.  I attempted to grab

2    him again.  Then we became entangled and wrestling at that

3    point.

4    Q.  Why did you lose your grip on him?

5    A.  He is larger than me so his arm's reach was longer than

6    mine.  He pushed me back.  I lost my grip pulling my arms off

7    of him.  I was able to reach onto his forearm, but I wasn't

8    able to overpower him.

9    Q.  What happened after that?

10   A.  After that Sergeant Kaiser proceeded down the hallway.  He

11   appeared.  I was behind -- well, Mr. Neal was in front of me

12   blocking my view, but it appeared that Sergeant Kaiser was

13   trying to grab the left arm of Mr. Neal.  Myself, Mr. Kaiser

14   were attempting to -- Sergeant Kaiser were attempting to get

15   Mr. Neal's hands behind his back.  We are shouting, Stop

16   resisting.  Stop resisting.  Get your hands behind your back.

17   Get your hands behind your back repeatedly.

18          Mr. Neal continues to push me back and forth against

19   the two walls.  It is a relatively narrow hallway.  So he is

20   very easily able to go bang into one wall and right back into

21   another one.  There is not a lot of space.

22          During this time the three of us slam into a door in

23   that hallway that I previously seen the female I mentioned

24   secure the bit bull.  The pit bull came running out of the

25   bedroom past the three of us that were in the doorway and I am

1   not sure where it went after that.  It went past me, and I was

2   concentrating on what I was doing at that time with Mr. Neal.

3   Q.  What happened after the pit bull came out of the room?

4   A.  Myself and Sergeant Kaiser continued to struggle with

5   Mr. Neal.  He was still refused.  He still have had I firm grip

6   on me, on my uniform pushing me up against the wall.  At that

7   time I heard what I believe to be Sergeant Kaiser state

8   something along the lines of Taser as an indication to Mr. Neal

9   as well as myself that he was going to deploy a Taser or he was

10  upholstering a Taser.

11          At that point I attempted to push back free myself

12  from Mr. Neal to create space so I wouldn't be struck by the

13  Taser.  I was unable to because Mr. Neal was still holding onto

14  me at the time.  I pushed back as far as I could.  I heard the

15  Taser deploy, which is the popping sound from the Taser darts

16  being -- puncturing the paper that is on the front of the Taser

17  cartridge.  When it is deployed and then you hear a crackling

18  or a popping sound as the electricity is deployed.  I heard the

19  popping sound.

20          It didn't appear that Mr. Neal had any affect due to

21  this.  So it was my impression at that time that he hadn't been

22  struck because he wasn't stopping his aggression.  He wasn't

23  loosening his hold on me, which he would have if he was struck

24  in my opinion.  While I was wrestling with him, the wires from

25  the Taser actually became tangled on my arms entangling on my

1   right and left arm, which caused the electrical charge from the

2   Taser to go across my arms, across my chest, locking my arms

3   up, which now I was pretty much defenseless at that short

4   moment.  This is a five-second surge.

5          At that moment Mr. Neal was able to overtake me, push

6   me against the wall and then we all turned and I was pushed

7   through that open doorway backwards with my back to the room

8   through the doorway and fell over a bed that was very close to

9   the doorway right inside the doorway.

10   I fell backwards over the bed, half on the bed, half on the

11   floor.  Mr. Neal landed on top of me, and then I'm not sure

12   who, if anybody, was on top of him.  My lower body, legs were

13   on the bed.  Mr. Neal was on top of them, and my back and head

14   were on the floor.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  And you said that you felt the effects of the Taser, right?

2   A.  Yes.  Momentarily, yes, because they were making contact

3   with my arms.  Yes.

4   Q.  And you said that it happened in cycles, correct?

5   A.  Correct.

6   Q.  Did you feel more than one cycle of electricity?

7   A.  No.

8   Q.  Did you hear the Taser go off more than once?

9   A.  No.

10  Q.  You said that the wires would shoot out, that they became

11  entangled on your arms?

12  A.  Correct.

13  Q.  How long are these wires?

14  A.  I recall, I believe they were somewhere around 16 feet.

15  I'm not 100 percent sure.

16  Q.  Did you have a Taser on you that night?

17  A.  No, I didn't.

18  Q.  Where were you when plaintiff was finally handcuffed?

19  A.  I was underneath him.

20  Q.  Were you able to assist in the handcuffing?

21  A.  Not assist, no.  I was just pushing, trying to push him off

22  of me, but I wasn't able to actually assist.

23  Q.  Did you feel any blows to your body while you were on the

24  bed?

25  A.  No.

 1              MR. DOGRAMACI:  Objection.  Leading.

 2              THE COURT:  Overruled.

 3    Q.  Did you feel any blows to your body while you were on the

 4    bed?

 5    A.  No, I did not.

 6    Q.  Did you see anyone use a baton while you were on the bed?

 7    A.  No, I did not.

 8    Q.  Did you see anyone use a baton at any point?

 9    A.  No.

10    Q.  Did you ever punch plaintiff?

11    A.  No.

12    Q.  Did you see anyone punch plaintiff?

13    A.  No.

14    Q.  Did you ever hit plaintiff with any other objects?

15    A.  No, I did not.

16    Q.  Did you see anyone hit plaintiff with any other objects?

17    A.  No.

18              MS. DeCASTRO:  Just one moment to confer?

19              THE COURT:  Yes.

20    Q.  Mr. Kaiser -- sorry.

21        Lt. Camhi, how did the struggle with the plaintiff end on

22    the bed?

23    A.  It ended -- I was underneath him, and then the next thing I

24    knew that he was being lifted off of me.

25    Q.  What, if anything, did you do after -- well, withdrawn.

1      Were you able to get up from the bed?

2  A.  I was no longer on the bed.  After he was lifted off me,

3  the rest of me slid.  Since I was underneath him, the rest of

4  my body slid off the bed onto the floor.  I was a little bit

5  dazed from falling to the floor and, of course, the tasing.  It

6  took me a few seconds, and I was able to get up and stand up

7  and proceed out of the room.

8  Q.  Did you have any further interactions with plaintiff that

9  night?

10 A.  No.

11 Q.  What, if anything, did you do after you left the location?

12 A.  I left the location.  I returned to the 40 Precinct and

13 assisted with paperwork in regards to the arrest and the Taser

14 deployment, and then I relieved the desk officer.

15      MS. DeCASTRO:  Nothing further.

16      THE COURT:  Redirect.

17 REDIRECT EXAMINATION

18 BY MR. DOGRAMACI:

19 Q.  Lt. Camhi, I'm going to ask about not right now, but I'm

20 going back in time to November 2012.  Even before this arrest

21 on Thanksgiving, you and -- he's now, I believe, a lieutenant,

22 you and Lt. Kaiser knew one another, correct?

23 A.  We were both assigned to the 40 Precinct.

24 Q.  You knew one another, correct?

25 A.  Yes, we were both sergeants at the 40 Precinct.

1   Q.  You've known one another for some time, correct?

2   A.  Just from the time that he was assigned there.  I never met

3   him before that, I don't believe.

4   Q.  You were friendly with one another?

5   A.  We'd never hang out outside of work, no.

6           MR. DOGRAMACI:  That's all.

7           THE COURT:  Recross-examination.

8           MS. DeCASTRO:  No, your Honor.

9           THE COURT:  You can step down.  Thank you.

10          (Witness excused)

11          MR. DOGRAMACI:  The next witness is Officer Wilson.

12   ROMAINE WILSON,

13       called as a witness by the Plaintiff,

14       having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. DOGRAMACI:

17   Q.  Sir, I want to use the right title.  Is it Officer Wilson?

18   A.  It's currently Sgt. Wilson.

19   Q.  Sgt. Wilson?

20   A.  Yes.

21   Q.  Thank you.

22          Sgt. Wilson, prior to plaintiff's arrest on November

23   23, 2012, you had seen and interacted with plaintiff, correct?

24   A.  That is correct.

25   Q.  You two knew one another, correct?

1   A.  I wouldn't say we knew each other, but I did patrol the

2   area around his house, yes.

3   Q.  OK.  You knew him by name, correct?

4            MS. DeCASTRO:  Your Honor, could we have a quick

5   sidebar?

6            MR. DOGRAMACI:  Your Honor, it might not be necessary.

7   I'm not going to go very far with this.

8            THE COURT:  OK.  Just be consistent with my prior

9   ruling on this issue.  OK?  Be consistent with my prior ruling.

10           MR. DOGRAMACI:  Yes.

11           Can I have my last question read back as well, your

12  Honor?

13           THE COURT:  Yes, you may.

14           (Record read)

15  BY MR. DOGRAMACI:

16  Q.  Would you answer that question, please, Sgt. Wilson?

17  A.  I don't recall knowing him by name, no.

18  Q.  You were present during the November 23, 2012, arrest of

19  plaintiff at 805 East 165th Street in the Bronx, correct?

20  A.  Yes.

21  Q.  And you participated in the arrest, correct?

22  A.  I did not physically participate in the arrest.

23  Q.  You saw him arrested, correct?

24  A.  I don't recall seeing him placed in handcuffs, no.

25  Q.  You were inside the apartment when he was arrested,

1   correct?

2   A.  Yes, sir.

3   Q.  And on the occasion of November 23, 2012, when plaintiff

4   was arrested, you were carrying among your police equipment an

5   extendible baton, correct?

6   A.  Yes, sir.

7   Q.  You were in uniform acting as a police officer, correct?

8   A.  Yes.

9   Q.  You saw Mr. Neal tasered, correct?

10  A.  I did not see Mr. Neal tasered, no.

11          MR. DOGRAMACI:  That's all, your Honor.

12          THE COURT:  All right.

13          Any cross-examination?

14          MS. DeCASTRO:  Just one moment?

15          THE COURT:  Sure.

16  CROSS-EXAMINATION

17  BY MS. DeCASTRO:

18  Q.  Sgt. Wilson, where are you currently working?

19  A.  I am currently assigned to Manhattan North Gang Squad.

20  Q.  What do you do in that capacity?

21  A.  I'm a supervisor in charge of case work.

22  Q.  On November 23 of 2012, who were you working with?

23  A.  I was working with Police Officer Green.

24  Q.  And at that time, were you still in the rank of police

25  officer?

1   A.  Yes, ma'am.

2   Q.  Why did you respond to that location?

3   A.  I responded in a backup capacity.

4   Q.  At any point on that day, did you take out your baton?

5   A.  I don't recall taking out --

6           MR. DOGRAMACI:  Objection.  Leading.

7           THE COURT:  I'll allow it.

8   Q.  At any point on November 23, 2012, did you take out your

9   expandable baton?

10  A.  I don't recall taking out my baton at all that day, no.

11  Q.  At any point on that date, did you strike plaintiff with

12  your expandable baton?

13  A.  No, I did not.

14  Q.  Did you strike plaintiff with anything else?

15  A.  No, I did not.

16  Q.  Did you ever enter the room where plaintiff was arrested?

17  A.  No, I did not.

18          MR. DOGRAMACI:  Objection to continuing leading.

19          THE COURT:  Overruled.

20  Q.  Did you ever enter the bedroom in which plaintiff was

21  arrested?

22  A.  No, I did not.

23  Q.  Did you ever assist in the handcuffing of plaintiff?

24  A.  No, I did not.

25  Q.  Did you ever punch the plaintiff?

1   A.  No, I did not.

2   Q.  Did you ever tase the plaintiff?

3   A.  No, I did not.  I was not --

4   Q.  Did you have a Taser on you on November 23, 2012?

5   A.  I was not equipped to carry a Taser at that time, no.

6           MS. DeCASTRO:  Just one moment, your Honor?

7           THE COURT:  Yes.

8   Q.  Sgt. Wilson, at what point did you arrive at the apartment?

9   A.  I don't recall the exact time, but shortly after the

10  initial calls came over.

11  Q.  When you arrived at the apartment, what, if anything, was

12  happening?

13  A.  When I, when I arrived to the apartment and I got upstairs,

14  I followed the trail of blood.  I knew that there was officers

15  upstairs already.  I got into the front vestibule of the

16  apartment, which I observed officers talking with Mr. Neal.

17          Shortly thereafter, a struggle ensued, and then a pit

18  bull became -- got into the hallway.  My attention was then

19  drawn to the pit bull, immediately, because it was running

20  around and barking very aggressively.  I believe I followed the

21  pit bull shortly -- to a short part of the corridor leading

22  towards the kitchen, at which point I observed the pit bull

23  bite at Officer Green's foot.

24  Q.  Did you ever place your hand on plaintiff on that day?

25  A.  No, I did not.

1           MS. DeCASTRO:  No further questions.

2           MR. DOGRAMACI:  That's all, your Honor.

3           THE COURT:  OK.  Thanks.

4           You can step down.  Thank you.

5           (Witness excused)

6           MR. HIGGINS:  Your Honor, plaintiff calls Officer

7    Michael Kaiser to the stand, please.

8           THE COURT:  All right.

9     MICHAEL KAISER,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. HIGGINS:

14   Q.  Good afternoon, Officer Kaiser.

15   A.  Good afternoon.

16   Q.  On November 23, 2012, you answered a call at 805 East 165th

17   Street in the Bronx, is that correct?

18   A.  Yes.

19   Q.  At that time you discharged a Taser, did you not, sir?

20   A.  While I was inside that location?

21   Q.  Yes, sir.

22   A.  Yes.

23   Q.  And the target of the Taser that you discharged was the

24   plaintiff, Mr. Christopher Neal, is that correct?

25   A.  Correct.

1   Q.  Officer Kaiser, you've been given training in the use of a

2   Taser, is that correct?

3   A.  Yes.

4   Q.  And so you know how to use one, is that fair?

5   A.  Yes.

6   Q.  Is it a requirement of the New York City Police Department

7   that you have training before you are authorized to use a Taser

8   in the field?

9   A.  Yes.

10  Q.  When you fire a Taser gun, there are two prongs that come

11  out of the front of the Taser, is that correct?

12  A.  That are discharged from the front of the Taser?

13  Q.  Yes.

14  A.  Yes.

15  Q.  And those prongs are metal and sharp at the end?

16          MR. MANNINGHAM:  Objection.  Leading.

17          THE COURT:  I'll allow it.

18          It's all right.  You can answer that.

19  A.  The prongs -- I've never touched the end of it.  I'm not

20  sure what they're made out of, to tell you the truth.

21  Q.  And your understanding of the purpose of the prongs is that

22  it's there to stick into the target that the Taser's aimed at,

23  is that correct?

24  A.  That's correct.

25  Q.  And connected to those -- well, how big are the metal

1   prongs?

2   A.   Around an inch, I'd say.

3   Q.   And they're thin and made of metal?

4   A.   They're thin.  I'm not exactly sure what material they're

5   made of.

6   Q.   Are they sort of like a straight fishing hook?  Is that

7   fair?

8            MR. MANNINGHAM:  Objection.

9            THE COURT:  I'll allow it.  It's hard to explain.

10  A.   They're straight, yes.

11  Q.   They're straight?  They don't have a snail or a hook at the

12  end; sort of a straight point, is that fair?

13  A.   A hook at the end?

14  Q.   You know, like a fishing hook has a little end on it so it

15  doesn't come out of the fish's mouth.  The Taser prong, is it

16  straight and sharp, or does it have a curve at the end so it

17  doesn't come out of the target that it's shot at?

18  A.   I don't know.

19  Q.   OK.

20  A.   No.

21  Q.   And attached to those prongs are wires, is that correct?

22  A.   Yes.

23  Q.   The purpose of those wires is to conduct electricity from

24  the Taser gun that you have in your hand through the wires to

25  the end of the prongs, is that correct?

1    A.  Yes.

2    Q.  And then that electrical discharge goes into the target,

3    presumably to immobilize the target, is that fair?

4              MR. MANNINGHAM:  Objection.

5              THE COURT:  Just answer it.  Is that right?  If you

6    need to elaborate, you can do so.

7    A.  Generally speaking, the -- yes.  Two prongs would discharge

8    from the front of the Taser.  They are attached to a line or a

9    wire that runs current through, and then the electrical current

10   will go through the wire into the prongs and into the target,

11   if everything works correctly.

12   Q.  OK.  When does the electrical charge go from the Taser gun

13   through the prongs into the target, if you know?

14   A.  To the best of my knowledge, when you, when you depress the

15   trigger.

16   Q.  And do you know how long that electrical charge lasts when

17   you depress the trigger?

18   A.  Approximately five seconds.

19   Q.  OK.  So you depress the trigger at the target, and the two

20   prongs go into the target and there's an automatic five seconds

21   of electrical charge that goes through the wires into the

22   prongs, is that correct?

23   A.  Well, the prongs -- when you depress the trigger, the

24   prongs are ejected out of the front of the cartridge.  Wherever

25   they go, they go.  And then yes, at the same time, as far as I

1   understand, that five-second cycle is going.

2   Q.  OK.  And can you send a second electrical charge through

3   the wires to the prongs after they have been shot from the

4   Taser gun?

5   A.  Yes.

6   Q.  And how do you do that?

7   A.  You would have to -- the five seconds had ended from the

8   first one, you would have to let go of the trigger and depress

9   the trigger again.

10  Q.  And that would send another cycle of electricity through

11  the wires, is that correct?

12  A.  Correct.

13  Q.  Do you know how long that second cycle would last?

14  A.  Five seconds, approximately.

15  Q.  And you could repeat this process a third time?

16  A.  Yes.

17  Q.  Do you know how many times you can repeat the process by

18  sending a cycle of electricity through wires and prongs that

19  have already been discharged?

20  A.  No, I don't know how many times.

21        THE COURT:  Do the wires stay out?  Do the wires stay

22  out but you can -- I don't know what the terminology is,

23  recharge it or do it again?

24        THE WITNESS:  Sure.  So, once the prongs and the wires

25  have been discharged, you can -- they're, they're not --

1   wherever they landed, that's where they'll land.  The wires

2   stay attached if they don't break, and then -- so that stays

3   the same.  And yes, then you could send another cycle through

4   the same wire and prongs.

5           THE COURT:  OK.

6   BY MR. HIGGINS:

7   Q.  Is it your understanding that you could conceivably pull

8   the trigger up to about ten times to send the cycle of

9   electricity through the Taser wire --

10          MR. MANNINGHAM:  Objection.

11  Q.  -- to the prongs?

12          THE COURT:  Overruled.

13  A.  I'm not sure.  It's operated by a battery, so I don't know.

14  It all depends on how, how full the battery is, if it's new, if

15  it's old.  I don't know how many, how many times it would send

16  the charge through.

17  Q.  OK.  Now, if you wanted to discharge a Taser at a second

18  target but you had already discharged the two prongs into one

19  target, how would you accomplish that?

20  A.  You would have to remove the cartridge that you had

21  discharged.

22  Q.  OK.  Sorry to interrupt you, but can you explain to us

23  first what you mean by the cartridge?

24  A.  Sure.  On the front of the device, there's -- they're

25  usually black.  It's about the size of a ring box that has two

1    little plastic -- it's plastic, two little plastic parts, you

2    pinch and you slide onto the front, and it clicks and that

3    is -- the cartridge is on your Taser.

4        When you press the trigger of the Taser, there's plastic

5    doors on the very front of that cartridge that pop off.  The

6    darts come out followed by the line, and that stays attached.

7            So you're asking now, that's happened?

8    Q.  No, I believe you answered my question.  Thank you, sir.

9    A.  OK.

10   Q.  So each cartridge contains two prongs with wires and some

11   sort of propulsion mechanism so that they can be shot at the

12   target, is that fair?

13   A.  Two prongs with wires.  I can't speak to the propulsion

14   mechanism.  I don't know.

15   Q.  How long would it take to take off a discharged cartridge

16   and put a new, not-yet-discharged cartridge onto the end of the

17   Taser gun?

18   A.  It would depend where you're getting the new cartridge

19   from.  Are you saying I'm holding both?

20   Q.  Yes.  Let's assume you have one, a second cartridge, right

21   near your hand.  How long?

22   A.  Sure.  You would have to -- it would not take very long.

23   I've never done it, but you remove the one that you've used,

24   drop it, pick up the other one and click it on.  It would not

25   take very long.

1  Q.  A matter of seconds, is that fair?

2  A.  Probably, depending on where you had another cartridge.

3  Q.  Now, the New York City Police Department doesn't let just

4  any officer go into the field with a Taser, is that correct?

5          MR. MANNINGHAM:  Objection.  Is he talking about now

6  or back then?

7          MR. HIGGINS:  Just generally.  I think my question is

8  as a general matter.

9          MR. MANNINGHAM:  He said any officer.  What does he

10 mean by that?

11 BY MR. HIGGINS:

12 Q.  You need special training to be authorized to carry a Taser

13 in the field, is that correct?

14 A.  You need to be trained in the use of a Taser to carry one,

15 yes.

16 Q.  Trained by the New York Police Department, correct?

17 A.  Yes.

18 Q.  And the New York Police Department has many rules and

19 regulations pertaining to the training in the use of a Taser,

20 is that correct?

21 A.  There's, there's rules on use of a Taser, correct.

22 Q.  Yes.  And there are rules and regulations on how and when

23 and what process by which an officer is able to take a Taser

24 into the field, is that correct?

25          MR. MANNINGHAM:  Objection.

1    A.  I'm not sure of the question.

2              THE COURT:  Why don't you rephrase the question.

3              MR. HIGGINS:  OK.  I'll rephrase it.

4    Q.  Does the -- New York City Police Department carefully

5    monitors and describes for officers how they're supposed to

6    handle and use Tasers, isn't that fair?

7              MR. MANNINGHAM:  Objection.

8              THE COURT:  Overruled.

9    Q.  Please answer the question, sir.

10   A.  Sure.  You mind asking or have it read back?

11             MR. HIGGINS:  Can you read back?

12             THE COURT:  No.  I have a rough transcript here right

13   here.

14             MR. HIGGINS:  OK.

15             THE COURT:  If this is wrong, let me know.

16             "Does the -- New York City Police Department carefully

17   monitors and describes for officers how they're supposed to

18   handle and use Tasers, isn't that fair?"

19             THE WITNESS:  Yes.

20   BY MR. HIGGINS:

21   Q.  And in fact, there are written orders on how you are to use

22   a Taser, is that correct?

23   A.  Correct.

24   Q.  And that order has been promulgated by the New York Police

25   Department brass to be complied with by its officers, isn't

1   that correct?

2   A.  Correct.

3   Q.  And as an officer, it's incumbent upon you to comply with

4   the rules that are promulgated by the police department for the

5   manner and use of a Taser, is that correct?

6   A.  Correct.

7   Q.  And that written order specifies what happens and what

8   you're supposed to do if you actually discharge a Taser in the

9   field, is that correct?

10  A.  Correct.

11  Q.  There's bookkeeping and paperwork requirements for what

12  happens if a Taser is discharged in the field, is that correct?

13  A.  Correct.

14          MR. HIGGINS:  Your Honor, we would like marked as

15  Exhibit 1 -- I'm sorry, as Plaintiff's Exhibit A for

16  identification -- should I describe the document?

17          THE COURT:  Don't defendants use numbers?

18          MS. DeCASTRO:  Yes.

19          THE COURT:  You can make it 1, because defendants' are

20  letters.

21          MR. HIGGINS:  May I show it to the witness?

22          THE COURT:  You may.

23          Do you have a copy for me and defense counsel?

24  BY MR. HIGGINS:

25  Q.  Officer Kaiser, have you ever seen what's been marked as

1   Plaintiff's Exhibit 1?

2   A.  Yes.

3   Q.  What is it?

4   A.  It is an interim order to patrol guide series 212 of the

5   police department.

6   Q.  And the subject matter is the "use of conducted-energy

7   devices, CED."  Do you see that?

8   A.  Yes.

9   Q.  And conducted-energy device is just the generic name for

10  Taser, isn't that fair?

11  A.  Yes.

12  Q.  In fact, Taser is a brand name, like Kleenex or any other

13  terms people use to just describe generic items, is that fair?

14  Taser's a brand name?

15  A.  Yes, Taser's a brand name.

16  Q.  Thank you.

17      So when you say Taser, it's the same as a CED, or a

18  conducted-energy device, is that correct?

19  A.  Correct.

20  Q.  So the document that you have in your hand --

21          THE COURT:  You don't need to read from the document.

22  Did you want to ask him a question?

23          MR. HIGGINS:  I want to offer it into evidence.  I

24  want to ask him about the document, how he received it.

25          THE COURT:  Are you familiar with this document?

1           THE WITNESS:  Yes.

2           THE COURT:  OK.

3           MR. MANNINGHAM:  Your Honor, we would object to this

4    coming into evidence.

5           THE COURT:  Yes.  Let's just actually meet at sidebar

6    briefly.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Two things.

3          First, I thought you were going to tell me when you

4    wanted to use the patrol guide for something other than for use

5    of force before you did so.

6          Second, are you using this to impeach him?

7          MR. HIGGINS:  I think I established that there are

8    rules he's required to follow -- and this goes to the bias

9    prong -- and in your pretrial order, your Honor, you said it

10   has probative value of reasonableness in a force case.

11         THE COURT:  I was focusing on use of force

12   specifically, but what exactly are you using to impeach him?

13         MR. HIGGINS:  Well, there are --

14         THE COURT:  Why don't you ask him a question and then

15   try to impeach him.

16         MR. HIGGINS:  The evidence is going to show they

17   didn't follow the procedure with this.  In fact, it's going to

18   show they didn't put down the correct serial numbers.  That's a

19   disparity the jury's going to want to hear about and the other

20   recordkeeping evidence they're supposed to keep.

21         THE COURT:  You want to impeach him just about the

22   recordkeeping, not just about the use of that.

23         MR. HIGGINS:  That's why -- they didn't answer

24   honestly when they said it was fired once, because each Taser

25   has its only internal memory as to how many times it was fired,

1    and you're supposed to log in the serial number of the

2    cartridge, and the entry they have doesn't match the entry of

3    the cartridge of the Taser in this report.

4           MR. MANNINGHAM:  Your Honor, we had this issue in his

5    deposition, and we explained to them that the Taser cartridge

6    was vouchered, it was just a paperwork error, and I presented

7    an email to both of them five months ago saying I have a

8    physical cartridge if you want to inspect it.

9           This issue did not show up until today.  We have the

10   physical Taser cartridge that showed it was a paperwork error.

11   We offered for them to come to our office for inspection of the

12   physical Taser cartridge, which was vouchered on that day.

13   They did not respond to my email.  They did not bring this

14   issue up until now, your Honor.

15          MS. DeCASTRO:  And second, on the admissibility of it,

16   they're using this document to impeach him.  In and of itself,

17   this document is not admissible.  It's collateral -- it's

18   really not an issue.  It's filled with hearsay.  It's not

19   admissible on its own, so it can't just be introduced into

20   evidence.

21          MR. HIGGINS:  It's admissible because it's not a

22   contract.  It's not a statement.  Not everything that's written

23   is a statement.  It's not a statement.  This is the directives

24   and the policies, and the rule of evidence is very clear it has

25   to be an assertion or statement by someone.

1          THE COURT:  Have you even established that there's a

2     contradiction here, something to impeach him on yet?

3          MR. HIGGINS:  No, I haven't.

4          THE COURT:  Why don't you see if you can do that first

5     and then we'll revisit this issue.

6          MR. DOGRAMACI:  Your Honor, may I make a suggestion?

7          THE COURT:  Yes.

8          MR. DOGRAMACI:  They're going to do their direct after

9     you.  This stuff can be used for impeachment after he's told

10    his story on direct.  We can save it for the next round.

11         THE COURT:  Right now, you're not using it to impeach

12    him.

13         MR. HIGGINS:  In his rules, his requirements, things

14    he was supposed to file, and we have the memorandums.  You're

15    supposed to put the serial numbers down; that's a disparity the

16    jury should be able to see.  At 2:30 in the morning, he said

17    the cartridge was the number X.  At 4:30 the same morning, he

18    said it was Y.  That shows it was shot more than once.

19         MR. MANNINGHAM:  Your Honor, I can explain.

20         THE COURT:  Can we follow Mr. Dogramaci's suggestion

21    in any event?

22         MR. HIGGINS:  If you let me proceed, yes.

23         THE COURT:  It's not ripe for impeachment at this

24    point.  You haven't laid a proper foundation in any event, so

25    why don't we proceed and then we can revisit it.

IaaWnea2                    Kaiser - Direct

1              MS. DeCASTRO:  Can we revisit the admissibility of the

2      document in and of itself after?

3              THE COURT:  Sure.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. HIGGINS:  May I?

3              THE COURT:  Go ahead.  You may proceed.

4    BY MR. HIGGINS:

5    Q.  Officer, you testified that you used a Taser on November

6    23, 2012, is that correct?

7    A.  Yes.

8    Q.  And did you comply with the rules and regulations for

9    filing paperwork for having used that Taser after the fact?

10              MR. MANNINGHAM:  Objection.

11              THE COURT:  Hold on.

12              Can you answer that question?

13              THE WITNESS:  I would just want to know what

14   paperwork.

15              THE COURT:  Yes.  What paperwork?  Why don't you ask a

16   specific question.

17   BY MR. HIGGINS:

18   Q.  Are there paperwork requirements that must be filed after

19   you discharge the Taser?

20   A.  Yes.

21   Q.  Did you comply with those requirements by filing such

22   paperwork?

23              MR. MANNINGHAM:  Objection.

24              THE COURT:  Why don't you specifically ask what

25   paperwork are you referring to?  Why don't you specifically ask

1    the question.

2              MR. HIGGINS:  I didn't know that after the sidebar I

3    was allowed to do that, Judge.

4              THE COURT:  OK.

5    BY MR. HIGGINS:

6    Q.  After you discharge a Taser, are you required to fill out a

7    form called the lethal-use report?  Is that correct?

8    Less-lethal-use report?  Sorry.

9    A.  We're talking about in 2012?

10   Q.  Yes.

11   A.  It -- the paperwork has to be done -- I don't know.  I'd

12   need to review this back then to see what the procedure was for

13   who -- what the actor was who filled it out.

14   Q.  You're referring to what's been marked for identification

15   as plaintiff's 1?

16   A.  I mean, I don't know if it's in this one or if it's in

17   another guide.

18             THE COURT:  OK.  Feel free to look at it and see if it

19   refreshes your recollection.

20   Q.  Officer Kaiser, perhaps, if it helps, as you try to refresh

21   your recollection, if you look at page 4 of what's been marked

22   as Plaintiff's Exhibit 1, at the bottom.

23   A.  At the bottom of page 4.  4 of 10?  So marked 238?

24   Q.  Yes, correct.

25   A.  Sure.

1    Q.  Yes, the italicized-version language right there.

2    A.  OK.

3              MR. MANNINGHAM:  Objection, your Honor.  I think he's

4    trying to get to a part that we just discussed at sidebar.

5              THE COURT:  It's OK.  He can see if it helps him

6    remember what the requirements were.

7              THE WITNESS:  OK.  I've read it.

8    BY MR. HIGGINS:

9    Q.  Does that refresh your memory as to whether paperwork must

10   be filed after a Taser's discharged on duty?

11   A.  There's a few things listed, but not the less-lethal report

12   that you're referring to.

13   Q.  You're familiar with the less, less than, less-than-lethal

14   report form, aren't you, sir?

15   A.  I know it was once used by the department, yes.

16   Q.  In fact, we've discussed this before, have we not?  Have

17   you not been asked questions about this under oath?

18   A.  Yes.

19   Q.  And that was at a deposition where Mr. Dogramaci asked you

20   questions, is that correct?

21   A.  Yes.

22   Q.  And you were sworn in, under oath, just like you were sworn

23   in today to testify truthfully at that deposition, is that

24   correct?

25   A.  Yes.

1    Q.  That was in March of this year, 2018.  Do you recall?

2    A.  I don't recall.  That sounds close.

3    Q.  And at the time you discussed the less-lethal report with

4    Mr. Dogramaci --

5    A.  Yes.

6    Q.  -- correct?

7              Officer Kaiser, when a cartridge, a Taser cartridge is

8    discharged and the target is hit with the prongs, is there a

9    paperwork requirement by which the officer who discharged the

10   Taser must do something relating to that cartridge?

11   A.  Is there paperwork required with it?

12   Q.  Yes, sir.

13   A.  That the officer who discharged it has to do?

14   Q.  Well -- yes.

15   A.  Not necessarily the officer who discharged it.

16   Q.  If not the officer who discharged it, then who?

17   A.  It can be -- I'm not sure -- again, what paperwork are we

18   talking about?

19   Q.  Are you familiar with a cartridge-use voucher form that may

20   sometimes be called a general property clerk invoice?

21   A.  Yes.

22   Q.  You've seen those forms before, haven't you?

23   A.  Yes.

24   Q.  And in fact, at the deposition in March of 2018, we

25   discussed one of those forms, isn't that correct?

1   A.   Yes.

2   Q.   Officer Kaiser, is each officer of the police department of

3   the City of New York required to keep what's called an activity

4   log?

5   A.   I believe it's below the rank of captain, yes.

6   Q.   Were you below the rank of captain in November 2012?

7   A.   Yes.

8   Q.   What is an activity log, if you can explain what that is?

9   A.   It's like a memo pad that has a serial number to it.  We

10  each get our own.  We write down our, our activities for, over

11  the course of a shift, the time you come in, different

12  assignments that you go to, the time you sign out.

13  Q.   It's in handwritten form, those entries, right?  Isn't that

14  correct?

15  A.   That's correct.

16  Q.   And those handwritten entries are done by you?

17  A.   Yes.  Sometimes someone else -- a supervisor will write in

18  your book as well, but generally it's by your book, you write

19  in yourself.

20  Q.   Thank you.

21       And at what time do you make those entries into that

22  logbook?

23  A.   After -- after whatever happened, whatever you're going to

24  write about, after it's happened.

25  Q.   So the entries are made at or near the time of the entries

1   that you're describing in the book, is that right?

2   A.  At or near, but if you get called onto something else, it

3   might get pushed, but before the end of that shift, you'll have

4   filled out everything you need to fill out.

5   Q.  And there's certain information that officers are required

6   to enter into that activity log, isn't that correct?

7   A.  Yes.

8           THE COURT:  If someone used a Taser during an

9   incident, whose obligation is it to put it in the activity book

10  or your memo book?  Is it just yours or one person who is

11  present at the scene?

12          THE WITNESS:  Into my activity log, it would be me.

13          THE COURT:  OK.  So if you used a Taser on a

14  particular occasion, would you be obligated to put that in your

15  activity log?

16          THE WITNESS:  Yes.

17          MR. HIGGINS:  Your Honor, if I may confer with

18  counsel?

19          THE COURT:  Yes.  Sure.

20  BY MR. HIGGINS:

21  Q.  Officer Kaiser, you were in uniform on November 23, 2012?

22  A.  Yes.

23  Q.  And when you went to 805 East 165th Street, you were acting

24  in accordance with your duties as an officer of the New York

25  City Police Department, is that correct?

1    A.  Yes, as a sergeant.

2    Q.  When you discharged the Taser that day, you were acting as

3    a police officer, is that correct?

4    A.  As a sergeant.

5    Q.  As a sergeant.  I apologize.

6    A.  Sure.  No, I just -- I was a sergeant, yes.

7              MR. HIGGINS:  That's all we have for now.

8              THE COURT:  All right.

9              Cross.

10             MR. MANNINGHAM:  Yes, your Honor.

11             MR. DOGRAMACI:  Your Honor, for clarity, we understand

12   this is, in fact, defendants' direct examination.

13             THE COURT:  Yes.

14             As I said to you folks a while back, it doesn't really

15   matter who calls a witness.  It could have been that the

16   defendants called sergeant --

17             Is it lieutenant?

18             THE WITNESS:  Lieutenant now, but it doesn't matter.

19             THE COURT:  -- Lt. Kaiser themselves, so when I say

20   cross-examination, it's really like their direct examination,

21   but technically he was called by the plaintiff, and that's why

22   we're using that terminology.

23             It really doesn't matter.  You just listen to what the

24   witness says, and then it will be up to you to assess each

25   witness's credibility.

1           You may proceed.

2           MR. MANNINGHAM:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. MANNINGHAM:

5    Q.  Good afternoon, Lt. Kaiser.  Can you tell us about your

6    history with the NYPD?

7    A.  Yes.  I was hired in January 2006.  After the academy, I

8    worked in the 32nd Precinct in Harlem.  From there, still as a

9    police officer, I went to the Manhattan North Task Force.  Got

10   promoted to sergeant, went to the 40th Precinct.  The 40th

11   Precinct, I went to internal affairs as sergeant.  I got

12   promoted to lieutenant from there, and currently I'm a

13   lieutenant in the 47th Precinct.

14   Q.  I'd like to turn your attention now to November 23, 2012.

15   On that day, where were you working?

16   A.  The 40th Precinct.

17   Q.  And what was your rank on that day?

18   A.  Sergeant.

19   Q.  Were you in uniform on that day?

20   A.  Yes.

21   Q.  What was your assignment?

22   A.  I was the patrol supervisor.

23   Q.  And what are your duties as a patrol supervisor?

24   A.  The patrol supervisor is responsible for all field

25   activities, so everything outside of the police station.

1    Q.  When you arrived at 805 East 165th Street, what, if

2    anything, did you do?

3    A.  When I pulled up, I got out of the car, and I remember

4    seeing a couple officers speaking with a civilian on the

5    sidewalk-street area.  I walked over -- that was in front of

6    that location.  I walked over to them.  I recognized that they

7    were from the conditions team, but I didn't see their

8    supervisor, so I asked where, where their sergeant was, and

9    they said they thought that he had went inside the building.

10            So at that point, I ran -- I went up a flight of

11   stairs into the building, up another flight of stairs, and

12   into -- straight into a hallway.  And I walked down that

13   hallway and was standing in the threshold of a kitchen at the

14   end of that hallway.

15   Q.  So you were standing in the hallway, correct?

16   A.  Yes.

17   Q.  And then what happened next?

18   A.  I remember looking through the doorway, and I saw Mr. Neal

19   standing at the sink, bleeding profusely and cleaning the blood

20   at the sink.  Standing behind him was Sgt. Camhi.  I looked at

21   him, and he tugged on his gloves, which to me meant two things:

22   One, try and get some gloves on; and two, we were going to be

23   arresting the person he was standing in front of.

24            At that, shortly thereafter, Mr. Neal started walking

25   towards me.  I stepped back into the hallway.  Mr. Neal walked

1   into the hallway, followed by Sgt. Camhi.

2   Q.  And once you were in the hallway, what did you do?

3   A.  Attempted to grab one of Mr. Neal's hands to get -- to get

4   that arm behind his back to place him in cuffs and arrest him.

5   I remember grabbing his arm and having -- being unable to get a

6   grip due to the blood that was on his arms.  I kept trying to

7   grab, grab his arms.  He kept, at first tense, and then started

8   swinging his arms, so I was unable to get his arm behind his

9   back.

10          This went on for a short time, where he was swinging

11  his arms.  We started -- I started banging into the wall back

12  and forth, and eventually, on one of these swings, I was thrown

13  into a door in the hallway.  When that door opened up, a pit

14  bull ran out, out of that doorway and actually ran through my

15  legs and into the kitchen.

16  Q.  Now, before the dog came out, you said he was swinging his

17  arms.  Was he saying anything to you?

18  A.  Yeah, the one thing I remember him saying was it's going to

19  take more than you two motherfuckers to arrest us -- to arrest

20  me.

21  Q.  After the dog ran out from the bedroom, what happened?

22  A.  At that point, we had gotten nowhere as far as getting him

23  into handcuffs.  I -- when the dog ran out of the bedroom and

24  in the kitchen, I saw some officers jump up on the counter to

25  get away from the dog.

1      I felt the situation was deteriorating, so at that point, I

2  let go of Mr. Neal and stepped back into another open doorway

3  so I could create distance between myself and him.  I

4  unholstered the Taser and said that I was going to deploy the

5  Taser.  I turned off -- I turned the Taser on -- there's a

6  safety switch to turn it on, and deployed the Taser in the

7  direction of Mr. Neal.

8  Q.  You said the situation was deteriorating.  Can you explain

9  what you mean by that?

10  A.  Yeah, I -- we -- so it was bad enough that we were

11  wrestling around in this hallway.  I knew there was no room for

12  any other officers to come and help myself and Sgt. Camhi.

13  There was just no, there was no way for anyone to come and

14  assist us and get more hands to try and get control of his

15  hands.  And once the dog got out and I saw this dog barking and

16  running at the officers and having officers jump on the counter

17  to get away from it, it just seemed dangerous, more dangerous

18  than it was prior to that.

19  Q.  You said there was no room to help.  Why?

20  A.  This hallway we were in, it was approximately three feet

21  across.  I'd say two people, one or two walked past each other,

22  at least one would have to turn their body, if not both people.

23  So having myself, Mr. Neal, and Sgt. Camhi in there, that was

24  all the room that -- that anyone could fit in there.

25  Q.  I want to step back and ask you about how a Taser works

1  generally.  Can you explain to the jury how a Taser works?

2  A.  Yes.  So, you unholster -- once you unholster the Taser,

3  there's a little switch at the top of it that you switch on,

4  like a tiny light switch.  This activates it so the power's on.

5  There's -- that also turns on a laser to give you a target to

6  aim at.  And then there's a button, kind of like a trigger,

7  that you depress.

8       And then from the front of the Taser, there's plastic doors

9  that spring off, pop open, two prongs come out of the front of

10 that.  They're attached to wires, some kind of, like a fishing

11 line-type wire.  And while this is happening, an electrical

12 current starts to go through it for five seconds.

13 Q.  You just said that there is a five-second electrical

14 current, correct?

15 A.  That's correct.

16 Q.  What happens if you continue holding the -- when you

17 depress the Taser, what happens if you continue pressing down

18 on the trigger?

19 A.  So, you -- if you depress the trigger and you just squeeze

20 it and didn't let go, it would still only be a five-second

21 cycle.  It would just shut off on its own.  It wouldn't

22 continue to generate electricity through.

23 Q.  What would you have to do if you wanted to send a second

24 cycle of five seconds of electricity?

25 A.  You would have to completely release that trigger and pull

1  the trigger again.

2  Q.  Can you make the cycle of electricity last longer than five

3  seconds?

4  A.  No.

5  Q.  Can you make the cycle last shorter than five seconds?

6  A.  Yes, if you -- the safety to turn the power on and off, if

7  you switch that off at any time, then it will cut the current.

8  Q.  Now, just generally speaking, if the prongs were to

9  penetrate a person's skin, would you be able to take those out

10 and then fire the same prongs again.

11 A.  No.  Once those prongs have left the cartridge, wherever

12 they land -- on the floor, in a target -- that's it; they're

13 never to be used again.  There would be no way to put them back

14 in.

15 Q.  And on this day -- now I'm going back to this day.

16 A.  OK.

17 Q.  -- did you have more than one cartridge on you?

18 A.  No, I don't believe I did.

19 Q.  Would it have been possible to have more than two?

20 A.  More than two?  No.

21 Q.  Would it have been possible to have two?

22 A.  Uh, it could have been.

23 Q.  And why do you say that?

24 A.  The old -- in 2012, we had different Tasers than we have

25 currently.  In 2012, some of the holsters that we had had a box

1   on the front of the holster where you could put an extra

2   cartridge.  But generally speaking, there was never an extra

3   cartridge.

4   Q.  But it was absolutely for sure you did not have more than

5   two on that day?

6   A.  Correct.

7   Q.  If the prongs had -- back to generally speaking.

8       If the prongs had penetrated the person's skin, would you

9   need to fire a second set of prongs?

10  A.  No.

11  Q.  And why is that?

12  A.  So, if, if the prongs do penetrate and are stuck in your

13  target -- and are you asking if you need to send a second

14  cycle?

15  Q.  Correct.  Yes.  Thank you.

16  A.  Then they'd stay there, and you would just -- the five

17  seconds went, you weren't able to arrest -- get the person in

18  custody, then you could let go of the trigger, depress it

19  again, and those same prongs -- nothing fires out, but the

20  electricity will go through the same prongs and wiring.

21  Q.  But here, back to this incident, did the prongs penetrate

22  Mr. Neal's skin?

23  A.  No.

24          MR. HIGGINS:  Objection, your Honor.  There's been no

25  foundation for knowledge that this witness had.

1          THE COURT:  Overruled.

2     Q.  After you discharged the Taser, what did you do?

3     A.  I discharged the Taser, the prongs went out.  It didn't

4     appear to have any real effect on Mr. Neal.  He continued

5     actively resisting.

6          What you hope for in a case like this, from training

7     videos, is for the central nervous system, muscular lock-up and

8     they fall to the ground and you're able to move in and handcuff

9     the person without resistance.  He stayed on his feet.  He

10    stayed actively resisting with Sgt. Camhi, so I had the Taser

11    in one hand and then went back in to try and struggle with him

12    with my other hand to continue getting him into cuffs.

13          At this point, we went through --

14          THE COURT:  Sorry.  I just want to ask one question.

15          When you were asked if the prongs penetrated his skin,

16    how do you know that they didn't?

17          THE WITNESS:  I'm saying that based on that he showed

18    no real sign of --

19          THE COURT:  OK, but did you actually see his skin?

20          THE WITNESS:  No.

21          THE COURT:  It was more his reaction physically.

22          THE WITNESS:  That's correct.

23          THE COURT:  I didn't mean to interrupt you.  Please

24    continue your answer.

25          MR. MANNINGHAM:  And I'm sorry, if I can ask a

1   question.

2   Q.  What about his reaction made you believe that they didn't

3   penetrate his skin?

4   A.  That he -- his -- he didn't show any signs of, of being hit

5   with a Taser.

6   Q.  You said he kept actively resisting.  What do you mean by

7   that?  Can you explain what he was doing?

8   A.  He was still pushing and shoving with Sgt. Camhi.

9   Q.  OK.  Then what happened next?

10  A.  I went, I went back, tried to grab an arm again and started

11  struggling again.  We went into the room where I'd hit the door

12  and the pit bull had come out, and the three of us went down

13  onto a bed, which was just a box spring and a mattress, like,

14  right in front of the bed -- the room there.

15  Q.  And what happened on the mattress?

16  A.  We continued to struggle, and eventually he was -- he was

17  placed in handcuffs at that time, on the bed.

18  Q.  Once Mr. Neal was on the mattress, how long did it take

19  before he was handcuffed?

20  A.  Not very long, but I'm really not sure how long.  Quickly.

21  Seconds.

22  Q.  Did you handcuff Mr. Neal?

23  A.  I don't recall if I specifically put the handcuffs on him,

24  but I was there struggling to get him in the handcuffs.

25  Q.  What happened after he was handcuffed?

1    A.  He was -- some other officers lifted him off the bed, and

2    he was walked out of the apartment.

3    Q.  And prior to being handcuffed, did anybody hit Mr. Neal

4    while he was on the bed?

5    A.  No.

6    Q.  Did you see anybody hit Mr. Neal at any point on this day?

7    A.  No.

8    Q.  Did you see anyone hit Mr. Neal with a baton on this day?

9    A.  No.

10   Q.  Did you see anyone hit Mr. Neal with an expandable baton on

11   this day?

12   A.  No.

13   Q.  When you fired the Taser, did you hear any laughing?

14   A.  No.

15   Q.  Did you hear anyone saying hit him again?

16   A.  No.

17   Q.  At any point, did you punch Mr. Neal?

18   A.  No.

19   Q.  At any point, did you hit Mr. Neal with a baton?

20   A.  No.

21   Q.  Did you hit Mr. Neal with any object?

22   A.  No.

23   Q.  After Mr. Neal was handcuffed, what did you do?

24   A.  I stood up off the bed, exited the building.  Once I had

25   time to look at myself, I realized I had been covered in his

1    blood.  My jacket was covered, my hands were covered.  I had

2    splatters on my face from when he was yelling at us in the

3    hallway.  So at that point, I left and walked out and walked to

4    my police car and then went back to the station house to clean

5    up.

6    Q.  Did you seek medical treatment as a result of this

7    incident?

8            MR. HIGGINS:  Objection, your Honor.

9            THE COURT:  Overruled.

10   A.  Yes, I did.

11   Q.  What medical treatment did you seek?

12           MR. HIGGINS:  Your Honor, can we have a sidebar?

13           THE COURT:  OK.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. HIGGINS:  Your Honor, we had deposition testimony

3   on this, and we believe that they're going to try to get him to

4   testify that he was treated, he took HIV treatment as a

5   protective measure because of the blood that he says he got on

6   him.  We think that would be very, very inflammatory.

7          THE COURT:  That shouldn't come in.

8          MR. MANNINGHAM:  No, it was as a precaution.  He will

9   testify that it was just as a precaution.  This isn't an

10  injury.  He wasn't the one who was injured as a result of the

11  this incident.

12         THE COURT:  But was he injured?

13         MS. DeCASTRO:  He had to take the HIV cocktail, which

14  made him extremely sick for a period of 30 days, and he had to

15  be out of work.

16         THE COURT:  No, that shouldn't be in.  If he was

17  actually physically injured from the tussle, then that's OK,

18  but if he just did this as a precaution and got sick as a

19  result, that's not coming in.  That's too prejudicial.

20         MS. DeCASTRO:  He had marks on his body, and plaintiff

21  was spitting blood on him.  If he actually got HIV -- he wasn't

22  injured and that caused him to have to go to the hospital and

23  caused him to have to take this cocktail and be out of work.

24         MR. HIGGINS:  Your Honor, any mention of HIV is a

25  powerful, powerful thing and the prejudice of that way

1  outweighs the probative value.

2         MS. DeCASTRO:  Plaintiff, in the same token, brought

3  that up yesterday, that he got in the middle of a fight with

4  his wife and the woman that had HIV.

5         THE COURT:  That's different.  I don't think it's

6  appropriate.  If you want to ask him if he had any scrapes or

7  physical injuries from the interaction, you can ask him that,

8  but I don't think you should be getting into HIV or the

9  cocktail that he took.

10        MR. MANNINGHAM:  Is there any way we can ask him

11 because of this incident he had to miss 30 days of work?

12        THE COURT:  No.  That should not come in.

13        MR. HIGGINS:  It's not probative and purely

14 inflammatory.

15        MS. DeCASTRO:  While we're here, just one more thing.

16        They put out an NYPD voucher, the cartridge, the fact

17 that the cartridge -- we have all of those things.  We can

18 introduce them right now.

19        THE COURT:  You can use them right now.  On the patrol

20 guide, I don't think there's any reason it should come in.  You

21 can ask him questions about the patrol guide if you think he

22 didn't comply with the patrol guide, and I'll give a limiting

23 instruction, but I don't think there's a reason to admit it

24 into evidence.  You can just ask him questions.  If there's a

25 suggestion that he did something wrong with respect to the

IaaWnea2                    Kaiser - Cross

1   vouchering or the paperwork afterwards, you can ask him about

2   that.

3          MS. DeCASTRO:  Can we introduce the exhibits into

4   evidence?

5          THE COURT:  Which exhibits?

6          MS. DeCASTRO:  The cartridge voucher and his memo

7   book, the activity report, all the things he created, matched

8   the number.  The document he did not create, which is the

9   property invoice, somebody else filled that out.  They filled

10  it out improperly, but the number on this matches the cartridge

11  voucher number.

12         MR. HIGGINS:  Here's why we wanted to get Rule No. 20

13  in.  That's the rule that says you have to -- we want this in.

14  We want that in too, your Honor.

15         THE COURT:  You both want all this stuff in?

16         MS. DeCASTRO:  But with the cartridge stuff --

17         THE COURT:  You can introduce the cartridge.  You can

18  ask him about that particular provision so there will be

19  testimony about it.  You don't need the actual document.

20         MR. HIGGINS:  OK.

21         (Continued on next page)

22

23

24

25

```
 1                    (In open court)

 2    BY MR. MANNINGHAM:

 3    Q.  Lt. Kaiser, I want to ask about the Taser prongs.  Just

 4    generally speaking, if Taser prongs had penetrated a person's

 5    skin, would you be authorized to take those out?

 6    A.  No.

 7    Q.  Who, if anyone, is authorized to take those out?

 8    A.  A doctor.  It has to be done in a hospital.

 9                    MR. MANNINGHAM:  Nothing further, your Honor.  Thank

10    you.

11                    THE COURT:  All right.

12                    Redirect.

13    REDIRECT EXAMINATION

14    BY MR. HIGGINS:

15    Q.  Officer Kaiser, you testified that you discharged the Taser

16    once and only once, is that correct?

17    A.  Yes.

18    Q.  If you had discharged it more than once, you would have had

19    to fill out paperwork showing the number of times you

20    discharged it, isn't that correct?

21    A.  That I would have had to fill out paperwork?

22    Q.  Yes.

23    A.  Well, every time -- we're speaking about activity logs.

24    Every time you discharge a Taser, whether you're testing it or

25    using it in the field, you put it in your activity log.
```

1  Q.  And you'd have to voucher each cartridge that was used by

2  you when you discharged the Taser, isn't that correct?

3  A.  The cartridge would be vouchered.

4  Q.  And each cartridge has its own unique serial number, is

5  that correct?

6  A.  That's correct.

7  Q.  And you're required to log that serial number into your

8  activity log, isn't that correct?

9  A.  The cartridge number?

10  Q.  Correct.

11  A.  If you fired it?

12  Q.  Yes.

13  A.  I'd have to take a look.

14  Q.  Take a look at?

15  A.  The guide, at the --

16  Q.  What's been marked as Plaintiff's Exhibit 1?

17  A.  Yes.

18  Q.  Please do.

19  A.  The only thing that I'm seeing is when you're, when you're

20  testing it.

21  Q.  What page is that you're looking at?

22  A.  5 of 10, or NYC000239.

23  Q.  At the top, paragraph 12?

24  A.  Correct.

25  Q.  Can you look at page 6, under paragraphs 20 to 21, and see

1    if that refreshes your recollection on what requirements you

2    have with regard to vouchering of cartridges?

3    A.  You said 20 to 21?

4    Q.  No.  I'm saying page 6.

5    A.  Page 6.

6    Q.  Yes.

7    A.  And you said?

8    Q.  Under paragraph 21, in italics, the second italics.

9    A.  Oh.

10   Q.  Can you read that and see if it refreshes your memory?

11   A.  OK.  I've read it.

12   Q.  Does that refresh your memory for the process you were

13   supposed to follow if a cartridge has been discharged?

14   A.  Well, you're asking about serial numbers, correct?

15   Q.  Yes.

16   A.  OK.  Then, then no to serial numbers.

17   Q.  When you voucher something -- you've vouchered documents

18   before in the course of your duties as a police officer, is

19   that correct?

20   A.  Correct.

21   Q.  When you voucher an item, you identify that item for

22   purposes of that entry on that voucher, is that correct?

23   A.  Correct.

24   Q.  And each cartridge for the Taser has a serial number, as

25   you testified, is that right?

1   A.  Correct.

2   Q.  So, on each voucher you enter, or you have entered, the

3   correct serial number so that there's a record of how many

4   cartridges and which cartridges have been discharged, isn't

5   that correct?

6   A.  I don't believe I've ever vouchered a cartridge.

7   Q.  Is your testimony that -- you testified that you discharged

8   a Taser on November 23, 2012.  So is it your testimony that you

9   did not voucher the cartridge that was discharged that evening?

10  A.  I did not.  Another officer did.

11  Q.  Were you responsible for providing the cartridge to that

12  officer?

13  A.  Yes.

14  Q.  You were required to provide information so that the

15  information that was entered by the officer was true and

16  accurate, though, isn't that correct?

17  A.  Correct.

18  Q.  And the person who actually entered the information was

19  your supervisor, isn't that correct?

20          MR. MANNINGHAM:  Objection.

21  A.  What document?

22          THE COURT:  Overruled.

23  A.  What document?  The property clerk invoice?

24  Q.  Yes.

25  A.  No.

1    Q.  The voucher.

2    A.  No.

3    Q.  And the reason why -- well, the reason why your superior

4    has to be involved is because a discharge of a Taser is a

5    serious matter, isn't it, Officer?

6              MR. MANNINGHAM:  Objection.

7              THE COURT:  Yes.  Sustained.

8              First, you just testified it wasn't your supervisor.

9              THE WITNESS:  I said -- yes, it was not a supervisor.

10   That invoice --

11             MR. HIGGINS:  I'm sorry.  I couldn't hear the witness.

12   I apologize, your Honor.

13             THE COURT:  All right.  Repeat your answer.

14             THE WITNESS:  No, it was not a supervisor who invoiced

15   the cartridge.

16   BY MR. HIGGINS:

17   Q.  And the cartridge number that was invoiced on the voucher

18   was supposed to match the cartridge number on the less-lethal

19   report that you completed, isn't that correct?

20   A.  The cartridge serial number?

21   Q.  Yes.

22   A.  Should match on both pieces of paperwork?

23   Q.  Yes.

24   A.  I know on the less-lethal report, it's cartridge serial

25   number.  On the PCI, serial number, identifying number, I'm not

1    sure if it's the exact same language.

2    Q.  I'm sorry.  You used acronyms or initials there.  PCI?

3    A.  PCI, which is property clerk invoice.

4    Q.  Property clerk invoice?

5    A.  Yes.

6    Q.  Like a voucher?

7    A.  It's a voucher, yes.

8    Q.  The same thing?

9    A.  Yes.

10   Q.  PCI is same as voucher?

11   A.  Yes.

12   Q.  Your testimony was that the serial number on the PCI, the

13   voucher, is supposed to match the serial number of the

14   cartridge on the less-lethal-use report, isn't that correct?

15   A.  The cartridge, if it's the same cartridge, they should be

16   the same.

17   Q.  And if more than one cartridge was used, then there should

18   be more than one PCI voucher, isn't that correct?

19   A.  I don't know if they would both go in, on one voucher or if

20   they would do two separate, to be honest.  I don't know.

21   Q.  OK.  Fair enough.  But then if they were both entered on

22   the voucher, then the voucher would reflect the two or more

23   cartridges that were actually discharged, isn't that fair?

24   A.  That's -- that's correct.

25   Q.  And you then had an obligation to enter that information

1   into your daily activity log that you talked about earlier,

2   isn't that correct?

3   A.  Yes.

4   Q.  The less-lethal report form also asks a series of questions

5   about whether or not the use of the Taser was effective, isn't

6   that correct?

7   A.  I believe so.

8   Q.  It asks generally whether it was a help or a hindrance in

9   performing your duties as an officer, isn't that correct?

10  A.  I believe so.  I'd have to look at one to know specifically

11  what you're talking about.

12  Q.  Now, you just testified that Mr. Neal didn't show --

13          MR. MANNINGHAM:  Objection, your Honor.

14  Q.  -- any signs --

15          MR. MANNINGHAM:  If he could provide the witness with

16  the form if he's going to be asking questions about it.

17          MR. HIGGINS:  I wasn't.

18          THE COURT:  If for any reason you don't remember

19  something or you need to see something, just say you don't

20  remember and you'll be shown the form.

21          THE WITNESS:  OK.

22          THE COURT:  But otherwise, you're moving on to another

23  series of questions, so please proceed.

24          MR. HIGGINS:  Your Honor, can we mark this as

25  plaintiff's 2?

1          THE COURT:  For identification?

2          MR. HIGGINS:  Yes, your Honor.

3          THE COURT:  Yes.

4          MR. HIGGINS:  May I show it to the witness, your

5     Honor?

6          THE COURT:  Yes.  Thanks.

7     BY MR. HIGGINS:

8     Q.  Officer Kaiser, looking at what's been marked for

9     identification as plaintiff's 2, sort of at the top, can you

10    just read it there and see if that refreshes your memory about

11    the detail that's to be provided regarding the efficacy of the

12    use of the Taser?

13    A.  At the top, you said, right?

14    Q.  About two inches from the top.

15    A.  Restraint by --

16    Q.  Using the device.

17    A.  Using the device, "was a help" is marked off.

18    Q.  You just testified that the Taser, that Mr. Neal showed no

19    signs of any effect of the Taser after you discharged it on

20    him.  Was that your testimony?

21    A.  That's correct.

22    Q.  If the Taser was no help at all, then the box on the

23    less-lethal form should have been checked that it had no

24    effect, is that correct?

25    A.  I didn't fill this out, so I can't say why they checked --

1   Q.  Who filled it out?

2   A.  Lt. Perez.

3   Q.  And who was Lt. Perez to you?  Was he your superior?  Or

4   was he --

5   A.  Superior.

6   Q.  And the superior officer was required to fill out this form

7   under the New York Police Department patrol guide, isn't that

8   right?

9   A.  Correct.

10  Q.  And the information that Officer Perez entered on the

11  less-lethal-use form was information he got from you, isn't

12  that correct?

13  A.  He, he interviewed me about the incident.

14  Q.  Lt. Perez was not there when you discharged the Taser and

15  shot Mr. Neal, is that right?

16  A.  Correct.  He was not there when I discharged the Taser.

17  Q.  In order for him to intelligently fill out the form, he had

18  to base it on information that you provided to him, isn't that

19  right?

20  A.  Correct.

21  Q.  So the information on this form, then, was provided by you

22  to Lt. Perez, is that right?

23  A.  He interviewed me and then filled out the form.

24  Q.  And this form was filled out that very night, isn't that

25  correct?

1    A.  Correct.

2    Q.  In fact, almost immediately after you came back from that,

3    that visit to 805 East 165th Street, isn't that correct?

4    A.  I don't recall when in the night, but that -- that shift,

5    yes.

6    Q.  Just to refresh your memory, I'd refer you to the top.

7    There is a description of the time.  If you can look at that

8    and see if that refreshes your memory as to the timing of when

9    this less-lethal report was filled out.  Do you see that?

10                   MR. MANNINGHAM:  Objection.

11                   THE COURT:  Overruled.

12                   Are you looking for something in particular?  What are

13    you looking for?

14    A.  You're asking what time this was filled out?

15    Q.  Yes.

16    A.  Are you asking for the fax transmittal time?

17    Q.  No, no, no.

18    A.  No?

19    Q.  On the form, about an inch down, see where it says --

20                   THE COURT:  You mean the time of the occurrence?

21    A.  Yeah, that's the time of the occurrence.

22    Q.  At the bottom, the form is dated and filed the same day,

23    though, isn't that correct?

24    A.  Yes, that's correct.

25    Q.  Is there a time on the fax banner?  I can't really read it.

1          THE COURT:  The fax is years later, so I don't think

2    that's what you're getting at.

3          Mr. Higgins, about how much longer do you have?  I

4    told the jury they were going to leave at 2:30.  Do you have a

5    few more minutes?

6          MR. HIGGINS:  Your Honor, I would like to offer what's

7    been marked as Plaintiff's Exhibit 2 into evidence.

8          MR. MANNINGHAM:  No objection.

9          THE COURT:  All right.  It will be admitted.

10         (Plaintiff's Exhibit 2 received in evidence)

11         THE COURT:  Do you have a few more minute, or do you

12   have a lot of time?

13         MR. HIGGINS:  I think I have more, so we should

14   probably break now.

15         THE COURT:  All right.

16         Folks, we're going to adjourn for the day.  We'll

17   start again tomorrow promptly at ten.  Breakfast will be

18   waiting for you at 9:30.  Just remember to keep an open mind,

19   and don't discuss the case.

20         Have a nice afternoon.  Thank you.

21         (Continued on next page)

22

23

24

25

1          (Jury not present)

2          THE COURT:  You can step down.  Thank you.

3          THE WITNESS:  Leave these here?

4          THE COURT:  Yes, sure.

5          MR. HIGGINS:  Your Honor, should the witness be given

6    the usual warnings, or he's a police officer and he knows?  He

7    shouldn't be asked questions.

8          THE COURT:  He doesn't have to be.  We're going to

9    talk about scheduling and the charge, but it's up to defendants

10   if they want to stay and discuss the charge or not.

11         Do you all need a break?  Do you all want to take a

12   break for a couple minutes, less than five, and then we'll come

13   back and discuss the charge?

14         MR. HIGGINS:  Yes.

15         THE COURT:  The only thing I want to ask now is just

16   about scheduling.

17         You never called Ms. Almonte today.  I assume that was

18   intentional.  Do you intend to call her tomorrow morning?

19         MS. DeCASTRO:  We do not.

20         THE COURT:  OK.  After Lt. Kaiser testifies, are we

21   done with the witnesses?

22         MR. MANNINGHAM:  Yes, your Honor.

23         THE COURT:  All right.  Good.  Why don't we just take

24   really a five-minute break.  We'll discuss the charge.  I'm

25   going to have my law clerk hand out the postverdict form; we'll

IaaWnea2

1   discuss that.  If we don't finish our discussion by 3:30 today,

2   we'll just meet earlier tomorrow morning, just so that you all

3   have the charge before your summations.  It seems like we're

4   going to get to summations in the morning.

5          Thank you.  See you in a few minutes.

6          (Recess)

7          THE COURT:  Everyone can be seated.

8          Did you all have time to review the draft charge that

9   I distributed?

10          MR. DOGRAMACI:  Plaintiff did, your Honor.

11          MS. DeCASTRO:  We did, your Honor.

12          THE COURT:  Great.  Thanks.  Why don't we hear first

13   from plaintiff.

14          Do you want to just let me know what objections you

15   have?

16          MR. DOGRAMACI:  Only two minor objections, your Honor.

17          One is on pages 18 to 19, from the bottom of 18 to the

18   top of 19.  The sentence says, "Keep in mind that in order to

19   recover damages for pain and suffering, plaintiff must present

20   credible evidence with respect to his suffering and

21   corroboration that a defendant's impermissible conduct caused

22   this suffering."

23          It's just the words saying that corroboration is

24   required.  It makes it sound like something more than just

25   credible.  I mean, the evidence we have is just plaintiff's

testimony, and this makes it sound like plaintiff's own

testimony is not enough; there has to be some additional

evidence corroborating plaintiff's testimony.

THE COURT:  Yes, I agree with you.  We should take out

the word "corroboration" but leave in the concept that the

defendant's impermissible conduct caused the suffering.  Let's

just think about how to word it.

MR. DOGRAMACI:  You could, for example, just say "must

present credible evidence with respect to his suffering and

that a defendant's impermissible conduct caused this

suffering."

THE COURT:  Yes, I think that's fine.

MR. DOGRAMACI:  OK.

MS. DeCASTRO:  I'm sorry.  What's the proposal?

THE COURT:  We're just taking out the word

"corroboration" at the top of 19, so it will read:

"A plaintiff must present credible evidence with

respect to his suffering and that a defendant's impermissible

conduct caused this suffering."

MS. DeCASTRO:  Could we add "present credible evidence

that defendant's impermissible conduct caused the suffering"?

THE COURT:  The way the sentence reads, I think, the

credible evidence goes to both the suffering and that the

defendant's impermissible conduct caused it.  I think it's fine

as is.

1          You had one more objection?

2          MR. DOGRAMACI:  Yes.  On page 19, in the middle of the

3    page, you give the jury an illustration about if compensatory

4    damages are established, and I think the illustration is very

5    useful, but just about the use of $100.  This reminds me of the

6    Court's ruling that plaintiff cannot in summation suggest a

7    particular dollar figure because that would anchor the jury to

8    that particular number.

9          Here, we have a hundred dollars being mentioned, and

10   in order not to anchor that number in the jury's mind, maybe we

11   could just say X.

12         THE COURT:  I'll either do X or a particular amount,

13   the words "a particular amount" without specifying the amount.

14         MR. DOGRAMACI:  OK.

15         THE COURT:  I think that's also a fair criticism.

16         MR. DOGRAMACI:  Thank you, your Honor.  That's all

17   from plaintiff.

18         THE COURT:  From defense counsel.

19         MS. DeCASTRO:  Yes, your Honor.

20         On page 13, last paragraph, we would ask for there to

21   be some language "as alleged."

22         THE COURT:  Where are you looking?

23         MS. DeCASTRO:  "Each of the following three elements

24   'as alleged' as to each defendant."

25         THE COURT:  I don't think it's necessary here.  I

1   mean, I'm happy to put in "as alleged" elsewhere, but I don't

2   think in this sentence it's suggesting anything.  It's just

3   saying that he must establish by a preponderance of the

4   evidence each of the following elements.  I don't think "as

5   alleged" adds much in this context.

6           What's your next objection?

7           MS. DeCASTRO:  We continue to object on 14 to the

8   language about, "you are to presume that officers' decision to

9   arrest Neal was lawful here," but we understand the Court's

10  prior ruling.

11          THE COURT:  Right.  Look, I think this is further than

12  plaintiff wanted me to go, but I understand.  Your objection is

13  noted for the record.

14          MS. DeCASTRO:  Sorry, your Honor.  I'm trying to find

15  where "as alleged" might be a better place.

16          THE COURT:  What are you concerned about with respect

17  to "as alleged"?  Are you concerned that the charge suggests

18  the truthfulness of the allegations, or are you trying to tie

19  his allegations to the elements?  What is your concern?  Why is

20  it that you think it's needed?

21          MS. DeCASTRO:  I guess both, because as to the Taser,

22  it is about whether or not it was reasonable.  But as to the

23  baton, they completely deny that the baton was used.

24          THE COURT:  Then let's look in sections that discuss

25  the baton.

1      MS. DeCASTRO:  OK.

2      THE COURT:  I tend not to marshal the evidence at

3  trial.  I know there are some references to the baton and the

4  Taser, but I try to stay away from doing it and have the charge

5  be neutral, and then you can make your arguments.  But I'm

6  happy to look in the particular section where it is mentioned.

7      I mean, I know that on page 13, I specifically noted

8  that "plaintiff brings two claims under 1983 asserting that two

9  of the defendants, Romaine Wilson and Michael Kaiser, used

10  excessive force against him, in violation of the Fourth

11  Amendment," so we said that.

12      MS. DeCASTRO:  Your Honor, could we add at least

13  something to that effect after that paragraph you just read;

14  "defendants deny that a baton was ever used"?  Right before

15  that, we're talking about what plaintiff alleges.

16      THE COURT:  Let me see.

17      What about putting it on page 14 in the last full

18  paragraph.  The first line starts with "Every person has the

19  right not to be subjected to unreasonable or excessive force by

20  a law enforcement officer.  On the other hand, an officer has

21  the right to use such force as is necessary under a given set

22  of circumstances.  As I've already explained, you're to presume

23  that the officers' decision to arrest Neal was lawful here.

24  The question for you in assessing whether Neal was deprived of

25  his Fourth Amendment rights are (1) whether each instance of

IaaWnea2

1  force" --

2         Do you want to say "alleged actually occurred in the

3  course of that arrest"?  And "(2) if it did" --

4         MS. DeCASTRO:  Yes.

5         THE COURT:  "Whether each instance of force as

6  alleged" or "actually occurred as alleged"?

7         MS. DeCASTRO:  Yes, that's fine with us.

8         MR. DOGRAMACI:  Your Honor, on behalf of plaintiff,

9  there's no dispute that force was used, though.  The only

10  dispute is whether the force used was excessive.

11         THE COURT:  There is dispute about whether some of the

12  force was used.  There's no dispute that some force was used.

13         MR. DOGRAMACI:  Yes.

14         THE COURT:  But there's definitely a dispute as to

15  precisely what force was used.

16         MR. DOGRAMACI:  OK.

17         THE COURT:  OK.  We've added that in.

18         I also meant to ask a very general question.  Do you

19  want me to add titles?  Do you want me to say Mr. Neal and then

20  officer or sergeant or lieutenant?  Right now, I've stripped it

21  of titles and I've just had it be Neal and Wilson and Kaiser

22  and left out all the titles, in part, because the officers'

23  titles changed.  But I want to be consistent, so if I'm giving

24  an officer a title, I want Mr. Neal to be referred to as

25  Mr. Neal.

1        MR. DOGRAMACI:  We would appreciate him being referred

2   to as Mr. Neal, your Honor.

3        THE COURT:  OK.

4        MS. DeCASTRO:  Then maybe the officers could also be

5   referred to as Mr.

6        THE COURT:  You think?

7        MS. DeCASTRO:  Let me just confer.

8        THE COURT:  OK.

9        MS. DeCASTRO:  Your Honor, we would object and just

10   ask for it to be Neal and then the last names.  It just gets

11   complicated.

12        THE COURT:  If Mr. Neal wants to be called Mr. Neal,

13   why don't we just put in the officers' titles as they testified

14   today.  You'll tell me what their titles are.  I know kaiser's

15   a lieutenant.  I think Camhi's a lieutenant.  Just give us the

16   titles, we'll put in their present titles, and we'll put in

17   Mr. Neal.

18        MS. DeCASTRO:  OK.

19        THE COURT:  We'll either do that, if that's what

20   plaintiff wants; otherwise we'll take out all the titles out.

21   But if you want Mr. for Mr. Neal, then we'll put in the

22   officers' titles.  OK?

23        MS. DeCASTRO:  That's OK with us.

24        THE COURT:  Why don't you just tell me.  We have

25   Mr. Neal.  We have now Lt. Kaiser and Camhi.

IaaWnea2

1          And what is Wilson's title?  What is Rodriguez's?

2   What is Green's?

3          MS. DeCASTRO:  Wilson is a sergeant.

4          THE COURT:  What's Green's?

5          MS. DeCASTRO:  Green is a police officer.

6          THE COURT:  OK.  And what is Garciarivas's?

7          MS. DeCASTRO:  Police officer.  And Rodriguez

8   remaining as detective.

9          THE COURT:  OK.  Did you have any other objections?

10          MS. DeCASTRO:  We have nothing else.

11          THE COURT:  OK.

12          MR. DOGRAMACI:  Your Honor, I caught one other thing.

13          THE COURT:  Yes.

14          MR. DOGRAMACI:  On page 10, a very small thing.

15          In the second full paragraph, in the middle, it says,

16   "Likewise, you should note any evidence of hostility or

17   affection that the witness may have towards one of the

18   parties."

19          Since as it turns out every witness is a party, I

20   think that sentence should be deleted.

21          THE COURT:  OK.  I'll take out that sentence.  I'm

22   also going to take out references to "her," because I thought

23   we'd have a female witness.  I'll make it all male because all

24   the witnesses were male.

25          Great.  Thank you all for reviewing this so quickly.

IaaWnea2

1  I know we were on a tight schedule.

2         Do you have any objections to the draft verdict form?

3         MR. DOGRAMACI:  Plaintiff has none, your Honor.

4         MR. MANNINGHAM:  Defendants have just two.

5         The first one would be No. 1, just adding, at the very

6  end of the sentence, "any of the following defendants."

7         THE COURT:  Sorry.  Tell me where you are again,

8  please.

9         MR. MANNINGHAM:  Sorry.  No. 1, under liability.

10         THE COURT:  OK.

11         MR. MANNINGHAM:  Just adding, at the end of the

12  sentence, "any of the following defendants."

13         THE COURT:  OK.

14         MR. MANNINGHAM:  And then the second objection would

15  be under damages, on the second page, No. 3.

16         We would just ask that the Court ask, has plaintiff

17  proven by -- like, If you answer yes to either questions one or

18  two, has plaintiff proven by a preponderance of the credible

19  evidence that he suffered actual compensatory damages, because

20  as written now, it somewhat implies that if you answered yes to

21  any part of question one or two, then he's entitled to

22  compensatory damages.

23         THE COURT:  All right.  I'll write, "If you answered

24  yes to any part of question 1 or question 2, has Mr. Neal

25  proven by a preponderance of the credible evidence that he is

IaaWnea2

1    entitled to compensatory damages?  If so, please enter the

2    amount of compensatory damages" -- and I'll take out "if

3    any" -- "that you award to Mr. Neal."

4            MR. MANNINGHAM:  Thank you, your Honor.

5            And then the next question would be, if not, how much

6    do you award in nominal damages?

7            THE COURT:  I'm sorry.  What's the problem with the

8    way it's written now?

9            MR. MANNINGHAM:  I'm sorry, your Honor.  The next

10   question is fine.

11           THE COURT:  OK.  Any additional objections?

12           MR. MANNINGHAM:  Just one last thing.

13           We just want to note our objection that we object to

14   the portion that addresses punitive damages.

15           THE COURT:  Including it at all?

16           MR. MANNINGHAM:  Yes, because we don't think the

17   evidence supports punitive damages in this case.

18           THE COURT:  OK.  I'll take that under consideration

19   and consider that argument after the jury's verdict.

20           MR. MANNINGHAM:  Thank you, your Honor.

21           MR. DOGRAMACI:  Just to be clear, I want to know when,

22   for our sake, when is the time to make a motion for a directed

23   verdict?  I mean, I thought we would orally make those motions

24   right after the evidence is completely submitted.

25           THE COURT:  Yes, I think you should orally make them

1    after the evidence is complete.

2           It's up to you.  The evidence is not quite complete.

3    Why don't we do this.  We'll finish the testimony tomorrow

4    morning.  We'll take a short break at that time.  You can make

5    the motion.  If it's going to be lengthy, which I doubt, then I

6    would ask you maybe to just officially make the motion but

7    maybe articulate your reasons while the jury's deliberating,

8    but I doubt you'll take too long.

9           MR. DOGRAMACI:  I think for plaintiff, we just want to

10   make a record.

11          THE COURT:  OK.  Then you'll do that.  We'll take a

12   break after all the evidence is in.  You can make your record,

13   say what you'd like to say.  I'll hear from defense counsel

14   briefly.  And then we'll bring them back in for summations.

15   Again, defense summation first and plaintiff second.

16          I will tell you that I give each of the jurors a copy

17   of the charge to read along.  What you should all have ready is

18   you should have a piece of paper with all the witnesses listed.

19   Actually, we have that.  We've taken care of that.

20          What you all should do is just organize your exhibits

21   and show them to each other so that we have one set of exhibits

22   that we can just send back all at once.  OK?

23          The only other thing, I think, that occurred to me is

24   just this issue with respect to the patrol guide.  Initially

25   when we discussed this, I had thought you were going to use the

1  patrol guide with respect to use of force.

2         MR. DOGRAMACI:  On that point, your Honor, I actually

3  wanted to say something about that, because I wanted to make

4  sure there isn't any confusion.

5         The particular 10- or 11-page patrol guide which has

6  been discussed so far today is the patrol guide that was

7  actually filed with the Court with the motions *in limine*, and

8  it has a section which relates to use of force.  That's what we

9  argued on the motions *in limine* is relevant, and that's what we

10 expect.

11        THE COURT:  Just show me exactly what part of it you

12 want to use.

13        MR. DOGRAMACI:  Yes.

14        Bottom of page 5, it says if you're using a Taser,

15 don't shoot more than three cycles of electricity out of it.

16        THE COURT:  I am going to let you elicit that.  Again,

17 I don't think this needs to be in evidence as a document, but I

18 am going to allow you elicit it.

19        What I'm inclined to do is then give a limiting

20 instruction, and I took this limiting instruction from one of

21 Judge Castel's cases, and say, "You've heard testimony

22 regarding the New York City Police Department patrol guide."

23 Maybe I'll change the wording.  This is really an interim

24 order.

25        MS. DeCASTRO:  Your Honor, some orders are actually a

IaaWnea2

1 part of the patrol guide.  They get put in.

2         THE COURT:  I see.  OK.  Why don't we say, "Regarding

3 New York City patrol guide."

4         Why don't I say, "You've heard testimony regarding a

5 portion of the New York City Police Department patrol guide.

6 It's important to understand that the patrol guide and the

7 federal Constitution are not coextensive.  A particular action

8 could violate a provision of the patrol guide without violating

9 the Constitution.  Similarly, an officer could violate the

10 Constitution without violating any portion of the patrol guide.

11 In this case, it's the federal Constitution that controls.

12 Therefore, you must determine whether the plaintiff's

13 constitutional rights were violated, not whether all parties

14 complied with the rules and regulations of the NYPD."

15         That's the instruction I was going to give.  I was

16 going to give it right after there was cross-examination about

17 those portions of the patrol guide.  I wasn't inclined to put

18 it in the final charge.

19         MR. DOGRAMACI:  I believe that it's already been held

20 by your Honor.  You've already decided that while this bit of

21 patrol guide is not determinative of what the Constitution

22 requires, it's relevant to a determination of what's

23 objectively reasonable.  We would ask that your Honor also make

24 sure that it's clear to the jury that it has some relevance;

25 it's a factor to be weighed.

IaaWnea2

THE COURT:  I can add in language that says, "In this case, although the patrol guide is relevant, it's the federal Constitution that controls.  Therefore, you must determine whether the plaintiff's constitutional rights were violated, not whether all parties complied with the rules and regulations of the NYPD."

MR. DOGRAMACI:  OK.

MS. DeCASTRO:  We would object to that, because it's not really relevant.  It's useful for the assessment of the officers' reasonableness and the reasonableness of the force, but it's not in and of itself relevant.

THE COURT:  Do you want me to say that?  Do you want me to say, "Although it's relevant to the reasonableness of the officers' use of force, the federal Constitution controls"?

MS. DeCASTRO:  We just object generally to all of this, and I think the way that you had it at first was fine. The only problem we had with it was, I think, that part of the sentence was violating the Constitution without violating the patrol guide.  I think that's highly prejudicial to police officers because it implies that the patrol guide -- you could violate the Constitution without violating a document that their agency created.  I just think that's prejudicial.

THE COURT:  You think the line "particular action could violate a provision of the patrol guide without violating the Constitution" is prejudicial to you?

IaaWnea2

1          MS. DeCASTRO:  No, no, no.  Violating the Constitution

2     without violating the patrol guide.  That's the problem.

3          THE COURT:  Oh.  I mean, I can take out that line.  I

4     don't think it is, but I don't think it helps plaintiff either,

5     so I mean, I'll take that out.

6          I think I will just add in a little bit of language

7     from the Second Circuit case that I cited to you in ruling on

8     the motions *in limine*, but I will make clear that it's the

9     federal Constitution that controls.

10         MR. DOGRAMACI:  Just to anticipate, in my summation,

11    I'm going to say that it's a relevant factor to be considered

12    by the jury.

13         THE COURT:  All right.  What I'll do is I will

14    distribute this language to you shortly.  I'll work on the

15    language and I'll distribute it to you.  Why don't you get here

16    at 9:45 tomorrow, so if we need to discuss it before summations

17    we can do it then.  OK?

18         MS. DeCASTRO:  Could we talk about an issue tomorrow?

19         THE COURT:  Sure, or we can talk about it now.

20         MS. DeCASTRO:  OK.

21         THE COURT:  I still have a few minutes.

22         MS. DeCASTRO:  Another issue on this patrol guide is

23    they're not being asked about the use-of-force provision.

24         THE COURT:  Well, they weren't thus far, and you're

25    right, which is how I started the discussion today.

1              MS. DeCASTRO:  I apologize.

2              THE COURT:  Instead, my understanding is Kaiser was

3    being impeached on, I guess it goes to credibility, as to the

4    paperwork afterwards.  But what Mr. Dogramaci just said is that

5    there's a portion of this that suggests that you shouldn't do

6    it more than three times.  It is says, "In no situation will

7    more than three standard discharge cycles be used against any

8    subject."  That does go to use of force.

9              MS. DeCASTRO:  Right, but there's no evidence that it

10   was used -- well, the officers deny using it more than three

11   times.

12             THE COURT:  I know, but that's a factual dispute.

13   Right?

14             MS. DeCASTRO:  Right, but then the patrol guide

15   doesn't go to the reasonableness of the officer's actions

16   because the officer disputes that he used it more than three

17   times.  It would go to the reasonableness if --

18             THE COURT:  It depends whether you believe Mr. Neal or

19   not.  Right?  Or if you believe the officers.  My recollection

20   is, and correct me, Mr. Neal wasn't sure exactly how many

21   times.

22             Did he say four to six?

23             MR. DOGRAMACI:  He said four to six, your Honor.

24             THE COURT:  Right.  He said four to six.  The jury may

25   well not believe him, but if they believe him and then the

1  patrol guide says, in any event, no more than three, I think

2  that does go to reasonableness.

3          Again, the credibility assessment's for the jury.

4          MS. DeCASTRO:  Your Honor, could we write a letter

5  about this tonight?  I don't think the patrol guide really says

6  that.  I think it's advisable.  I don't really know which part.

7  I don't have it.

8          THE COURT:  The bottom of page 5 says:

9          "When a CED is used against a subject, it shall be for

10  one standard discharge cycle, and the member using the CED must

11  then reassess the situation.  Only the minimum number of cycles

12  necessary to place the subject in custody shall be used.  In no

13  situation will more than three standard discharge cycles be

14  used against any subject.  Officers are reminded of other

15  appropriate force options should the CED fail."

16          MS. DeCASTRO:  Could we submit an additional letter

17  tonight?

18          THE COURT:  You can.  I think I've already ruled on

19  this, and I thought the instruction was helpful just to clarify

20  that it's not the same standard as the constitutional standard,

21  and I think that's important for the jury to know, but using

22  that language -- I believe it was dicta from the circuit -- I

23  do think is relevant as well.

24          MR. DOGRAMACI:  Your Honor, if I could make one point?

25          The language you just read was directly quoted on the

1    motions *in limine*, the entire paragraph.  We directly quoted

2    it.  We made it an issue on the motions *in limine*.  We won that

3    motion on this issue.  After we won on this issue, defendants

4    submitted a two-page letter over the weekend.  Yet another

5    letter, I don't see how that's a good use of the time of

6    plaintiff or of defendants right now.

7         THE COURT:  It's their time, because they're the ones

8    writing the letter.  I agree with you.  I've already ruled on

9    this, as I just noted, and I fully intend to be consistent.

10   But I'm also willing to keep an open mind and read what I get.

11        We'll be here tomorrow at 9:45, and we should be done

12   in the morning.

13        Mr. Higgins.

14        MR. HIGGINS:  I just want to be heard on two documents

15   that I'd like to mark tomorrow and offer into evidence, why we

16   showed it's admissible, and we think we can.  And one is the

17   voucher for the cartridge.  And the point that I not only came

18   across --

19        THE COURT:  I thought there was no objection to the

20   voucher and the cartridge, because I think defendants want to

21   introduce the cartridge.

22        MS. DeCASTRO:  Yes.

23        THE COURT:  Right?

24        MS. DeCASTRO:  No objection.

25        THE COURT:  There's no objection to that.

IaaWnea2

1          MR. HIGGINS:  And is there an objection to this log?

2          MS. DeCASTRO:  No objection.

3          THE COURT:  Right.

4          MR. HIGGINS:  Sorry.

5          THE COURT:  Don't worry about it.  Those there's no

6     objection to, so I think we're in good shape.  OK?

7          MR. HIGGINS:  Thank you, your Honor.

8          THE COURT:  Anything else?

9          All right.  I'll see you all in the morning.  Thank

10    you.

11          (Adjourned to October 11, 2018, at 9:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2     Examination of:                           Page

3     CHRISTOPHER NEAL

4     Cross By Ms. Decastro . . . . . . . . . . . 141

5     Redirect By Mr. Dogramaci . . . . . . . . . 195

6     Recross By Ms. Decastro . . . . . . . . . . 203

7     Redirect By Mr. Dogramaci . . . . . . . . . 204

8      JUAN RODRIGUEZ

9     Direct By Mr. Dogramaci . . . . . . . . . . 205

10    Cross By Ms. Decastro . . . . . . . . . . . 206

11    Redirect By Mr. Dogramaci . . . . . . . . . 214

12     COTY GREEN

13    Direct By Mr. Dogramaci . . . . . . . . . . 216

14    Cross By Mr. Manningham . . . . . . . . . . 217

15     BAUDILO GARCIARIVAS

16    Direct By Mr. Dogramaci . . . . . . . . . . 220

17    Cross By Mr. Manningham . . . . . . . . . . 221

18    Redirect By Mr. Dogramaci . . . . . . . . . 224

19     DAVID CAMHI

20    Direct By Mr. Dogramaci . . . . . . . . . . 225

21    Cross By Ms. Decastro . . . . . . . . . . . 226

22    Redirect By Mr. Dogramaci . . . . . . . . . 245

23    ROMAINE WILSON

24    Direct By Mr. Dogramaci . . . . . . . . . . 246

25    Cross By Ms. DeCastro . . . . . . . . . . . 248

1    MICHAEL KAISER

2    Direct By Mr. Higgins  . . . . . . . . . . . 251

3    Cross By Mr. Manningham  . . . . . . . . . . 274

4    Redirect By Mr. Higgins  . . . . . . . . . . 288

5                    DEFENDANT EXHIBITS

6    Exhibit No.                              Received

7     A   . . . . . . . . . . . . . . . . . . . 153

8     C   . . . . . . . . . . . . . . . . . . . 189

9                    PLAINTIFF EXHIBITS

10   Exhibit No.                              Received

11    2   . . . . . . . . . . . . . . . . . . . 298

12

13

14

15

16

17

18

19

20

21

22

23

24

25